UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | File No. 1:16-cr-123 |
| | ) | |
| Derick C. Wilkinson, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF DIGITAL RECORDING OF
DETENTION HEARING

Taken at
United States Courthouse
Bismarck, North Dakota
June 14, 2016

BEFORE THE HONORABLE CHARLES S. MILLER, JR.
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. JONATHAN J. O'KONEK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699

                       FOR THE UNITED STATES

- - - - - - - - - -

MS. MICHELLE ANN MONTEIRO
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

                       FOR THE DEFENDANT

- - - - - - - - - -

<u>GOVERNMENT WITNESS</u>

                       <u>Page No.</u>

<u>Megan Bennett</u>
  Direct Examination by Mr. O'Konek          4
  Cross-Examination by Ms. Monteiro          11

- - - - - - - - - -

Certificate of Court Reporter - Page 18

- - - - - - - - - -

1       (The above-entitled matter came before the Court, The
2   Honorable Charles S. Miller, Jr., United States District Court
3   Judge, presiding, commencing at 3:00 p.m., Tuesday, June 14,
4   2016, in the United States Courthouse, Bismarck, North Dakota.
5   The following proceedings were had and made of record by
6   digital recording with the defendant present by videoconference
7   from Rugby, North Dakota.)
8           - - - - - - - - - - -
9           THE COURT:  Okay.  We'll go on record in Criminal
10  Number 1-16-123, *United States of America of America versus*
11  *Derick Colin Wilkinson*.  Mr. Wilkinson is appearing by video
12  from Rugby.  Present in Bismarck is the Court and Court staff.
13  Mr. O'Konek is here on behalf of the United States, and your
14  attorney, Ms. Monteiro, is present.
15          This is the time that the Court set for the hearing
16  on the issue of release or detention.  The Court has received a
17  copy of the pretrial services report, and it will be made a
18  part of the record.  The parties can proffer any additions or
19  corrections.  The United States may proceed.
20          MR. O'KONEK:  The United States calls Special Agent
21  Megan Bennett.
22          THE COURT:  Ms. Bennett is appearing by video from
23  Minot.
24                    MEGAN BENNETT,
25  having been first duly sworn, was examined and testified as

follows:

## DIRECT EXAMINATION

BY MR. O'KONEK:

**Q.** Special Agent Bennett, can you please state your full name for the record?

**A.** My name is Megan Patricia Bennett.

**Q.** And where do you currently work?

**A.** I currently work for the FBI at the Minot resident agency.

**Q.** For how long have you worked there?

**A.** I have been an FBI employee since January 4, 2009.

**Q.** What are some of your main responsibilities at the Minot field office?

**A.** I investigate potential violations of federal criminal and national security laws.

**Q.** And do you also assist in any investigations on the Fort Berthold Indian Reservation?

**A.** Yes, as a matter of course I assist other law enforcement agencies when requested.

**Q.** Now I want to talk to you a little bit about April 26th of 2016. On that date did your office receive a call about Derick Wilkinson?

**A.** Yes, I received a call early that morning, at approximately 2:22 a.m., from a tribal investigator.

**Q.** And can you briefly go into the nature of the phone call and what happened in your investigation?

1    A.   Three Affiliated Tribes Criminal Investigator Sam Lincoln
2    informed me that there had been a serious assault in the New
3    Town area and that the victim in the matter was being
4    transported to Trinity Hospital.  And Investigator Lincoln
5    asked that I respond to Trinity Hospital to potentially conduct
6    interviews, recover evidence, and get an assessment of the
7    condition of the victim.
8    Q.   Now, when you say "condition of the victim," who is the
9    victim?
10   A.   The victim was Michael White Thunder, who is also known as
11   Michael McDonald.
12   Q.   When you said you got a call from Three Affiliated Tribes
13   law enforcement, what did they tell you that Derick Wilkinson
14   had done to Michael White Thunder?
15   A.   They said that Derick Wilkinson had been observed stomping
16   Michael White Thunder in a street behind some bars in New Town.
17   Q.   When you say "stomping," what do you mean by that?
18   A.   Using his shoes or boots to impact the head of Michael
19   White Thunder.
20   Q.   Did a witness actually see this happen?
21   A.   Yes, a witness used the word "stomp" when speaking and --
22   to investigators -- tried speaking to tribal investigators, and
23   later she wrote that in a written statement.
24   Q.   And was this individual Olivia Baker?
25   A.   Yes.

