UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

United States of America,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )    File No. 1:16-cr-123
                               )    Appeal No. 17-1938
Derick Colin Wilkinson, aka    )
Derrick Colin Wilkinson,       )
                               )
                Defendant.     )

<u>TRANSCRIPT OF MOTIONS HEARING</u>

Taken at
United States Courthouse
Bismarck, North Dakota
December 8, 2016

BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

    MR. JONATHAN J. O'KONEK
    MS. DAWN DEITZ
    U.S. Attorney's Office
    220 E. Rosser Ave
    P. O. Box 699
    Bismarck, North Dakota 58502-0699


                     FOR THE UNITED STATES


- - - - - - - - - -


    MS. MICHELLE ANN MONTEIRO
    MR. RYAN COSTELLO
    Assistant Federal Public Defenders
    Federal Plaza
    324 North Third Street, Suite 1
    Bismarck, North Dakota 58501


                     FOR THE DEFENDANT


- - - - - - - - - -


Certificate of Court Reporter - Page 41


- - - - - - - - - -


2

1          (The above-entitled matter came before the Court, The

2    Honorable Daniel L. Hovland, United States District Court

3    Judge, presiding, commencing at 9:00 a.m., Thursday,

4    December 8, 2016, in the United States Courthouse, Bismarck,

5    North Dakota.  The following proceedings were had and made of

6    record in open court with the defendant and counsel present.)

7                    - - - - - - - - - - -

8          THE COURT:  We'll open the record in the case of

9    *United States versus Derick Wilkinson*.  Here on behalf of the

10   federal government is Jonathan O'Konek from the U.S. Attorney's

11   Office and Dawn Deitz.  Representing the defendant here are

12   Ryan Costello and Ms. Monteiro from the Federal Public

13   Defender's Office.

14         This is scheduled as a hearing on some motions in

15   limine concerning what evidence is going to be permitted at

16   trial and what is not going to be permitted.  I've reviewed the

17   government's motion in limine and their supplement.  I never

18   saw a response from the Federal Public Defender's Office to the

19   government's motion in limine.

20         MR. COSTELLO:  Your Honor, we didn't file a written

21   response.  We had planned on just making oral argument today

22   and offering an offer of proof as to the matter.

23         THE COURT:  All right.  So let's talk about the

24   government's motion in limine, and is there anything -- I mean,

25   I'll give both attorneys an opportunity to make any other

3

1    arguments they wish to make, if you would like to do so at this

2    time.

3          MR. O'KONEK:  Nothing from the United States, Your

4    Honor.

5          MR. COSTELLO:  Your Honor, so as to the motions in

6    limine the government has raised, they've obviously raised

7    issues with introducing 404(b) and 404(a) evidence regarding

8    the assaults on Ms. Betty Mulluk-Heart and Skylar Moran, and

9    then 404(b) and 404(a) evidencing prohibiting admission of

10   methamphetamine use on the part of the Mister -- the alleged

11   victim, Michael White Thunder.  And then there's two other

12   issues with the 404(b) and 404(a) on Olivia Baker and

13   consciousness of flight.

14         So as the government notes in its motion to introduce

15   reverse 404(b) evidence, where we're admitting evidence about

16   an alleged victim's character trait towards violence, the

17   defendant has to have known about the incident prior to --

18   prior to the alleged criminal conduct in this case.  So

19   specifically, the defense has subpoenaed the two -- two

20   witnesses that -- the two alleged victims from Mister -- one --

21   one proved victim and one alleged victim from Mr. Michael White

22   Thunder's domestic violence incidents.

23         Betty -- Ms. Betty Mulluk-Heart, as an offer of

24   proof, Your Honor, we would state that our client does not know

25   anything about that specific incident or he did not learn --

4

1    know about it before the alleged criminal conduct in this case,

2    so Ms. Mulluk-Heart is not allowed to testify as to specific

3    instances of criminal conduct under 404(b).  We do believe she

4    can provide an opinion or a -- or testimony evidence as to

5    opinion or reputation for violence of the alleged victim,

6    Michael -- Mr. Michael White Thunder, if we called her to

7    testify to that.

8            Now, 40 -- that's under 404(a).  404(a), Your Honor,

9    doesn't require our client to have knowledge of the incident,

10   so at this point, Your Honor, I think it's clear that if -- if

11   we are allowed to call Ms. Betty Mulluk -- Mulluk-Heart, it

12   would be limited -- to the limited scope that she could testify

13   as to a reputation for violence or criminal or --

14           THE COURT:  Well, the government agrees with that.

15           MR. COSTELLO:  Yeah.  Exactly, Your Honor, so I just

16   want to clarify that.

17           THE COURT:  It's not an issue of contention.

18           MR. COSTELLO:  So -- and then specifically Ms. Skylar

19   Moran, so we do have another offer of proof here.  Our client

20   did --

21           THE COURT:  Well, let's talk about Betty

22   Mulluk-Heart.  I mean, is -- are you going to offer her for

23   anything more than just an opinion on the defendant's -- or the

24   victim's propensity for violence and domestic assault, or --

25           MR. COSTELLO:  Nothing more than an opinion.

5

1          THE COURT:  Because I thought there was a -- I

2     thought in the government's supplement, they provided an

3     exhibit that was a disclosure from Ms. Monteiro that indicated

4     that they were -- she was going to be talking about some other

5     crazy incident at someone's house.

6          MR. COSTELLO:  Well, we had hoped -- we had thought

7     at the time that she would be able to testify as to that, as to

8     the incident in which Michael White Thunder assaulted her and

9     kind of dragged her through -- around the house.  But given our

10    client doesn't have exact knowledge of that incident, we can't

11    get into 404(b), so we would concede that part of it.

12         THE COURT:  Well, even if he had knowledge, I

13    wouldn't let it in.

14         MR. COSTELLO:  Okay.  Fair enough, Your Honor.  So

15    that we would concede it would just be as to her opinion as to

16    the matter.  We have spoken with her and provided a memorandum

17    from when our investigator spoke with her to the government in

18    which she does indicate that she does have an opinion that when

19    he's -- Mr. Michael White Thunder is under the influence of

20    either drugs or alcohol, he's a violent person or a mean

21    person, meaning a violent person.

22         THE COURT:  And, Mr. O'Konek, do you have a problem

23    with that?

24         MR. O'KONEK:  No, not just the opinion of Ms.

25    Mulluk-Heart or Skylar Moran as to the fact that when he

6

1    drinks, he becomes violent.  That's -- we don't object to that.