1  **Q.**  And she had said that she approached Michael White Thunder
2  and Derick Wilkinson kind of engaged in a -- they were outside
3  -- they were outside the Legion bar?
4  **A.**  Yes.
5  **Q.**  And there at some point she saw Derick Wilkinson drag
6  Michael White Thunder from the vehicle?
7  **A.**  Yes, she saw Derick Wilkinson drag Michael White Thunder
8  by his feet across the street to an area that was closer to the
9  Legion bar area.  And she also made some kind of verbal
10 comments like stop or I'll call the police, something to that
11 effect.
12 **Q.**  And Ms. Baker saw Derick Wilkinson stomp on Michael White
13 Thunder's head or face several times, is that right?
14 **A.**  Yes, that is what she told investigators.
15 **Q.**  At any point did -- what happened after -- what did the
16 witness say happened after Derick Wilkinson stomped on Michael
17 White Thunder's head?
18 **A.**  She reported that Derick Wilkinson made some comment to a
19 female person in the car out of which Derick Wilkinson had
20 dragged White -- Michael White Thunder, and Derick's comment to
21 the female passenger was something like she needed to leave or
22 he was going to slap her too.
23 **Q.**  Now, what were the injuries that Michael White Thunder
24 sustained?
25 **A.**  Several fractures of the head.  The sphenoid -- sphenoid

6

1  bone -- that's s-p-h-e-n-o-i-d.  That bone was fractured, as --
2  and there were also some nasal fractures and one other type of
3  fracture.  Oh, orbital fracture as well.
4  Q.  Now, when you say the "sphenoid," is that the bone that
5  connects the cranium to the lower face?
6  A.  Yes.  A doctor I spoke to at Trinity Hospital described
7  that bone as the bone that connects the cranium to the lower
8  face.
9  Q.  So after Derick Wilkinson stomped on Michael White
10 Thunder's face, did he, in fact, leave the scene?
11 A.  Yes, he did.
12 Q.  And how did tribal law enforcement find Michael White
13 Thunder?  Was he conscious or unconscious?
14 A.  He was unconscious.
15 Q.  Did he -- where did he -- where did the law enforcement
16 take him?
17 A.  Where did they take Michael White Thunder?
18 Q.  Right.  Did they -- did the ambulance come and take him to
19 a hospital?
20 A.  Yes, to Trinity Hospital.  Initially there had been a
21 life-flight helicopter service that was called because of the
22 condition of White Thunder, but that was cancelled due to
23 inclement weather, and he was transported by ambulance to
24 Trinity Hospital in Minot.
25 Q.  And he was intubated to assist his breathing?

1   A.   Yes.

2   Q.   And did you take a photograph of Michael White Thunder

3   when he was at Minot Trinity Hospital?

4   A.   Yes, I did.

5   Q.   And do you have a copy of that photograph in front of you

6   that I provided to you earlier?

7   A.   Yes, sir, I do.

8   Q.   Okay.  And I'm referring to what has been marked as

9   Government Exhibit 1.  Now, did you take that photograph of

10  Michael White Thunder on the 26th of April, 2016?

11  A.   Yes, I did.

12  Q.   And is it a fair and accurate depiction of what he looked

13  like on the -- on the 26th of April, 2016?

14  A.   Yes, it is.

15          MR. O'KONEK:  At this point, Your Honor, the United

16  States would offer this as Government Exhibit 1.

17          THE COURT:  Ms. Monteiro?

18          MS. MONTEIRO:  No objection.

19          THE COURT:  Exhibit 1 is received.

20  Q.   (MR. O'KONEK CONTINUING)  Now I want to talk just a little

21  bit about after Derick Wilkinson drove away from the scene.