2              THE COURT:  Okay.

3              MR. COSTELLO:  So as to Ms. Skylar Moran, Your Honor,

4    there the government had provided us a -- discovery on a couple

5    incidents.  The only --

6              THE COURT:  Skylar Moran is the victim's ex, right?

7              MR. COSTELLO:  The alleged victim's ex, yes, Your

8    Honor.  So Skylar Moran, our client -- as an offer of proof

9    here, Mr. Wilkinson does know of the incident, the assault in

10   which Mr. Michael White Thunder was convicted for -- convicted

11   of assaulting Skylar Moran.  His basis of the knowledge is he

12   first heard about an incident between Skylar Moran and Michael

13   White Thunder through Stephanie Moran.  Stephanie Moran is Mr.

14   Wilkinson's ex-girlfriend and the mother of his children --

15   some of his children.  She is also the first cousin of Skylar.

16   He described them as sisters in the sense on the reservation,

17   that the -- close relatives like that often tend to go by

18   sisters.

19              She had mentioned something offhand to him a while

20   back about -- about Michael putting Skylar in the hospital.

21   This information was then followed up by when -- Mr. Wilkinson

22   has worked at the casino, at Pocket Aces, at the bar.  He also

23   worked the Player's Pub subsequently to that.  When he -- when

24   he was working at Pocket Aces at the casino, Loren Moran, who

25   is Skylar Moran's father, who was also present the night -- or

1    who would -- not present during the assault between Michael

2    White Thunder and Skylar Moran, but showed up afterwards, when

3    law enforcement arrived, and Loren Moran was the individual

4    that called law enforcement.

5            Mr. Wilkinson explained to me that Loren Moran was --

6    that Mr. Wilkinson was serving Loren Moran and he told --

7    talked to him about the incident, the fight between Skylar and

8    Michael.  He provided basic details, explaining that he -- that

9    Michael had -- Michael had bit Skylar.  Provided details there

10   was some fight, and that he even pulled out his phone and

11   showed some photos of Skylar from after the incident to Derick

12   Wilkinson.  Additionally, Mr. Wilkinson revealed that he

13   thought someone had stabbed one of -- one of the other persons

14   during that assault.  He wasn't sure if he had gotten that from

15   Loren Moran.

16           I would state, Your Honor, we -- independently we

17   interviewed Bruce Freeman, who is an alleged witness in this

18   case.  I don't -- we have subpoenaed him to testify, although I

19   don't know if we will call him.  He -- Mr. Wilkinson was living

20   at Mr. Freeman's residence, and when Mr. Wilkinson was later

21   arrested by law enforcement, it was at Mr. Freeman's residence.

22   Skylar Moran is the -- used to date Mr. Freeman, and

23   Mr. Freeman related that Skylar Moran had explained to him what

24   happened and that she had had to try to stab Michael White

25   Thunder at one point.  So I do believe that maybe at one point

1    in time Mr. Freeman relayed that to --

2              THE COURT:  Skylar Moran had stabbed --

3              MR. COSTELLO:  Had to stab Michael White Thunder in

4    response at some point, so we do -- to the assault, so I do

5    believe that maybe Mr. Freeman had revealed that to Mr.

6    Wilkinson at some point or it had come up in general

7    conversation, or if not, potentially Mr. Moran -- Loren Moran,

8    Skylar's father, would have told her (sic).  So we do believe

9    that's a sufficient basis to indicate there was -- that he knew

10   there was a fight, he knew she had been assaulted, he knew she

11   had been bit, Your Honor.  I have copies of exhibits the

12   government --

13             THE COURT:  But what -- how many trials are we going

14   to have in this case --

15             MR. COSTELLO:  Your Honor --

16             THE COURT:  -- of how many separate incidents?  I

17   mean --

18             MR. COSTELLO:  This is the only one we -- the

19   specific instance we intend to get into.  It wouldn't be a

20   mini-trial, Your Honor.  It's a conviction.  He -- Mr. White --

21   Michael White Thunder was convicted for this.  He pled guilty.

22             THE COURT:  Right.

23             MR. COSTELLO:  It's established this incident

24   happened.

25             THE COURT:  Well, I'm not disputing that.  He was

1    convicted.

2         MR. COSTELLO:  And I have -- well, I'll provide

3    photos to the Court of the incident so the Court can see it.

4    It goes to Mr. Wilkinson's state of mind at that time of the

5    alleged assault between -- with him and Mr. White Thunder.  It

6    goes to what his impression was of Mr. White Thunder.

7         We also -- the evidence in this case will bear out

8    that there was some dispute or argument in the bar that night

9    between Mr. Michael White Thunder and Mr. Wilkinson as to

10   insults he was providing to Mr. Wilkinson's girlfriend, Miranda

11   Fox.  And then when inside the vehicle there was some level of

12   an incident in which Mr. Michael White Thunder was getting out

13   of control and getting assaultive and was swinging away at Ms.

14   Fox's seat.  We don't -- Ms. Fox --

15        THE COURT:  Swinging away at her seat?

16        MR. COSTELLO:  Yes, Your Honor.  She remembers --

17   from the testimony -- the statement she had provided to the

18   government, she remembers just suddenly her seat being kicked

19   and hit back and forth.  And she doesn't remember if she got

20   hit in the head by Mr. Michael White Thunder or if it hit -- if

21   he smacked the head -- the head seat of the car into the back

22   of her head.  And then at that point Mr. Wilkinson turned

23   around and started defending Ms. Fox and started hitting

24   Mister --

25        THE COURT:  Well, who initiated the contact?

10

1          MR. COSTELLO:  So Mr. Michael White Thunder would

2    have initiated the contact, and then --

3          THE COURT:  With a seat or with a person?

4          MR. COSTELLO:  It's unclear, Your Honor.  The

5    testimony from what the government has given us is unclear as

6    to whether it was the seat or a person.  At that point in time

7    Mr. Wilkinson then responds and hits Mister -- starts hitting

8    Mr. White Thunder.  So, Your Honor, I think that goes to the

9    key element of our case.  It's defense -- our defense is

10   defense of another, that he's defending his girlfriend, Miranda

11   Fox, as part of self-defense.

12         THE COURT:  Because her seat got kicked?

13         MR. COSTELLO:  Because Mr. White Thunder is drunk and

14   intoxicated and swinging away at her.  He doesn't know what

15   Mr. White Thunder is going to -- is going to do at this point,

16   if he's going to continue to try to hit her or if he is going

17   to start getting aggress -- even more violent with either one

18   of them.  He's been making numerous comments throughout the

19   night about Ms. Fox.  Mr. Wilkinson then intervenes at that

20   point to halt and stop and protect Ms. Fox from what was going

21   on.