22  Where did law enforcement find him?

23  A.   They found him at a house located about ten -- ten miles,

24  or so, out of New Town.  It's Bruce Freeman's residence.  I

25  believe the address is 1001 38th Street or 1001 38th Avenue

1  Northwest in New Town, and that -- that's where Derick went
2  with his girlfriend, Miranda Fox, after they left the bar area.
3  **Q.**  And where specifically in the house did law enforcement
4  find Derick Wilkinson?  Did -- did they find him in a crawl
5  space?
6  **A.**  Well, at -- at multiple points, based on the information
7  given to me, Derick was underneath the -- in the crawl space of
8  the house trying to avoid law enforcement officers who were
9  responding to Bruce Freeman's house.  But at some point after
10  he came up from the crawl space, he was noticed by a law
11  enforcement, and they made contact with him then.
12  **Q.**  And at some point did you get a search warrant to search
13  Derick Wilkinson's vehicle and the house where he was located?
14  **A.**  Yes --
15  **Q.**  And did you --
16  **A.**  -- I did.
17  **Q.**  And did you find blood spatter in Derick Wilkinson's
18  vehicle?
19  **A.**  Yes, and Derick Wilkinson's vehicle, which I believe is
20  actually registered to Miranda Fox, there was blood spatter in
21  the front passenger seat, on the speaker and the door, on the
22  front passenger door and window.  And then there was more blood
23  on -- in the back of the vehicle, kind of the back -- I would
24  call it the rear passenger seat kitty-corner from the driver.
25  There was a lot of blood on the window, on the door, and it

1  saturated a bag and a sleeping bag that were in the back of the
2  vehicle and also stained some -- some other items in the back.
3  **Q.**   And when you had a search warrant of the residence where
4  Derick Wilkinson was located, did you find his boots or what
5  appeared to be his boots?
6  **A.**   Yes, we recovered a pair of boots, which had on them what
7  appeared to me to be blood and -- yeah.  Yes.  The answer is
8  yes.
9  **Q.**   Now I want to talk a little bit about the interview that
10 Detective Sam Lincoln from Three Affiliated Tribes did with
11 Derick Wilkinson.  At some point did Derick Wilkinson explain
12 what happened that night?
13 **A.**   Yes, he did.
14 **Q.**   And what -- and just briefly, what did he say happened to
15 the best of his recollection?
16 **A.**   Base -- basically Derick and Michael White Thunder and
17 Miranda Fox had been out drinking that evening at several
18 different establishments in New Town, including the Legion and
19 the Players Pub, I believe, or maybe it's Sportsman's, but at
20 the end of the night they ended up having drinks together.  And
21 it got to the point where Michael White Thunder was making some
22 comments to Miranda, something about getting a blow job from
23 her, and their interactions at the bar became unpleasant, and
24 at some point Michael White Thunder was cut off by the
25 bartender and they had to leave.

1          And -- and then after they left, they went out to the
2    car, and Miranda sat in the driver's seat, and they were --
3    they were in the car, and Wilkinson and --
4    Q.   At some point did Michael White Thunder make a comment
5    again about Miranda in front of Derick?
6    A.   Yes, and I'm -- I have documents to reference here, and at
7    some point an investigator -- I don't know if it was Sam
8    Lincoln or another investigator, but Derick explained that
9    Michael White Thunder had made a comment about pulling a train
10   on Miranda Fox, which is -- Derick interpreted to be an
11   extremely rude and egregious comment about Derick's girlfriend,
12   so at that point Derick lost it and punched Michael White
13   Thunder about five times in the face.
14   Q.   And at some point did Derick also admit to law
15   enforcement, Sam Lincoln, that he had pulled Michael White
16   Thunder from the vehicle?
17   A.   Yes, he did.  Yep.
18         MR. O'KONEK:  Those are the only questions the United
19   States has.
20         THE COURT:  Ms. Monteiro.
21                    CROSS-EXAMINATION
22   BY MS. MONTEIRO:
23   Q.   The only question I have is, what is this concern -- White
24   Thunder's medical condition now?  Has he been released from the
25   hospital?