22         I think, Your Honor, looking under 405(b) we're

23   allowed to get into specific instances of a -- of a character

24   trait or violent conduct if it's part of our defense.  That is

25   part of our defense, Your Honor.  I do believe that the fact

1    that Mr. Wilkinson has no -- knew Mr. White Thunder assaulted a

2    women on a previous occasion, an ex -- an ex-girlfriend of

3    Mr. White Thunder's, that that goes to his state of mind at

4    that point of time and what -- and what Mr. Wilkinson needed to

5    do to protect himself, but more importantly to protect Miranda

6    Fox at that point.  It's 1:00 in the morning.

7              THE COURT:  So why would he need to do anything to

8    protect himself?  He wasn't being swung at.

9              MR. COSTELLO:  True, Your Honor.  The focus of our

10   defense is protection of Miranda Fox, but as the Court knows,

11   anyone that -- when it comes down to an incident, any fight at

12   the middle of the night, one doesn't know where that's going to

13   go at that point, whether Mr. White Thunder will start

14   assaulting him too or what.

15             I think at this point, Your Honor, it goes clearly to

16   our claim of defense of another, and I think that should be

17   admitted in, to allow Skylar Moran to testify briefly about

18   that incident in which she was assaulted.  And then if Mr.

19   Wilkinson decides to testify, to testify as to what he knew

20   about that incident.  And, Your Honor, I have copies of the

21   conviction and the photos from the incident with Ms. Moran I

22   can admit to you now.

23             THE COURT:  Well, what's the government's position on

24   what they believe is admissible relative to this November 2015

25   assault?

1          MR. O'KONEK:  Yes, Your Honor.  At most what would be

2     admissible would be if the defendant chose to testify, to

3     explain what was going through his mind at the time that the

4     victim was swinging at Miranda Fox.  Although the defense has

5     an opportunity to put on a defense for their client, specific

6     instances of conduct coming through Skylar Moran is

7     inappropriate, because what's important to their defense,

8     therefore, is what the defendant knew at the time, that that

9     was what was going through his mind, is that he's protecting

10    his girlfriend from somebody he believes to have beat women up

11    in the past.

12         What Skylar Moran has to say about that is irrelevant

13    because what we just heard from the defense is that he didn't

14    hear it from Skylar Moran.  He heard it through a chain of

15    individuals.  I believe Loren Moran was the end of that chain

16    who actually talked to him about it.

17         So our position is that the defendant can certainly

18    speak to the reputation and opinion of the victim for being

19    violent towards women, and at most he could explain what was

20    going through his head about the incident involving Skylar

21    Moran, what he learned, I believe -- I guess now from Loren

22    Moran.  The defense should not be allowed to contact -- or call

23    Skylar Moran to testify about what happened because she didn't

24    tell him anything.

25         And also, the fact that he was convicted is overly

1     prejudicial under 403.  It doesn't go to impeach the witness

2     under 609 because it's not a felony conviction or a crime of

3     honesty or dishonesty.  And so we believe that at most the

4     defense should only be allowed to have their client testify

5     about what was going through his mind about this instance,

6     without going into convictions or anything like that.

7             MR. COSTELLO:  Your Honor, our response would be that

8     we should be allowed to go into Skylar -- put Skylar Moran to

9     testify about the incident, to explain that he did assault --

10    that Michael White Thunder did assault her.

11            Looking at what -- the offer of proof we made, Mr.

12    Wilkinson did know about the incident, and that was going

13    through his mind at that time.  Obviously Mr. Wilkinson --

14    chooses to testify, he can testify to that fact too.  He can

15    testify to that, but at the same time we know that he knew

16    about this incident.

17            Skylar Moran can come in and independently verify it.

18    It goes to our ability to corroborate our own client's version

19    of events if he chooses to testify.  We have the ability to --

20    to put on witnesses to corroborate our defense.  We have a

21    Constitutional right to do that.  When it comes --

22            THE COURT:  Well, subject to Rule 403 and any trial

23    court's discretion not to turn the case into a charade and a

24    parade of multiple other incidents.

25            MR. COSTELLO:  Yes, Your Honor.

1          THE COURT:  It's crystal clear from Eighth Circuit

2     case law that no judge has to allow a criminal case to evolve

3     into a multitude of mini-trials about other incidents that

4     occurred in this case on the reservation between Michael White

5     Thunder and others.  I mean, there's no doubt about it, that

6     you can present evidence in the form of opinions from other

7     witnesses like Skylar Moran and Betty Mulluk-Heart that

8     Mr. White Thunder's -- what his reputation is in the community

9     for violence towards women, but there's not an absolute

10    Constitutional right to present every little incident that

11    Mr. White Thunder has been involved in.

12         MR. COSTELLO:  And, Your Honor, we're not asking to

13    present every little incident.  We're asking to present one

14    incident between Michael White Thunder and Skylar Moran that

15    was clearly on Mr. Wilkinson's mind that presents -- that

16    allows us to present a complete defense of -- defense of

17    another, to explain this is -- the incident happened.  Skylar

18    Moran can come in and testify -- should be allowed to come in

19    to testify to that incident and should be allowed to explain

20    generally what happened.

21         And then if Mr. Wilkinson decides to testify, he can

22    explain that incident was on his mind.  I think there's no

23    doubt that he knew about this incident at this point, Your

24    Honor.  Obviously that goes to his state of mind at that time.

25    He can testify to that, and Skylar Moran can testify as to

1    verify that incident.

2          If we had -- if we're limited to only presenting Mr.

3    Wilkinson to testify to that, the jury could just dismiss that

4    as a claim of a -- an independent and unreliable,

5    uncorroborated claim that a -- of a self-serving claim of a

6    defendant to try to get himself out of a -- out of -- out of

7    criminal charges.  We need the ability to present an

8    independent witness to verify this incident happened.  I think

9    that's essential to this case.  I think 404(b) and 405(b) allow

10   that in this case.

11         And I think you're right, Your Honor.  We don't get

12   to go into every little incident that happened between Michael

13   White Thunder and Skylar Moran.  With Betty Mulluk-Heart we're

14   limited to only opinion and reputation as to -- as to Michael

15   White Thunder's --

16         THE COURT:  So is it your intention -- do you think

17   that you have a right to introduce the fact that there was a

18   conviction arising out of this assault as well, even though

19   that conviction doesn't fall within the realm of Rule 609?