1  A.   He has been released.

2  Q.   Okay.  And is he relatively okay now, or --

3  A.   To my -- to my knowledge, he is.  However, when I visited
4  Michael White Thunder in the hospital a couple of days after he
5  was admitted, he reported still having blurry vision.  And I
6  did review the medical records, and there is an indication
7  there that the -- some medical professional urged Michael White
8  Thunder to continue getting care from an -- I believe it was an
9  optometrist because there was some concern about the orbital
10 fractures.

11         MS. MONTEIRO:  Okay.  Thank you.  Nothing else.
12         THE COURT:  Ms. Bennett, if you know, how long was
13 Mr. Wilkinson in tribal custody?
14         THE WITNESS:  From the date of the incident, which
15 would be April 26th, through yesterday, which was June 13,
16 2016.
17         THE COURT:  Anything else, Mr. O'Konek?
18         MR. O'KONEK:  No, Your Honor.
19         THE COURT:  Ms. Monteiro?
20         MS. MONTEIRO:  No, Your Honor.
21         THE COURT:  Thank you, Agent Bennett.
22         THE WITNESS:  Thank you.
23         THE COURT:  You may proceed with anything else that
24 you would like to proffer or argument you want to make, and
25 then I'll turn to Ms. Monteiro.

                                12

1          MR. O'KONEK:  Yes, Your Honor, and briefly, the only
2    thing the United States has to add is that Mr. Wilkinson has a
3    history of violence from the age of 14 through today.  Just to
4    point the Court's attention to the pretrial services report
5    that talks about when at age 14, he sodomized three of his
6    sisters, and one of the victims he had, I guess, taped her
7    mouth shut.
8          He's gotten into a domestic violence incident with
9    his former girlfriend, that he had said -- said at one point he
10   was -- talked about killing her and disposing of the body.  And
11   now we have in April, assaulting an individual for making an
12   offhanded comment and breaking several bones in his body.  All
13   of those demonstrate that he is committing a crime of violence
14   and has a pattern of criminal behavior that (inaudible)
15   violence, which would show that he is a serious risk to the
16   public, to include Michael White Thunder, who is now out of the
17   hospital.
18         Based upon that and the fact that he fled after the
19   assault and essentially hid in a crawl space to avoid getting
20   caught by the police, we believe that that also demonstrates
21   that by a preponderance of the evidence, that he would be a
22   flight risk.
23         And given the weight of the evidence, to include Mr.
24   Wilkinson's own admission of striking Mr. White Thunder
25   multiple times, and the fact that his boots were -- had blood

1   on them, as well as the witness who saw Mr. Wilkinson stomp on
2   Michael White Thunder's face, we'd ask that he be detained.
3             THE COURT:  Ms. Monteiro.
4             MS. MONTEIRO:  Your Honor, we'd ask the Court for my
5   client's release.  First of all, he's not a flight risk.  It's
6   likely that he will reappear.  He's a longtime member of the
7   community.  His mother, father live in the community.  He's got
8   three children.  He's got two jobs, actually.  He's employed at
9   the Players Pub and also at Wilkinson Welding.  He works for
10  his father.  He also tells me that he intends to get rehired at
11  the casino.  Apparently he had worked there before, so he's
12  employed.  He's got ties to the community.  He's got family
13  members in the community.
14            He would intend, if the Court were to release him, to
15  reside with his father in White Shield.  It's a Garrison
16  address, but it's actually in White Shield.  It would be his
17  father's address.  He wants the Court to know that he's the
18  sole financial support for his three children.
19            Now, as far as being a danger to the public, I
20  realize this is a serious charge.  Clearly this involved
21  alcohol use.  That could be taken care of by the Court putting
22  a no-use condition on.  Whatever other conditions the Court
23  would give him, he'd be willing to follow.  He could have no
24  contact with the victim, although this was his friend, and now
25  that drinking is over with and this situation is over, I don't