20         MR. COSTELLO:  Well, we can't impeach him as to that.

21   We can introduce it as an independent evidence of the -- of

22   violence, Your Honor.  I do believe we do have a right to

23   introduce the conviction.  We don't necessarily get to impeach

24   him on it, and our goal isn't necessarily to impeach

25   Mr. Michael White Thunder under 609.

1          THE COURT:  But Rule 609 says that kind of

2    conviction, that is not admissible.

3          MR. COSTELLO:  And we're focusing on impeachment

4    there, Your Honor.  I think we're using it to show that the

5    incident happened and our client's state of mind.  That's what

6    we're using it to show under 404(b).  We're not using --

7    necessarily using it to impeach Mr. Michael White Thunder, to

8    say that he is untruthful on the stand or to impeach his

9    testimony as a witness or to impeach his ability to recall the

10   incident under 609.

11         Rather, we're using it under 404(b) and 405(b) to

12   establish our client's state of mind, our -- what our client

13   knew about Mr. Michael -- Michael White Thunder, and to

14   establish that this incident did occur and that was on his mind

15   and --

16         THE COURT:  So tell me what went on in this car.  I

17   mean, who -- who initiated the contact?  What -- was this just

18   a verbal altercation in the car and Mr. Wilkinson interpreted

19   White Thunder as being disrespectful, so to speak, to his

20   girlfriend and --

21         MR. COSTELLO:  No, Your Honor.  Mr. Mike -- Michael

22   White Thunder initiated the incident in the car.

23         THE COURT:  Well, what did he do?

24         MR. COSTELLO:  So he started hitting and -- hitting

25   Ms. Fox's seat.  He started swinging at her.  Like I said, Your

1    Honor, from what the testimony we have, it's unclear

2    necessarily as to whether he hit her in the head, himself, or

3    he just hit the seat into her head.  At this point she started

4    going into a shell.  She was terrified.  She was -- she was

5    having an anxiety -- an anxiety attack, Your Honor.  I think

6    her testimony -- her witness statement to the government

7    explained at this point in time she was terrified about what

8    was happening.

9         Mr. Michael White Thunder was swinging at her and

10   swung away at Mr. Wilkinson, and then Mr. Wilkinson responded

11   and started hitting Mr. Mike -- Mr. White Thunder in the

12   backseat of the car.  Mr. White Thunder was sitting in the car.

13   Ms. Fox was in the front driver's seat.  Mr. Wilkinson was in

14   the passenger front seat.  Mr. White was in the backseat behind

15   Ms. Fox and was swinging away at that point.

16        There had been earlier, as you noted -- you kind of

17   noted the idea of disrespectful comments that had been

18   happening earlier throughout --

19        THE COURT:  Well, that happens all the time when

20   people are drinking and -- and using street drugs and out

21   partying.

22        MR. COSTELLO:  It happens frequently when that comes

23   around, Your Honor.

24        THE COURT:  I've seen it thousands of times.

25        MR. COSTELLO:  Right, and if it was just that,

18

1    then -- Your Honor, then there wouldn't be necessarily any -- a

2    legitimate claim of self-defense of another.  But it's when the

3    incident in the car -- when Michael White Thunder, who was

4    incredibly inebriated, starts swinging away at Miranda Fox,

5    then that starts initiating the contact.  That initiates the

6    assault.  Then Mr. Wilkinson responds.

7         The video surveillance shows that Mr. White Thunder

8    was under -- substantially under the influence.  He's a much

9    larger individual than Mr. Wilkinson.  He's swinging away at

10   Miranda Fox, flailing at her, and then Mr. Wilkinson

11   intervenes.  I think that is what happened in the vehicle, Your

12   Honor.

13        THE COURT:  So your client and Ms. Fox are certainly

14   able to testify about what was going through their mind and

15   what happened in the car, right?

16        MR. COSTELLO:  Yes, Your Honor, they're certainly

17   able to testify to that.

18        THE COURT:  Anything more that you want to say,

19   Mr. O'Konek?

20        MR. O'KONEK:  Your Honor, only that the defense is

21   correct in that it -- that it probably will come out at trial

22   that the testimony has in some way changed as the case has gone

23   on.  Miranda Fox has told law enforcement that he was swinging

24   at her.  In a jail phone call to the defendant she says she was

25   hit in the head.  So our position is we don't exactly know what

1    the witnesses will say at trial.  Our belief is it is what the

2    defendant -- or defense just said, that --

3            THE COURT:  The testimony always evolves over the

4    course of the case as people become more knowledgeable about

5    what the disputed facts are.

6            MR. O'KONEK:  Yes, Your Honor, but that -- that is

7    it.  I mean, we don't dispute what the defense just proffered

8    as going to be the testimony by Miranda Fox.  It's just that

9    part of the self-defense issue is going to be a factual basis

10   for the -- for the jury to make that decision, whether --

11   number one, legally whether it does qualify as self-defense by

12   the Court and factually whether it qualifies as self-defense,

13   if it meets that threshold to even go to the jury, but that

14   will be something we can take up at trial.

15           THE COURT:  Well, with respect to the incident with

16   Skylar Moran on November 19, 2015, it's my -- I'm going to

17   defer ruling on whether I'm going to allow Ms. Moran to testify

18   about the specifics of that incident.  She certainly can take

19   the stand, and I don't think the government has any objection

20   to her testifying about Mr. White Thunder's reputation for

21   violence, domestic violence, domestic assaults and particularly

22   violence towards women.  But at least at this stage I'm going

23   to defer on the specifics of that incident until I hear the

24   evidence play out at trial.

25           But I don't want anybody talking about the specifics

1    of that incident in opening statements.  And if -- during the

2    government's case in chief, if defense counsel believes that

3    somehow the door has been opened and they should have a right

4    to bring the specifics of this Skylar Moran incident into --

5    into the trial, then I want to visit about that outside the

6    presence of the jury before that ever happens.  But my clear

7    inclination from the review of Eighth Circuit case law is

8    that -- that I would not allow the specific details of a

9    November 19, 2015 assault on Skylar Moran to come into evidence

10   at this trial.

11           The conviction, itself, is not going to come into

12   evidence.  It's violative of Rule 609, and I'm not going to

13   have a mini-trial on the November 19, 2015 assault on Skylar

14   Moran.  What she can offer in this case is certainly opinions

15   about White Thunder's propensities.  But the details, the

16   specifics, my inclination is not to allow that in, but I'll

17   defer ruling until I see how the evidence plays out at trial.