1  think any -- there's obviously any immediate danger to
2  Mr. White Shield (sic) at this point.  I think he'd be willing
3  to do home detention if the Court were to release him as well.
4        The -- the matters that are on his record, I'll point
5  out now, while there are -- is a serious sexual abuse matter on
6  his record, that is when he was 14 years old.  That's when he
7  was charged.  I don't know whether it occurred, but he was
8  charged when he was 14 years old, so quite some time has gone
9  by since that happened.
10       And the domestic assault allegation, there's no
11 disposition to that.  I don't know how that resolved, but I
12 also see from this that it looks like both parties had injuries
13 in that domestic assault situation.  I don't even know that
14 there was ever a conviction there.  But his most important
15 request is that he be allowed to be out and be at work so he
16 can support his children.  He's concerned about their finances
17 if there's no one to support them.
18       THE COURT:  Well, I conclude, based on the evidence
19 that's been presented, that at the very least the defendant is
20 a risk to -- a danger to the community, and the government has
21 demonstrated that by clear and convincing evidence.  I'm -- he
22 may very well be a risk of nonappearance as well based on what
23 the Court understands was his need for continued confinement
24 when he was a juvenile, up to the point where he was released
25 from federal custody at that point.

1              But, you know, Mr. Wilkinson, and perhaps I'm overly
2     sensitive with regard to the events of the past recent days,
3     but if you had had this history of violent behavior as a
4     juvenile -- and it's very bad violent behavior.  It's not just
5     acting out on sexual impulses and -- it's more than that.  It's
6     evidence of a state of mind, and it's very disturbing.  Had
7     this been in the distant past and you were here on a burglary
8     charge or some other charge and you hadn't had any recent
9     problems with violence, I'd probably look at this case one way.
10             But here you're before the Court on a charge of
11    having engaged in very violent conduct, and the United States
12    has presented the evidence that suggests that the evidence
13    against you is very strong, and it's probably just lucky in the
14    long run that you didn't end up killing this individual.
15             There is some evidence of additional violent behavior
16    in between your juvenile record and -- and the present incident
17    conduct involving a spouse, which from -- even though there's
18    not a disposition, there is some reports that are available
19    that indicate also a very disturbing frame and thought of mind.
20             Under the circumstances, I conclude that release
21    would not be appropriate to the community, and I am not
22    convinced that something short of release is appropriate
23    either.  Given the propensity for violence, that apparently
24    even though exhibited very dangerously and disturbingly when
25    you were a juvenile, apparently whatever impulses there are

1   toward that conduct persists today, and I don't think that I
2   can afford to take a chance.
3           THE DEFENDANT:  I've -- I've been through treatment,
4   Your Honor.
5           THE COURT:  I -- I appreciate that, and -- but I
6   think you just need to get this problem put behind you and move
7   on from there one way or the other.  You just about -- at least
8   from what I can see, just about killed this guy.  And the fact
9   that you've been through treatment, apparently that wasn't
10  enough to prevent this from having occurred, and I don't think
11  I can take a chance of this happening again.
12          The defendant will be held in custody pending further
13  proceedings.  Court is adjourned.
14          (Proceedings concluded at 3:20 p.m., the same day.)
15                      - - - - - - - - - -
16
17
18
19
20
21
22
23
24

CERTIFICATE

State of North Dakota   )
                        ) ss
County of Burleigh      )


    I, Sandra E. Ehrmantraut, do hereby certify that the foregoing and attached typewritten pages contain an accurate transcription, to the best of my ability, of said digital recording made at the time and place herein indicated.

    Dated:  November 7, 2016

                                    /s/ Sandra E. Ehrmantraut