18           And clearly with respect to Betty Mulluk-Heart, the

19   defendant -- defense counsel has conceded that any specifics

20   about White Thunder assaulting her are not admissible at trial.

21           And so let's talk about White Thunder's meth usage,

22   if there's anything more that anyone wants to say about that.

23   Certainly I think it's fair game for anyone to raise questions

24   about what his level of intoxication or impairment was on the

25   night of the incident, but I'll let both counsel tell me

1    what they -- what their thoughts are on evidence concerning

2    Mr. White Thunder's meth usage.

3           MR. O'KONEK:  Yes, Your Honor.  We believe that, just

4    as the Court said, it's proper for the defense to elicit on

5    cross-examination whether at the time of the incident Mr. White

6    Thunder was under any sort of substance that would impair his

7    perception.

8           Our main objection is whether the defendant should be

9    allowed to bring that up during his testimony, that he was

10   aware of it.  We don't believe through the evidence that the

11   defendant was actually aware that the victim was on meth, and

12   we are -- we were just concerned that that could come up at

13   trial as a basis to support a self-defense claim, when there's

14   a factual dispute as to whether or not he was even aware.

15          There's a jail phone call -- or, excuse me, an

16   interview during -- a transport interview that Special Agent

17   Bennett had conducted with the defendant wherein he explains

18   after the incident he kind of flees to Bruce Freeman's house.

19   At that point he talks with Bruce Freeman, and it seems that

20   Bruce Freeman tells him that Michael White Thunder was on meth,

21   only after the incident had occurred, so that is our main

22   thing.

23          And then also we just don't want general character

24   evidence to come in to say, well, Michael White Thunder was a

25   meth head or that he has, you know, essentially a history of

22

1    meth usage.  We believe it should be confined to

2    cross-examination of the victim of his intoxication level at

3    the time of the incident, and that is as far as we believe it

4    should go.

5          MR. COSTELLO:  Your Honor, obviously, as you noted,

6    the government noted, we should be allowed to cross-examine him

7    on it at the time of the incident.

8          THE COURT:  Oh, absolutely.

9          MR. COSTELLO:  Yeah.  We do believe, though, we

10   should be allowed to go a little bit further as to his prior

11   act -- a prior bad act to it.  It's the same thing with -- we

12   had with the -- the same issue with the assaults.  We have to

13   show our client knew the incident under *Bordeaux* and *Drapeau*.

14         Looking at -- I'll provide an offer of proof as to

15   what he knew about Mr. Michael White Thunder -- Mr. Michael

16   White Thunder's methamphetamine use prior to the incident.  He

17   has known Mike White Thunder for a while.  When he -- when Mr.

18   Wilkinson -- when I say "he," Mr. Wilkinson has known White

19   Thunder for a while.  He -- Mr. Wilkinson used to date

20   Stephanie Moran while Michael White Thunder was dating Skylar

21   Moran.

22         (Mr. Costello was asked by the court reporter to slow

23   his speaking down.)

24         MR. COSTELLO:  So taking it a step back, Mr.

25   Wilkinson used to date Stephanie Moran while Michael White

1    Thunder was dating Skylar Moran.  They'd see each other at

2    family events, barbecues.  He'd see him out at the bar.  Mr.

3    Wilkinson has worked at the Player's Pub and the Pocket Aces

4    for a while now.  Michael White Thunder would come in very

5    frequently to either of those establishments and drink.

6           He's never seen -- Mr. Wilkinson has never seen

7    Michael White Thunder actually use.  However, he can tell --

8    his impression is he could always tell that Mr. White Thunder

9    used.  That was based on his mannerisms and how he acted.

10   Specifically, he'd be walking in an usual manner, very fast.

11   His eyes would be wide open, like bloodshot.  He -- his actions

12   were unusual.  He knows there's a substantial methamphetamine

13   problem in New Town, so he's had some --

14          THE COURT:  Well, everybody knows that.

15          MR. COSTELLO:  Yes, Your Honor, and he's had some --

16   he obviously has some access to individuals that use

17   methamphetamine.  Your Honor, a bartender at the bars, they

18   would very -- would very likely know, have -- have a lot of --

19          THE COURT:  Well, he doesn't know that he's using

20   methamphetamine.  Maybe he's using some other street drug.

21          MR. COSTELLO:  And to an extent that's possible, Your

22   Honor, but methamphetamine is the big one.  It's a -- it's a --

23   obviously it's -- yeah, the mannerisms that he describe

24   Mr. White Thunder would engage in are mannerisms of someone

25   that's stimulated and --

24

1            THE COURT:  Well, I guess my question is, you know,

2     the door is open for asking Mr. White Thunder about whether he

3     was using on this particular occasion of this assault.  And you

4     can certainly ask him a question if he's been a meth user prior

5     to this evening and how long he's been a meth user.  But

6     getting into great details about how many people use meth in

7     New Town and the specific details of his meth usage, the

8     quantities that he uses, whether he shoots up or not, who he

9     uses with, where he uses, I mean, I'm not going to turn this

10    case into a meth trial.

11            You can get in all you want about him and -- you

12    know, in terms of his usage of meth on this particular evening.

13    You can argue all you want in closing argument about, he's a

14    doper, he's a dope head, he's a meth user, he's a meth freak.

15    I mean, whether he used on one occasion or used on other

16    occasions, he's still a meth user.  So you're not going to be

17    prejudiced, but -- about anything concerning his meth usage,

18    but I'm not going to have Mr. Wilkinson or anyone else spend

19    15, 20 minutes talking about White Thunder's meth usage.  I

20    mean, let's be reasonable about things.

21            MR. COSTELLO:  Okay.

22            THE COURT:  Everybody knows if he was using meth on

23    the day of this assault, it's fair game.

24            MR. COSTELLO:  Understood, Your Honor.

25            THE COURT:  Anything else about that?

1           MR. O'KONEK:  No, Your Honor.

2           THE COURT:  Any questions about what's permissible?

3    I think you know -- all of you have been around long enough to

4    know that what was going on on the evening of the incident is

5    fair game for anybody on direct or cross.

6           Then we've got Olivia Baker's DUI conviction,

7    September of 2016.  She's not yet been convicted of that.  Does

8    the defendant plan to get into that, because --

9           MR. COSTELLO:  Not --

10          THE COURT:  -- I'm not going to allow it, but --

11          MR. COSTELLO:  Your Honor, no, not really.  The only

12   concern had been if Ms. Baker had tried to make some claims

13   that she's never had a drug or alcohol problem and never used.

14          THE COURT:  Well, if she makes a claim that she's

15   never had any problems related to drug or alcohol usage, then

16   arguably that opens the door, but the government is probably

17   not going to have her talk about that.  But this occurred five

18   months after this assault.  She hasn't been convicted.  She's

19   presumed to be innocent.  I can't think of a question that you

20   would be permitted to ask her about that.

21          MR. COSTELLO:  And that was our understanding, Your

22   Honor, was really only if she or the government kind of opened

23   the door under the issue.  Then maybe we'd be allowed to ask

24   some limited questions.

25          THE COURT:  Well, if she gets on the stand and she

1    says, "I've never used street drugs and I've never used alcohol

2    in my life," then maybe it opens the door to a question about

3    what happened on September of 2016.  But if she opens that

4    door, I want to talk about what you're going to be permitted to

5    ask her outside the presence of the jury before it ever occurs.

6              MR. COSTELLO:  Yes, Your Honor.

7              THE COURT:  But she's a witness in the government's

8    case in chief?

9              MR. O'KONEK:  Yes.  Yes, Your Honor.  She's the

10   eyewitness.

11             THE COURT:  She was out there at the time?

12             MR. O'KONEK:  Yes, sir.

13             THE COURT:  And was everybody under the influence

14   that was out there at the time of this incident?

15             MR. O'KONEK:  She was not under the influence at the

16   time, and we actually have a body camera footage from her

17   interview that can show that she was clear, coherent, and --

18             THE COURT:  Oh, okay.

19             MR. O'KONEK:  -- does not appear to be intoxicated.

20             THE COURT:  But was everybody in the car under the

21   influence?

22             MR. O'KONEK:  Yes, Your Honor.

23             MR. COSTELLO:  Yes, Your Honor.

24             THE COURT:  Okay.  So then somewhere in the middle

25   lies the truth of what happened because nobody has really got a

1    good perception of what occurred.

2              Then there was a notice of intent to impeach filed by

3    Ms. Monteiro concerning Michael White Thunder's three

4    convictions, and does the government have any objection to

5    that?  I guess my only question was, is the criminal trespass

6    charge an offense that's punishable by a year-plus in prison?

7    Is it a felony conviction?

8              MR. O'KONEK:  I believe it was, Your Honor.  When we

9    looked them up, I believe all three of them were felonies.

10             THE COURT:  But were there any of those convictions

11   that they intend to impeach -- or present as impeachment

12   evidence, convictions that the government is challenging?

13             MR. O'KONEK:  No.  No, Your Honor.

14             THE COURT:  Okay.  So it's all fair game?

15             MR. O'KONEK:  Those three, yes, Your Honor.

16             THE COURT:  All right.  Anything else?

17             MR. O'KONEK:  The only issue would be just the

18   consciousness of guilt --

19             THE COURT:  Oh, okay.

20             MR. O'KONEK:  -- request.  I know speaking with the

21   defense, they said they had an objection under 403, but just to

22   put our point forward --

23             THE COURT:  Objection under what?

24             MR. O'KONEK:  403, Your Honor.

25             THE COURT:  Okay.

28

1          MR. O'KONEK:  Just -- just talking before the

2    hearing, that's what they had mentioned.  For our purposes the

3    evidence is going to clearly point that after this incident

4    occurred, the defendant, Miranda Fox, they drove away from the

5    scene.

6          During an interview with the defendant, law

7    enforcement heard the defendant tell them that he ran away

8    because he was scared he was going to get in trouble for the

9    assault.  He drives to Bruce Freeman's house.  He's staying

10   kind of in that house, but he finds a crawl space or almost

11   like a basement area under -- underground of the house, and

12   he's kind of crawling around in there, and law enforcement are

13   trying to get him out to arrest him.

14         And ultimately there was -- he's arrested later on,

15   after he crawled out, but he doesn't have a shirt on, doesn't

16   have shoes on, and has dirt -- one of the witnesses will say he

17   had scratches on his back and dirt, showing that he was likely

18   coming from the crawl space.  So our perception of that is that

19   that is clear consciousness of guilt.  We would like to be --

20   we'd like to get into that with several of our witnesses.

21         When we do, we'd request that, you know, for the

22   defendant's benefit the Court order -- give a limiting

23   instruction basically explaining that this is not evidence to

24   support guilt, it just demonstrates that -- it goes to the

25   defendant's state of mind, that it is consciousness of guilt

1   evidence.  It doesn't directly support that he did, in fact,

2   commit the assault, but it's just consciousness of guilt

3   evidence.

4           THE COURT:  Well, there's an Eighth Circuit pattern

5   closing instruction on that, I believe.

6           MR. O'KONEK:  Yes, Your Honor, and I believe we've --

7   we included that in our requested instructions, but just given

8   that we're already having kind of this motion in limine

9   hearing, we wanted to add that to not only give the defense

10  notice, but to have the ability to present it in front of the

11  Court prior to the start of the trial.

12          THE COURT:  All right.  Mr. Costello?

13          MR. COSTELLO:  Your Honor, our position is the

14  government hasn't sufficiently connected the inferences to

15  state that this is consciousness of guilt.  So the government

16  talked about -- as the government just explained to the Court,

17  Mr. Wilkinson is not wearing clothes -- he's not wearing shoes

18  when he's outside, when he's arrested, when he's underneath in

19  the crawl space.  At that time, Your Honor, there -- it was

20  cold outside.  There had been snow on the ground.  Mr.

21  Wilkinson -- if Mr. Wilkinson is seeking to flee, he's not

22  going to be fleeing in snow in bare feet and without a shirt,

23  Your Honor.

24          He -- he and his girlfriend leave the scene at the

25  alleged -- of the incident with Mr. Mike -- with Mr. White

1    Thunder that evening.  It shows merely, Your Honor, that

2    they're -- that they are trying to get out of --

3            THE COURT:  They left the scene with Mr. White

4    Thunder?

5            MR. COSTELLO:  Oh, the -- at the bar where the

6    alleged -- where the fight occurred, Your Honor, where the

7    alleged crime occurred.

8            THE COURT:  I thought the fight occurred in the car.

9            MR. COSTELLO:  It occurred in the car and then

10   outside of the car behind the Player's -- or behind the Legion

11   bar in the downtown area, Your Honor.  They left that scene to

12   get away from Mr. White Thunder.  They go home.

13           THE COURT:  I thought he was unconscious.

14           MR. COSTELLO:  I believe he was unconscious by the

15   end of it, Your Honor, or at least appeared to be unconscious

16   by the end of it.  Law enforcement, they found him later, noted

17   that he was unconscious at that time.  When they leave, they

18   don't -- they don't flee.  They go -- they go home.  They go

19   home to Bruce Freeman's residence, where Mr. Wilkinson lives.

20   They're not trying to get out.  They're not trying to run from

21   law enforcement or evade law enforcement.

22           When he's found -- you know, we don't know exactly as

23   to what was going through Mr. Wilkinson's mind.  Obviously he

24   -- if he were to testify could potentially explain that, but if

25   he's looking to flee, Your Honor --

1          THE COURT:  Well, he's going to have to testify,

2     isn't he, to explain self-defense in the case?

3          MR. COSTELLO:  It's -- it generally is advisable, I

4     guess, that, yeah, someone would testify as to that.  It's not

5     necessarily required, Your Honor, but it's something where

6     we're at -- we're not sure as yet whether he will testify or

7     not.

8          THE COURT:  Okay.

9          MR. COSTELLO:  Looking at that incident, if he's

10     looking to flee and avoid consequences of something because

11     he's feeling -- he believes he's guilty of a crime, why is he

12     trying to flee not wearing shoes and a shirt?  I mean, if he --

13          THE COURT:  Well, isn't that for the jury to decide?

14          MR. COSTELLO:  Your Honor, well, the government has

15     to sufficiently show that -- has to sufficiently provide

16     evidence of -- these inferences were met, that this is

17     consciousness of guilt.  It's not necessarily for the jury to

18     decide if they haven't met their threshold requirement.  If

19     he's attempting to flee, Your Honor, if that's some level of

20     consciousness of guilt, he would have gone home, packed up his

21     bag, put on proper clothes to be out in winter, and then fled

22     the scene of the -- fled the reservation.

23          THE COURT:  Well, somebody that's sober might have

24     done that, but people under the influence don't always make the

25     soundest of decisions.

1          MR. COSTELLO:  So then if -- if that's the position,

2    Your Honor, then alcohol is influencing his mind, not

3    consciousness of guilt at all.  Then I don't think that -- that

4    would properly interrupt the chain that the government is

5    trying to establish to show consciousness of guilt.  At that

6    point he's just not making proper decisions on what to do after

7    that because alcohol is influencing him.

8          Additionally, Your Honor, I think under 403 it's

9    impermissible.  It -- from what little probative value it has,

10   it raises a substantial amount of unfair prejudice.  It, as the

11   government has noted, creates -- as the government and the

12   Court has noted the issue of mini-trials, it would create a

13   mini-trial as to whether he's guilty of a crime of obstruction

14   of justice or fleeing or resisting law enforcement.

15         It puts that issue on the table when we're dealing

16   with what happened with Mr. White Thunder.  It changes the

17   entire jury's perspective on the matter of whether we have one

18   or multiple crimes charged here.  And it's a crime that he

19   isn't charged with, Your Honor, whether he was resisting arrest

20   or fleeing or obstructing --

21         THE COURT:  No, but isn't the jury entitled to see

22   the whole scenario of events as they played out that evening

23   from the time they were arguing in the bar until the time -- up

24   until the time he was arrested?

25         MR. COSTELLO:  The jury has a right to see the -- a

33

1    certain -- the scenario as it -- and to an extent as it plays

2    out.  They don't have the right to see -- I mean, because that

3    -- at what point in time does that -- does that chain of events

4    stop?  At what point is the jury limited from -- limited to

5    what they're allowed to see?

6            I mean, at that -- if we're -- if we're going to

7    allow that in, then we have to start considering what other

8    incidents have bearing on the -- what decisions and the actions

9    that were made that night and whether those are then properly

10   allowed within the causal chain of events.  I don't think the

11   jury necessarily has a fundamental right to hear about

12   consciousness of guilt due to an alleged flight.  I don't think

13   that fundamentally comes in for the jury to hear in this case.

14           THE COURT:  Well, the Court has broad discretion in

15   ruling on any evidentiary issues, and in the broad exercise of

16   my discretion, I'm going to allow into evidence in this case

17   everything that went on that evening from the -- what occurred

18   in the bar or bars in New Town between the defendant and

19   Mr. White Thunder and his girlfriend, Miranda Fox.  I'm going

20   to allow evidence concerning the incidents in the bar, in the

21   car, outside the car, outside the bar, in the back alley behind

22   the bar, and everything leading up to the arrest of Mr.

23   Wilkinson.  I think that's all fair game for the jury to

24   understand what transpired that evening.

25           The jury can draw its own conclusions about

1     Mr. Wilkinson's conduct after he left the bar.  Both attorneys

2     can argue what they want to argue about whether it's evidence

3     of consciousness of guilt or whether it's not.  That's all for

4     the jury to decide and for the attorneys to argue, but I think

5     it's only fair that the jury hears the whole story that evening

6     from start to finish.  So that's the way I've consistently

7     ruled in every criminal case that I've ever handled since 2002,

8     and I'll continue to rule the same way.  The jury is entitled

9     to hear the evidence that's relevant to what transpired on the

10    evening of the assault.

11               Any other issues?

12               And in terms of consciousness of guilt, if the

13    government has requested a pattern instruction from the Eighth

14    Circuit, which they apparently have, I'll give that

15    instruction.  I don't -- I'll wait and see how the evidence

16    plays out as to whether I feel there's a need to give some

17    limiting instruction about the arrest scenario, but more often

18    than not there's not a need for such an instruction.  But the

19    Eighth Circuit pattern on consciousness of guilt I'd certainly

20    give if warranted.

21               Any other evidentiary issues?

22               MR. O'KONEK:  No, Your Honor.

23               MR. COSTELLO:  No, Your Honor.

24               THE COURT:  How many witnesses -- the government, I

25    guess, is --

1          MR. O'KONEK:  We believe it will be around 15, Your

2     Honor.

3          THE COURT:  Fifteen?

4          MR. O'KONEK:  Fifteen, maybe 16.

5          THE COURT:  And if you start with the evidence on

6     Monday afternoon, when do you expect that you'll conclude?  I

7     suppose most of them are relatively short witnesses, but --

8          MR. O'KONEK:  Yes, Your Honor.  We believe we'll be

9     done by Tuesday at close of business.

10          THE COURT:  Okay.  And you've got a couple of medical

11     doctors.  They're treating physicians, or was there surgery

12     involved in this case?

13          MR. O'KONEK:  No surgery, Your Honor.  The first one

14     is an E.R. physician.  He was the -- Dr. Jun is the individual

15     who treated the defendant (sic) at the time of the incident.

16     And then we have the radiologist -- that treated the victim.

17     Excuse me.  And then we have the radiologist who essentially

18     can explain the broken bones, the fractures, and give a better

19     estimate as to what the serious bodily injury was of the

20     victim.

21          THE COURT:  And then we have a tribal enrollment

22     director.  Is Native American status going to be challenged, at

23     issue in this case, or --

24          MS. MONTEIRO:  Your Honor, I'll be -- I'll be talking

25     to my client this afternoon about that, and we'll let the

1    prosecution know.

2           THE COURT:  Okay.  And then apparently the jail

3    administrator from Rugby, there was some phone calls that --

4           MR. O'KONEK:  Yes, Your Honor.

5           THE COURT:  Phone calls between whom?

6           MR. O'KONEK:  The defendant and his girlfriend, the

7    two people that were in the car other than the victim.

8           THE COURT:  Okay.  And what is -- is there just one

9    conversation, or --

10          MR. O'KONEK:  We have currently five that are marked.

11   They're -- they're roughly around the August timeframe.  August

12   30, I believe, is the main one.  We intend to only admit one

13   during trial.  Four would -- the other four are mainly for

14   impeachment or bias, depending on what the witnesses say at

15   trial.  But there is the one -- the one that we intend to admit

16   is a conversation between the defendant and his girlfriend

17   where they talk about how she should just cry at trial to help

18   him essentially win the case, and it's that discussion that we

19   believe would go to any sort of motive to fabricate.  The

20   others are less involved than that, but they go to show bias,

21   their -- their loving relationship, those sorts of things.

22          THE COURT:  Okay.  And then if the government rests

23   at the end of Tuesday, Ms. Monteiro, Mr. Costello, how long do

24   you think that your case would last?

25          MS. MONTEIRO:  Perhaps Wednesday morning at the

1    longest.

2                  THE COURT:  Okay.  A half day, or --

3                  MR. COSTELLO:  Right.  We'd have possibly Skylar

4    Moran and Betty Mulluk as a witness.  We have Bruce Freeman on

5    our list.  It's unlikely we'd call them -- call him, but it's a

6    possibility, and then perhaps Mr. Wilkinson.

7                  THE COURT:  Is there a video of any of this that

8    occurred outside the bar or inside the bar?

9                  MR. O'KONEK:  Yes, Your Honor.  There's a two-minute

10   video that shows the victim and the defendant leaving the bar.

11   The victim is essentially falling down, and the defendant picks

12   him up and carries him, and then you go off screen and you

13   don't know what happens.

14                  But there's also two recorded interviews --

15   audio-recorded interviews between law enforcement and the

16   defendant that we would intend to play, I believe one edited

17   down for things that aren't necessary.  And we've discussed

18   that with the defense, about making sure we can make edits that

19   were appropriate.  The first one, I believe, is about 35

20   minutes, and the other one is about 40 minutes long.

21                  THE COURT:  Is there video outside the bar of what

22   transpired in the car or outside the car?

23                  MR. O'KONEK:  No, Your Honor.  All there is is the

24   video that kind of shows the defendant picking the victim up

25   when he kind of passes out -- or I guess not passes out.  He

1    falls down because he's very drunk, and then they just kind of

2    walk off screen, and that's the last you -- you see.  And

3    according to the defendant's interview with law enforcement,

4    once he puts him in the vehicle, it's minutes later that the

5    assault actually occurs, but none of that is on the video.

6            THE COURT:  And does the government have an exhibit

7    list that's been put together yet?

8            MR. O'KONEK:  We have our exhibits put together.  We

9    intend on having the defense come over and inspect them

10   tomorrow.  And we will file them with the Court no later than

11   noon tomorrow.

12           THE COURT:  Okay.  And we've got this meeting --

13   pretrial meeting at 9 o'clock on Monday morning, and typically

14   what I talk about is the preliminary jury instructions and then

15   any other evidentiary issues.  I think we've taken care of

16   evidentiary issues, but were there any objections that anyone

17   had filed to the preliminary instructions?

18           MR. O'KONEK:  No, Your Honor.

19           MS. MONTEIRO:  Your Honor, I have been on vacation.

20   I looked at them, and my understanding was I had until the end

21   of today to file any objections.  I don't anticipate I will

22   have any, but I'd --

23           THE COURT:  Okay.

24           MS. MONTEIRO:  -- like to just be able to review them

25   this afternoon.

1          THE COURT:  Yeah, that's fine.

2          MS. MONTEIRO:  Thank you.

3          THE COURT:  But does the government have any --

4          MR. O'KONEK:  No, Your Honor.  We submitted an e-mail

5    to the Court saying we didn't have any objections.

6          THE COURT:  Okay.  I mean, there's -- they're pretty

7    routine.  It's -- the only issue is really if there's a problem

8    with the elements of the crimes as they're listed in the

9    preliminary instructions.  But, yeah, if you could get back to

10   us.

11         MS. MONTEIRO:  I will.

12         THE COURT:  And if you don't have any problems, I

13   mean, we can get together -- well, we'll still get together at

14   9 o'clock, I guess, and give everybody a chance to note any

15   objections to the preliminary instructions, as well as talk

16   about any other exhibits that might be controversial.  Are

17   there any that you envision now?

18         MR. COSTELLO:  I don't envision any.  We may have a

19   couple of photograph exhibits to put together, and we'll get

20   that by tomorrow as well.

21         THE COURT:  All right.  Thank you.  We'll stand

22   adjourned then.

23         (Proceedings concluded at 9:51 a.m., the same day.)

24                - - - - - - - - - -

25

1    <u>CERTIFICATE OF COURT REPORTER</u>
2        I, Sandra E. Ehrmantraut, a Certified Realtime
3    Reporter,
4        DO HEREBY CERTIFY that I recorded in shorthand the
5    foregoing proceedings had and made of record at the time and
6    place hereinbefore indicated.
7        I DO HEREBY FURTHER CERTIFY that the foregoing
8    typewritten pages contain an accurate transcript of my
9    shorthand notes then and there taken.
10       Dated:  May 15, 2017
11
12               <u>/s/ Sandra E. Ehrmantraut</u>
                 Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25