UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,      )
                               )
            Plaintiff,         )
                               )
      vs.                      )      File No. 1:16-cr-123
                               )      Appeal No. 17-1938
Derick Colin Wilkinson, aka    )
Derrick Colin Wilkinson,       )
                               )
            Defendant.         )


TRANSCRIPT OF JURY TRIAL
VOLUME I
Pages 1 - 144


Taken at
United States Courthouse
Bismarck, North Dakota
December 12, 2016


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. JONATHAN J. O'KONEK
MS. DAWN DEITZ
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699


FOR THE UNITED STATES



- - - - - - - - - -



MS. MICHELLE ANN MONTEIRO
MR. RYAN COSTELLO
Assistant Federal Public Defenders
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501


FOR THE DEFENDANT



- - - - - - - - - -

<u>GOVERNMENT WITNESSES</u>

Page No.

<u>Katie Potts</u>
    Direct Examination by Ms. Deitz            29
    Cross-Examination by Mr. Costello          36


<u>Officer Criselda Cruz</u>
    Direct Examination by Mr. O'Konek          38
    Cross-Examination by Ms. Monteiro          47


<u>Michael White Thunder</u>
    Direct Examination by Mr. O'Konek          48
    Cross-Examination by Ms. Monteiro          55
    Redirect Examination by Mr. O'Konek        67
    Recross-Examination by Ms. Monteiro        68
    Examination by The Court                   69


<u>Dr. Hong Jun</u>
    Direct Examination by Mr. O'Konek          71
    Cross-Examination by Mr. Costello          84
    Redirect Examination by Mr. O'Konek        91
    Recross-Examination by Mr. Costello        93


<u>Dr. Sridhar Naidu</u>
    Direct Examination by Mr. O'Konek          96
    Cross-Examination by Ms. Monteiro         108


<u>Officer Kristy Parisien</u>
    Direct Examination by Mr. O'Konek         110
    Cross-Examination by Mr. Costello         116


<u>Officer Jennifer Everett</u>
    Direct Examination by Ms. Deitz           118
    Cross-Examination by Ms. Monteiro         129


<u>Miranda Fox</u>
    Direct Examination by Ms. Deitz           130

1           (The above-entitled matter came before the Court, The

2    Honorable Daniel L. Hovland, United States District Court

3    Judge, presiding, commencing at 9:03 a.m., Monday,

4    December 12, 2016, in the United States Courthouse, Bismarck,

5    North Dakota.  The following proceedings were had and made of

6    record in open court with the defendant and counsel present,

7    but out of the presence of the jury panel.)

8                    - - - - - - - - - - -

9           THE COURT:  Good morning.  We'll open the record in

10   the case of *United States of America versus Derick Wilkinson*.

11   We're outside the presence of the jury.  All parties are

12   present, along with Mr. Wilkinson, and I just have a few things

13   to talk about.  I want to give everybody a chance to note any

14   formal objections or exceptions to the preliminary

15   instructions.  The government have any?

16           MR. O'KONEK:  No, Your Honor.

17           MS. MONTEIRO:  We have none, Your Honor.

18           THE COURT:  Okay.  The witnesses that I'll -- or

19   potential witnesses that I'll ask the jury panel about are --

20   are all the lay witnesses residents of New Town?

21           MR. O'KONEK:  I believe most of them are.  Katie

22   Potts is from Bismarck, North Dakota, now.  She used to live in

23   New Town.  And if I can check, Doctor -- well, Dr. Jun and

24   Dr. Naidu are from Minot, obviously.  We will not be calling

25   Sergeant Chad Roe because he has moved down to South Dakota.

4

1    Miranda Fox is from White Shield.

2                THE COURT:  Where?

3                MR. O'KONEK:  White Shield, sir.

4                THE COURT:  Okay.

5                MR. O'KONEK:  We have -- we have reached a

6    stipulation for Indian status and Indian country, so we will no

7    longer be calling Sevant Taft, Your Honor.

8                THE COURT:  Sevant Taft.  All right.

9                MR. O'KONEK:  And so Mike Graner is from Rugby.

10   Samuel Lincoln, he lives in -- he works in New Town, but he

11   lives, I believe, in Stanley, North Dakota.  And then the rest

12   are just agents.  Bruce Freeman also lives in New Town.

13               THE COURT:  And Skylar Moran and Betty Mulluk-Heart

14   are in New Town?

15               MS. MONTEIRO:  Ms. Mulluk-Heart is from White Shield,

16   Your Honor.  Ms. Moran is from New Town, I believe.

17               THE COURT:  Okay.  The government has got a rather

18   lengthy set of exhibits.  Are those -- are there some problem

19   exhibits that defense anticipates that --

20               MS. MONTEIRO:  Your Honor, we did have a couple of

21   objections to some of the photographs, but we were able to work

22   that out with Mr. O'Konek and Ms. Deitz and limit the

23   photographs, so everything is acceptable.

24               THE COURT:  Okay.  And then in terms of jury

25   selection, are there any questions that anyone wishes that I

1    answer -- ask rather than either party?

2         MR. O'KONEK:  No, none other than the standard

3    questions that you normally ask, sir.

4         MR. COSTELLO:  Likewise, Your Honor, no -- none other

5    than the standard questions.

6         THE COURT:  All right.  And after winnowing down the

7    witness list, the government expects they'll be done with their

8    case by when?

9         MR. O'KONEK:  Probably tomorrow afternoon, probably

10   after -- sometime after lunch, Your Honor.

11        THE COURT:  All right.  And the defense will take how

12   long?

13        MS. MONTEIRO:  Half a day at the most, Your Honor.

14        MR. COSTELLO:  Yeah, probably depends on as whether

15   Mr. Wilkinson testifies.

16        THE COURT:  Anything else we need to talk about?

17        MR. O'KONEK:  The only issue is just -- I know that

18   normally we -- we're not allowed to go into the sentencing

19   portion, so there are some witnesses through some information

20   we received from the defense that may want to go into that they

21   don't want the accused to go to jail and things like that.

22   Just potentially a reminder.  I know that's a question I plan

23   on asking during voir dire, but potentially -- if it wasn't

24   included in the Court's instructions -- or the Court's

25   questions to the panel that -- you know, that sentencing is not

1    relevant to this proceeding.  This is whether the accused is
2    not guilty or guilty.
3            THE COURT:  You're going to go into that --
4            MR. O'KONEK:  Just -- I just have one question just
5    to -- basically asking if there's anybody who has a problem
6    with the fact that they won't know what the sentence will be
7    and they won't have a say in the sentence.
8            THE COURT:  Oh, okay.  That's fine as far as I'm
9    concerned.  Anything else?
10           MR. O'KONEK:  No, Your Honor.
11           MR. COSTELLO:  Two issues, Your Honor.  I guess I'll
12   start.  So Miss -- the issue we had about the pretrial motions
13   as to Ms. Skylar Moran to whether she could testify to a
14   specific instance of misconduct under 404(b), the Court had
15   deferred ruling until the end of the government's case, kind of
16   indicating that the Court was thinking it wouldn't allow that
17   evidence in.
18           THE COURT:  Right.
19           MR. COSTELLO:  We do have an update I think the
20   government is also aware of.  Ms. Moran's father passed away
21   over the weekend.  The wake is Tuesday and the funeral is
22   Wednesday.  You know, given that we're losing some witnesses
23   and the government thinks they're going to be done quicker,
24   she'd probably be unavailable Tuesday and Wednesday.
25           Would it -- we had reached out to the government to

7

1    ask whether they'd be okay with her testifying via phone, if
2    possible.  As to whether we would -- at this point, unless the
3    Court changes its ruling, we'd probably only be asking her her
4    opinion as to Michael White Thunder, the alleged victim, as to
5    whether he has a character trait for violence.  Obviously, if
6    the Court changes its ruling, we'll ask a few more thorough
7    questions, but that's kind of where we're at at this point,
8    Your Honor.
9           We'd -- we would hope -- originally thought maybe we
10   would just ask for a recess and have her testify first thing
11   Thursday morning, but given that we probably won't be going
12   very long on Wednesday, that would be a waste of time.  I think
13   testifying via phone would be the best option at this point, if
14   the Court is willing to do that and the government --
15          THE COURT:  I'm always willing to do that.  It's
16   usually not very effective, but if the government doesn't have
17   an objection to it, it's fine with me.  Do you?
18          MR. O'KONEK:  No, no objection, Your Honor.
19          THE COURT:  All right.  So she's available by phone
20   on Tuesday?
21          MR. COSTELLO:  We're going to have -- she had
22   indicated she'd probably be available by phone.  We're going to
23   -- our investigator is talking to her right now trying to iron
24   out whether -- you know, if she could get down here or if she
25   can call us via phone and set something up, so we'll continue

1    to talk with her today about that.

2              THE COURT:  All right.

3              MR. COSTELLO:  And then we'll -- obviously, if it

4    turns out we can't make it happen, maybe -- we may just release

5    her from the subpoena, but -- and then the second issue I

6    believe Ms. Monteiro is going to bring up.

7              MS. MONTEIRO:  Yes, Your Honor.  We learned on

8    Friday, when speaking with Mr. White Thunder, who's the victim

9    in this case, that Mr. White Thunder is actually on probation,

10   and it came up in that -- when he was being asked whether he

11   had been using meth on the day of the offense, he -- his

12   response was, "No, I'm on probation.  I can't use meth."  Well,

13   there's medical records that suggest he may -- you know, a

14   positive methamphetamine test, so we would request permission

15   to cross-examine Mr. White Thunder on the fact that he is on

16   probation.

17             It's relevant because, again, he's -- obviously

18   Mr. White Thunder doesn't want to get in trouble.  It goes to

19   bias.  He's not going to admit to any type of assault of

20   Miranda Fox or Mr. Wilkinson because he doesn't want to get in

21   trouble for his probation, and he's unlikely to admit to any

22   type of meth use for the same reason, so we're just bringing

23   that up with the Court, that that was our intent.

24             MR. O'KONEK:  The only objection we have to that,

25   Your Honor, is should he bring that up as a reason why -- we

1    believe that if he brings that up, it's fair game for the

2    defense to go into that.  We don't believe it's proper for the

3    defense to posit that as a reason before he would bring that up

4    himself, so it basically is up to the witness.  If he wants to

5    say, "I wouldn't do that because I'm on probation," I believe

6    the defense can go into that.  I just don't believe it's proper

7    for them to say, "You were on probation at this time," without

8    him first eliciting that himself as a reason why he would or

9    wouldn't do things.

10            MS. MONTEIRO:  And I think we should be able to ask

11   him, Your Honor, because, again, it goes to bias.  It goes to

12   why he would come in this courtroom and not admit to any

13   assaultive conduct or not admit to any drug or even alcohol use

14   for that matter.

15            THE COURT:  All right.  Well, I'm going to defer

16   ruling and we'll see what he has to say --

17            MS. MONTEIRO:  Okay.

18            THE COURT:  -- on the stand.  He's going to be called

19   today, or --

20            MR. O'KONEK:  Yes.  He had a similar instance with --

21   he considers Skylar Moran his -- he considers Skylar Moran's

22   father his father-in-law, so he would like to go to the wake

23   tomorrow, so we're going to put him in a little bit earlier in

24   the order to get him in today.

25            THE COURT:  All right.  Anything else for the good of

1    the order?

2              MR. O'KONEK:  No, Your Honor.

3              MR. COSTELLO:  No, Your Honor.

4              THE COURT:  All right.  We'll just stand in recess

5    until 9:30.  We'll try to start promptly at that time.

6              (A recess was taken from 9:12 a.m. to 9:45 a.m., the

7    same day.)

8              (In open court with the defendant, counsel, and the

9    jury panel present.)

10             THE COURT:  Good morning.  I want to welcome all of

11   you to the federal district court of North Dakota here.  My

12   name is Dan Hovland.  I'm one of two federal judges in North

13   Dakota here, and I live and work in Bismarck and handle all the

14   federal cases in Bismarck and up in Minot.  I have a

15   counterpart.  Ralph Erickson is the federal judge in Fargo, and

16   we have federal courthouses out east in Grand Forks and Fargo.

17             But I want to welcome you.  I appreciate your

18   patience here throughout the morning.  You are here to resolve

19   a dispute in a criminal case, and the name of the case is

20   *United States versus Derick Wilkinson*.  I'm first going to ask

21   that the attorneys that are here introduce themselves to you,

22   as well as anyone sitting at counsel table with them, so we'll

23   start with the government.

24             MR. O'KONEK:  Good morning.  My name is Jonathan

25   O'Konek.  I'm an assistant United States attorney here in

11

1    Bismarck.  To my right is Special Assistant United States

2    Attorney Dawn Deitz.  She's also an assistant United States

3    attorney here in Bismarck, and to her right is FBI Special

4    Agent Megan Bennett.

5              THE COURT:  Thank you.  The defendant.

6              MS. MONTEIRO:  Good morning.  I'm Michelle Monteiro.

7    I'm an attorney here in Bismarck; Ryan Costello, attorney here

8    in Bismarck as well; and this is our investigator, Matt

9    Giddings; and my client, Derick Wilkinson.

10             THE COURT:  Thank you.  At this time we're going to

11   proceed with jury selection.  I know that all of you have seen

12   a short videotape on that process this morning.  We'll -- we

13   should be able to select a jury by the end of this morning, and

14   ultimately we'll be selecting 12 jurors.  In criminal cases in

15   federal court there's always 12 trial jurors that are selected,

16   but there's 28 of you that have been first selected for

17   questioning.

18             And I'll be doing most of the questioning this

19   morning, but I also give both parties an opportunity to ask

20   some questions when I'm done.  Most of the questions that I'm

21   going to be asking are really designed to find out more about

22   your background and your experience and whether you know

23   anything about this case.

24             And when I and the attorneys finish their

25   questioning, then both parties in the case are entitled to use

1      what are called peremptory challenges.  That's just a fancy

2      legal term that means they have an opportunity to arbitrarily

3      strike some of you from the list so that we get it down to a

4      panel of just 12 jurors.  Each side in a criminal case has a

5      certain number of strikes that they can arbitrarily use.  They

6      don't have to have a reason to use it.

7                    And there's no real magic to this process.  The

8      attorneys have to rely upon their trial experiences and their

9      familiarity with this case.  And they and their clients have to

10     decide whom they believe would be the most fair and impartial

11     jurors to sit in this particular type of case.  So if you are

12     eliminated from that process by the end of this morning, don't

13     take it personally.  There's -- believe me -- no magic to the

14     process.  People just rely on their gut instincts as to whom

15     they believe would be the most appropriate juror to listen to

16     the evidence.

17                    This is a criminal case.  Again, the case is entitled

18     *United States versus Derick Wilkinson*, and Mr. Wilkinson has

19     been charged with two separate criminal offenses in a document

20     that's called an Indictment.  The crimes that have been charged

21     are -- Count 1 is a crime of assault resulting in serious

22     bodily injury, and Count 2 is assault with a dangerous weapon.

23     This all arises out of an incident that took place on or about

24     April 25th, April 26th of 2016, in the New Town, North Dakota,

25     area, correct?

                                    13

1               MR. O'KONEK:  Yes, Your Honor.

2               THE COURT:  And these two criminal offenses were

3    first laid out in a document called an Indictment.  The

4    Indictment in a federal case is not a piece of evidence that

5    you'll see.  It's simply the formal charge brought against a

6    defendant that puts a defendant on notice of what he has been

7    charged with in federal court.

8               What's important for you to remember in a criminal

9    case is that the defendant is presumed to be innocent.  The

10   defendant in a criminal case doesn't have to testify, doesn't

11   have to introduce any evidence, doesn't have to prove or

12   disprove anything.  The burden of proof in any criminal case in

13   this country rests on the shoulders of the federal government

14   in this case.  The federal government has the responsibility to

15   present evidence to you to prove up the essential elements of

16   the crimes that have been charged.

17              So what that requires of you in a criminal case is to

18   set aside any suspicions that you might have due to the fact

19   that this defendant, Mr. Wilkinson, has been charged with these

20   two crimes in federal court and that he's here defending

21   himself at trial.  He is presumed to be innocent unless the

22   government sustains its burden of proof.

23              (The questioning of the jury panel is not included

24   herein pursuant to the request of the ordering party.)

25              THE COURT:  If your name was not read off, that means

14

1    that you were selected as one of the 12 trial jurors, and I

2    would ask that you take a seat in the jury box, please.  We'd

3    like to have six people in the front row and six in the back

4    row.  Mr. O'Konek, are you satisfied that these are the 12

5    individuals selected as trial jurors in this case?

6              MR. O'KONEK:  Yes, Your Honor.

7              THE COURT:  Mr. Costello?

8              MR. COSTELLO:  Yes, Your Honor.

9              THE COURT:  All right.  Then I would ask that all of

10   you please stand and we'll have you sworn in as trial jurors.

11             THE CLERK:  Could you raise your right hand, please?

12             (The 12-person trial jury is duly sworn.)

13             THE COURT:  Please be seated.  To those of you that

14   were not selected as trial jurors, please keep in mind, as I

15   told you earlier, don't take it personally.  And for those of

16   you that were selected for questioning, I appreciate your

17   patience throughout this process this morning.  I appreciate

18   the patience of all of you for being a part of this jury

19   selection process in this case, but you are now excused.  You

20   have no further obligation to be here on behalf of the federal

21   district court, so thank you and have a nice day.

22             To those of you that were selected as trial jurors,

23   we'll take a break, but before I let you leave, my staff needs

24   to visit with you and give you some directions about where you

25   report in and where the jury room is.  We need to get you some

1    security badges, and that will just take probably ten minutes,

2    or so, of your time, so please don't leave after I close the

3    record here.

4           But then we'll reconvene at 1 o'clock today.  And at

5    1 o'clock, what will happen is that I'll first read to you what

6    are called the Preliminary Instructions in the case, and they

7    give you some guidance as to what your role as a juror is.  And

8    you'll have a copy of those instructions that you can follow

9    along.  The law requires that I read them to you, and that will

10   take 10 or 15 minutes.

11          And then the attorneys will present their opening

12   statements to you right after lunch, and then we'll start

13   hearing from witnesses this afternoon.  And I'll try to

14   conclude matters around 4:30 today, so you can keep that in

15   mind if you've got other obligations after the normal workday.

16   So we'll stand in recess until 1 o'clock.

17          (A lunch recess was taken from 11:37 a.m. to

18   1:01 p.m., the same day.)

19          (In open court with the defendant, counsel, and the

20   jury present.)

21          THE COURT:  Welcome back to all of you.  We are back

22   on the record in the case of *United States versus Derick*

23   *Wilkinson*.  At this time, members of the jury, I'm going to

24   read to you these Preliminary Instructions.  You've got a set

25   there on your seat.  You're welcome to follow along.  And

16

1    again, the law requires that they be actually read to you in

2    open court, so, again, you're welcome to follow along.

3           (The Judge reads the Preliminary Instructions in open

4    court, pages 1 through 13.)

5           THE COURT:  The government may make its opening

6    statement at this time.

7           MR. O'KONEK:  Thank you, Your Honor.

8           THE COURT:  And both parties will need to make sure

9    they're using microphones so we can pick it all up and the

10   court reporter can pick it up.

11          MR. O'KONEK:  Yes, Your Honor.

12          THE COURT:  All right.

13          MR. O'KONEK:  May it please the Court, opposing

14   counsel.  On April 26th of 2016, in New Town, North Dakota,

15   about 1 o'clock in the morning, kind of cold outside for a late

16   day in April.  It's raining.  It turns to sleet and snow.  The

17   defendant, Derick Wilkinson, he's in a car with an individual

18   named Michael White Thunder.  They've been drinking at a bar.

19   Michael White Thunder was heavily intoxicated.  You'll see a

20   video footage of him falling outside of the bar, the defendant

21   picking him up, carrying him fireman style, bringing him to his

22   car, placing him inside.

23          After Mr. White Thunder was inside the vehicle, the

24   defendant and his girlfriend begin to talk, and something makes

25   Mr. Wilkinson very angry, so he punches him one, two, three,

17

1    four, five times.  He knocks him out cold.  As he's slouched in

2    the backseat of the vehicle, Mr. White Thunder is unconscious.

3    And Mr. Wilkinson goes outside the vehicle, pulls Mr. White

4    Thunder out of the car, throws him down, and proceeds to stomp

5    on his face over and over and over again with his boots.  If

6    that wasn't enough, he actually drags him further, about a

7    hundred feet past the bar, and he steps on his face one or two

8    more times until finally he actually jumps up and lands with

9    both feet on his face.

10            After this occurs -- an eyewitness sees what happens,

11   calls in to the police.  They come out and find Mr. White

12   Thunder.  He is bloody.  He's bruised.  His eyes are swollen

13   shut.  They see that he's having trouble breathing, so they put

14   a tube down his throat to help him with it.

15            Law enforcement finds out that Mr. Wilkinson got into

16   a car that he was in with his girlfriend and he drives off.

17   Police find him two, three hours later hiding in a crawl space

18   at his friend's house, Bruce Freeman's house in New Town, North

19   Dakota.

20            What started all this?  What was the reason for

21   Mr. Wilkinson punching Mr. White Thunder?  What was the reason

22   for stomping on his face?  It was anger.  Mr. Wilkinson had

23   heard time and time that night from Mr. White Thunder, sexual

24   comments about his girlfriend.  And you'll hear from Mister

25   -- you'll hear from the -- the evidence that when Mr. Wilkinson

1    is in the vehicle, he can't take it anymore.  He heard one

2    comment too many, and he responded with words, nonthreatening,

3    just improper things to say about someone's girl.  He responded

4    with -- instead of words, he used his hands and he used his

5    feet.

6              And you're going to learn a lot about what happened

7    during the late hours of April 25th.  You're going to hear a

8    lot about what happened in the early morning hours of

9    April 26th.  You're going to see things through the eyes of

10   many different people, from law enforcement who responded to

11   the scene, doctors who will tell you about Mr. White Thunder's

12   injuries.  You'll hear from law enforcement that interviewed

13   the defendant, hear what the defendant told them about why he

14   did it, that he was angry.  He was angry about the comments

15   that this individual made about his girlfriend.

16             And what you'll see is, what happened that night is

17   that after Mr. Wilkinson assaults Mr. White Thunder, he leaves

18   him there in a puddle, basically up to his shoulders in water.

19   When the police arrive around 1 o'clock in the morning, they

20   put a C collar on him because they're afraid he might have neck

21   injuries.  They put the tube down his throat to help him

22   breathe.  They call the ambulance.  The ambulance arrives

23   20 minutes later, but before they put him in the ambulance, law

24   enforcement takes photos of Mr. White Thunder.  You'll get to

25   see those photos, see that he looks like a different person

1  than the person that will testify here in the next couple of

2  days.

3          Mr. White Thunder essentially goes to the hospital

4  about two hours later.  He's taken to Trinity Hospital in

5  Minot.  He gets there.  He is unconscious.  They give him heavy

6  painkillers.  They see that he is -- has drainage from both

7  ears.  He's hypothermic.  He has a body temperature between 94

8  and 95 degrees.  They find out that he has not only bruising to

9  the face and blood all over his face, but they do a CAT scan

10 and they see that he has several broken bones to his nose, he

11 has a nasal septum fracture, and he has an orbital wall

12 fracture on his left side, right below the eye socket.

13         Michael White Thunder miraculously recovers, but

14 you'll hear from him that for about three weeks he -- he just

15 has swelling in his face.  He can't eat.  He's having problems

16 sleeping.  And even to this day his nose, it's hard for him to

17 breathe through because of the beating, and he can't even

18 really close his jaw.

19         During this time, when Mr. White Thunder is in the

20 hospital, Mr. Wilkinson took off with his girlfriend.  He's

21 hiding at a residence he stays at, Bruce Freeman's house.

22 You'll hear about what happened.  Law enforcement find out that

23 he's living there, so they talk with Bruce Freeman.  He lets

24 them come in, look to see where Mr. Wilkinson is.

25         Law enforcement sees that an individual is below the

1    house in a crawl space that -- kind of in an area where they

2    can see the pants, but they don't know who it is necessarily,

3    and this individual is running back and forth in between the

4    house and below the house.  They find out later on, as he pops

5    up through the crawl space, that he is wearing -- he's not

6    wearing a shirt, he's not wearing any boots, but they find

7    boots in the room that he stays in covered in blood.

8          So law enforcement do a search warrant of the

9    residence.  They do a search warrant of the vehicle that they

10   find outside of the residence, the same vehicle that

11   Mr. Wilkinson and his girlfriend got into when they drove away.

12   In the vehicle they find blood all over the back.  There's a

13   sleeping bag soaked in blood.  They find blood on the

14   windshield -- or on the windows, blood on the door.  They find

15   blood everywhere.

16         In the house they find the boots again, and they find

17   other items that the defendant was wearing.  They're also

18   covered in blood.  FBI sends the boots that Mr. Wilkinson was

19   wearing to the lab and they test it, and the blood that was

20   found on the right boot belongs to Michael White Thunder.

21         After all this occurred and the law enforcement give

22   the defendant some time to sober up, they speak with him on

23   that same day, on April 26th, about 15 hours after this all

24   happened, and initially he denies he was even there.  He says

25   nothing happened.  "I was at the bar.  I don't really

21

1    remember."  But when pressed, says, "Okay.  I beat him up.  I

2    kicked his butt," or those words to that effect, "because he

3    was making passes at my girlfriend, so I punched him five

4    times.  I pulled him out of the vehicle, and I left him there."

5    In that interview he doesn't say anything about stomping on his

6    head, but says, yes, he did run away, and he left because he

7    was scared he was going to be arrested, scared he was going to

8    go to jail.

9            And in the interview that was conducted two months

10   later with law enforcement, he, the defendant, explains that

11   he, in fact, did kick Mr. White Thunder and that he had, in

12   fact, crawled -- hid in the crawl space.  That's important

13   because what this case is really about is the defendant's anger

14   towards Mr. White Thunder.

15           And when you see the evidence presented, you'll see

16   that Mr. White Thunder suffered serious bodily injury with

17   broken bones, the time it took him to heal.  You'll see that

18   the boots that Mr. Wilkinson used were dangerous weapons.  All

19   of this occurred on Fort Berthold Indian Reservation.  The

20   defendant is an Indian, and most importantly, the defendant was

21   in no fear for his life, no fear for his girlfriend's safety.

22   He reacted out of anger, and instead of using words to respond

23   with words, he uses fists and he uses feet.  Thank you.

24           THE COURT:  Mr. Costello, do you wish to make an

25   opening statement?

22

1          MR. COSTELLO:  Yes, Your Honor.  Your Honor, opposing

2     counsel, Derick.  Derick and Miranda had began a new

3     relationship.  It was still kind of the beginning phase of it.

4     It was exciting.  It was fun.  It was passionate.  As a matter

5     of fact, on April 25, 2016, Derick and Miranda had went out for

6     a date night, went out to get some dinner.  They went out to

7     the bar afterwards to have some drinks.  They were sitting

8     there enjoying themselves, enjoying being together when Michael

9     White Thunder walked up.

10          Now, Michael White Thunder is not in a good state of

11     mind at this point.  He's pretty depressed about a relationship

12     he had just been in.  Unfortunately, the woman he had been with

13     had cheated on him and left him recently, so he wants to sit

14     there and talk with Derick, a friend, a mutual acquaintance of

15     his, kind of about the situation.  He's very intoxicated.  He's

16     high.  He's a little out of control, but it only gets worse as

17     the night goes on.

18          He, Derick and Miranda are having -- having drinks

19     there.  Eventually Michael gets to the point where he's too

20     intoxicated that he -- he's becoming argumentative with the

21     bartender, Ms. Potts.  He's becoming argumentative with Derick.

22     They're having issues where he's making inappropriate sexual

23     passes at Miranda, inappropriate sexual comments about her.  At

24     that point the bartender cuts them off.  Derick decides to

25     leave with Miranda, finish the evening.

1           However, Michael needs a ride home.  He's far too

2    intoxicated to drive.  He's not there with anyone else, so

3    Derick decides, okay, I'll take you home.  We'll get you home

4    safely.  The government is right, you're going to see a video

5    in which they walk out the back door of that bar.  Michael

6    White Thunder is so intoxicated, he's stumbling around.  He

7    falls over.  Instead of leaving him there, instead of taking

8    him back inside and saying, "Get a cab, find another ride,"

9    Derick decides to pick him up, take him into the car and try to

10   get him home.

11          However, something happens in the vehicle.  Something

12   happens to a point where inappropriate sexual comments --

13   something more than inappropriate sexual comments.  Something

14   more is starting to happen.  Something is really happening that

15   is getting Derick frustrated and making him scared.  At one

16   point the comments Mr. White -- Mr. White Thunder are making in

17   the car get elevated a notch.  They reference a blow job,

18   running a train on this girl, comments that Derick cannot

19   stand.

20          Then eventually Michael White Thunder is so depressed

21   and he's so drunk, he starts flailing his fists around.  He's

22   kicking.  He's swinging.  He is smacking the back of Miranda's

23   seat.  Now, Miranda is the individual driving the vehicle.

24   She's in the driver's seat.  In the front passenger's seat is

25   Derick.  Michael White Thunder is sitting in the back

1    passenger's seat on Miranda's side.  He's swinging away,

2    smacking at the car seat, swinging at Miranda.  At some point

3    Miranda is terrified.  She's trying to put her head down.  She

4    is blacking out from anxiety.  She is so scared about what is

5    happening right now.

6        At some point she thinks she gets hit in the head and

7    mentions something.  She can't tell if it's Michael smacking

8    the car seat with the back of her head (sic) or his fists

9    hitting her in the head.  At that point Derick says enough is

10   enough.  He reaches back and shoves Michael back, and a scrap

11   ensues.  Derick is punching at Michael.  Michael is swinging,

12   punching back.  Punches and kicks are being thrown.  That is

13   the statement Derick provides to Special Agent Bennett in his

14   ride over to federal court on June 14th.  Punches and kicks

15   were being thrown.

16       Eventually Derick gets the upper hand.  He steps out

17   of the car.  He goes over.  He starts pulling Mr. White Thunder

18   out of the vehicle.  He starts kicking his head.  Derick is

19   making sure Michael White Thunder is not going to get back up

20   and continue in this fight.  Mike -- you're going to -- you're

21   going to see Michael White Thunder.  He is over six feet tall,

22   over 200 pounds.  Derick is about five-foot-six, between 170

23   and 180 pounds.

24       If Michael White Thunder gets up to continue that

25   fight, Derick does not know where it's going next.  He doesn't

1    know if he can stop Michael White Thunder.  He doesn't know

2    that if Michael White Thunder gets up and starts punching him

3    back and smashing his face into the cement, what's next.  What

4    -- will he stop at Derick?  Will he start assaulting Miranda

5    again?  He's drunk.  He's out of control.  Derick is afraid.

6          Now, there's one critical witness in this case that

7    really kind of explains as to why Derick felt the need to keep

8    kicking Michael White Thunder when he was down on the ground,

9    kicking him in his head.  That's the eyewitness to this case,

10   Olivia Baker.  She's out with her husband that night having --

11   her husband is drinking.  She's out with him, spending time

12   with him.

13         She's out at the Player's Pub, which is where Derick

14   and Michael had initially started drinking with Miranda, and

15   then the three of them had moved over to Legion's bar, a couple

16   blocks -- just at the end of the block, about maybe a hundred,

17   200 feet down.  Olivia is in the Player's Pub.  She gets up.

18   She walks out.  She's walking to get a pack of cigarettes.  She

19   wants to have a smoke.  She starts hearing screaming.

20         She has a -- and let me take a step back.  She has an

21   interview with law enforcement on July 26, 2016, with Special

22   Agent Bennett, who's sitting at the table.  She explains to her

23   that -- Olivia explains to her that her initial impression that

24   night is a woman is being assaulted.  She hears screaming.

25   Now, at first she can't tell who it is, but then she hears a

26

1    female screaming.  She looks over.  She sees a car rocking back

2    and forth, and it's a unique kind of scream.  It's a scream now

3    that she believes -- she knows is a woman.  She's terrified.

4    She's wondering what is happening.

5         There -- she also talks about how there are other

6    people out there that night, other people on that street, on

7    that alley walking to the liquor store, walking from the bars.

8    What's critical about her testimony isn't necessarily what she

9    saw Derick do and what she -- it is what she heard, but not

10   necessarily what she saw Derick do, but it's what she saw the

11   other people do.  Everyone could hear a woman screaming.

12        And what do these other witnesses do?  Not a single

13   one of them stops.  They, quote, unquote, scurry by.  They

14   don't stop and take out their phones and call the police.  They

15   don't go to the vehicle to see what's going on.  They keep on

16   walking.  And that community at that night, the people there

17   don't bother to intervene if a woman is being assaulted.

18        Now, Olivia is terrified.  She knows she's got to do

19   something.  She runs back to the Player's Pub.  She doesn't

20   have her cell phone on her at this point.  She runs downstairs.

21   She goes to the bartender.  She asks her to call the police.

22   The bartender is too busy to call the police, so Olivia goes

23   and finds her cell phone, calls the police herself.  In this

24   time not a single person has called the police.  You will hear

25   from the law enforcement officers, Olivia Baker is the first

27

1    one that called.  She's there to give a statement when law

2    enforcement arrives.  Not a single one of those other people

3    could be bothered to pull out their cell phone out of their

4    pocket and make a phone call.

5            At this point in time Derick -- when Derick was

6    kicking Michael, this is what he's afraid of.  He has to kick

7    Michael to make sure he's not getting back up.  He has to kick

8    Michael to make sure he can protect Miranda.

9            Now, you're going to see some troubling photos in

10   this case, and they're photos of Michael White Thunder.  I'm

11   not going to mince words.  They're -- they're pretty difficult

12   to see.  The government talked about them.  What you're not

13   going to see are troubling photos of Derick Wilkinson beaten

14   and bloodied.  But most importantly what you're not going to

15   see are photos of Miranda Fox beaten and bloodied.

16           At the end of this case we're going to ask you to

17   find Derick Wilkinson not guilty of assault resulting in

18   serious bodily injury and not guilty of assault with a

19   dangerous weapon.  Thank you.

20           THE COURT:  The government may call its first

21   witness.

22           MS. DEITZ:  Thank you, Your Honor.  The government

23   calls Katie Potts.

24                       KATIE POTTS,

25   having been first duly sworn, was examined and testified as

                              28

1    follows:

2                        DIRECT EXAMINATION

3    BY MS. DEITZ:

4    **Q.**   Please state your name.

5    A.    Katie Potts.

6    **Q.**   And, Ms. Potts, have you ever been employed at the Legion

7    bar in New Town, North Dakota?

8    A.    Yep, I managed it.

9    **Q.**   And when were you the manager of that location?

10   A.    February of 2012 until October 2015 -- or '16.

11   **Q.**   And you indicated you were the manager of that facility?

12   A.    Yes.

13   **Q.**   Can you briefly describe for the jury your job duties?

14   A.    Overseeing everything, bartending, cooking, pretty much

15   everything, hiring, firing, bouncing, all of it.

16   **Q.**   And did the -- did the Legion bar, at the time in which

17   you were the manager there, did it have a video surveillance

18   system?

19   A.    Yes.

20   **Q.**   And did your job duties encompass reviewing that

21   surveillance system, installing it, things like that?

22   A.    Yes.

23   **Q.**   So are you familiar with how that video surveillance

24   system works?

25   A.    Yes.

29

1   **Q.**   Now, we're going to come back to that after a little bit

2   here.  Were you working at the Legion in New Town, North

3   Dakota, on the evening of April 25th, going into April 26th of

4   2016?

5   A.   Yes.

6   **Q.**   What time did you arrive at work that day?

7   A.   10:00 a.m.

8   **Q.**   And that being on the 25th?

9   A.   Yes.

10  **Q.**   What time it did your shift end?

11  A.   2:00 a.m.

12  **Q.**   So opening and closing?

13  A.   Yep.

14  **Q.**   Did anything happen that night that was brought to your

15  attention, anything kind of odd?

16  A.   The cops came in looking for people.

17  **Q.**   And what did the law enforcement specifically request of

18  you that evening?

19  A.   They wanted to view the surveillance.

20  **Q.**   Now I want to take you back for a little bit before law

21  enforcement shows up.  Do you recall the defendant, Derick

22  Wilkinson, coming into the bar?

23  A.   Yes.

24  **Q.**   And are you familiar with the defendant, Derick Wilkinson?

25  A.   Yep.

1    **Q.**   And how do you know him?

2    A.    He would come into the bar.

3    **Q.**   So you were familiar with him prior to this night?

4    A.    Yes.

5    **Q.**   Approximately what time did he come into the Legion?

6    A.    About 10:30.

7    **Q.**   And was anyone with him?

8    A.    There were two other individuals.

9    **Q.**   And do you -- a male, female?

10   A.    One male and one female.

11   **Q.**   Did you know either of those individuals at the time?

12   A.    I know their faces.  I didn't -- I don't know their names.

13   **Q.**   Did you -- so you didn't know the male or that -- that

14   other male or the female at the time?

15   A.    No.

16   **Q.**   And do you recall those individuals' demeanor when you

17   encountered them?

18   A.    They were all very intoxicated.

19   **Q.**   All three of them were very intoxicated?

20   A.    Yes.

21   **Q.**   Now I want to ask you a question about that level of

22   intoxication.  Did you notice anything odd with that behavior,

23   or did it just seem to be normal drunk behavior?

24   A.    Normal drunk behavior, just very drunk.

25   **Q.**   Do you have any experience with seeing individuals under

1   the influence of controlled substances?

2   A.   Yes.

3   **Q.**   Specifically methamphetamine?

4   A.   Yep.

5   **Q.**   And what do you think of when you see someone on meth?

6   A.   Just very fidgety, meth mouth, very -- I don't know how to

7   explain it.

8   **Q.**   What do you mean by "meth mouth"?

9   A.   Goes like (indicating).

10   **Q.**   Kind of like grinding of the teeth?

11   A.   Grinding of the teeth all the time.

12   **Q.**   And did you notice that with any of those individuals?

13   A.   No.

14   **Q.**   Now, while your -- were you the only bartender that night?

15   A.   Yes.

16   **Q.**   And so you're the only one providing service to those

17   individuals.

18   A.   Yes.

19   **Q.**   So what did you notice of them while you're interacting

20   with them?

21   A.   They were all just very drunk.  One was passing out, so I

22   had to ask them to leave.

23   **Q.**   Which one was passing out?

24   A.   Not Derick, the other male was passing out, so I asked

25   Derick to take them, they had to get going because he was the

1    only halfway coherent one.

2    Q.   Did you serve any of them any alcohol?

3    A.   I had served them one drink, and then I took it away.

4    Q.   And prior to taking the drink away or maybe even after, do

5    you recall hearing any conversation between any of them?

6    A.   Yes.

7    Q.   And what specifically do you recall?

8    A.   They were talking about all of them having sex with the

9    one girl.

10   Q.   And when you say "they," who do you mean?

11   A.   Derick and the other male.

12   Q.   And was the female participating in the conversation?

13   A.   No.

14   Q.   So it was just between the two males?

15   A.   Yes.

16   Q.   And do you recall any specifics -- any other specifics

17   about the conversation?

18   A.   No.

19   Q.   And how long were those individuals at the bar?

20   A.   Half an hour.

21   Q.   Did they all leave together?

22   A.   Yes.

23   Q.   And did they leave on their own, or was it because you

24   asked them to leave?

25   A.   I had to ask them to leave.

1    **Q.**   And what happens next?  What's the next thing you recall

2    happening?

3    A.   They left, and somebody ran downstairs and said the cops

4    were outside.  And then two of the female officers came down

5    and checked through the -- asked to see my surveillance.

6    **Q.**   And to your knowledge, was the incident -- well, not the

7    incident.  Excuse me.  Was -- did your video surveillance

8    system pick up the individuals leaving the bar?

9    A.   Leaving the bar, yes.

10   **Q.**   And your security system, I just want to talk a little bit

11   about that.  Does it have a timestamp?  How does it work?

12   A.   It has a timestamp with the date and the time.

13   **Q.**   And can you tell me a little bit about this video

14   surveillance system, how it works?

15   A.   There's 11 different cameras throughout the building and

16   outside of the building.  You can recall from 30 days.  It

17   saves all the information.  You can go through it, watch

18   whatever you need to.

19   **Q.**   And does it work on a -- does it run 24/7?

20   A.   Yes.

21          THE COURT:  Could you pull that microphone over --

22          THE WITNESS:  I'm sorry.

23          THE COURT:  -- closer to you, please?  Thank you.

24   **Q.**   (MS. DEITZ CONTINUING)  And you said it runs on a

25   continuous roll and you can go back 30 days.

1   A.   Correct.

2   Q.   And was your video surveillance working -- system working

3   on the incident in question --

4   A.   Yes.

5   Q.   -- on the night in question?  Ms. Potts, I'm bringing you

6   what's marked as Government's Exhibit Number 1.  Do you

7   recognize this disk?

8   A.   Yes.

9   Q.   And what is it?

10  A.   It is the surveillance from the night of the incident.

11  Q.   And how do you know?

12  A.   Because my initials and the date that I looked at it were

13  on there.

14  Q.   So you've actually viewed what is on this disk in

15  question?

16  A.   Yes.

17        MS. DEITZ:  Your Honor, government would offer

18  Exhibit Number 1.

19        MR. COSTELLO:  No objections.

20        THE COURT:  Exhibit 1 is received.

21        MS. DEITZ:  Permission to publish?

22        THE COURT:  You may.  And how long is it?

23        MS. DEITZ:  Maybe two minutes.

24        THE COURT:  Okay.

25        (Government's Exhibit 1 is played in open court.)

1  **Q.**  (MS. DEITZ CONTINUING)  Ms. Potts, is that what you recall

2  of the video that you viewed?

3  A.   Yes.

4  **Q.**   And there were two individuals in that video, is that

5  correct?

6  A.   Yes.

7  **Q.**   Do you recognize either of those individuals?

8  A.   Yes.  Derick was carrying the other one that was in the

9  bar.

10  **Q.**   So there was a male in a blue sweatshirt and then a male

11  wearing black.  Which one is which?

12  A.   The male in the black was Derick.

13  **Q.**   So the male in the blue sweatshirt was the other male with

14  Derick that --

15  A.   Yes.

16  **Q.**   -- you didn't recognize.

17  A.   Yep.

18         MS. DEITZ:  I have nothing further, Your Honor.

19         THE COURT:  Mr. Costello.

20                    CROSS-EXAMINATION

21  BY MR. COSTELLO:

22  **Q.**   Ms. Potts, do you remember talking with law enforcement

23  that night when they came into the bar?

24  A.   Yes.

25  **Q.**   It was two female officers?

1    A.   Yes.

2    **Q.**   Kristy Parisien and Officer -- and the --

3    A.   And Officer Cruz.

4    **Q.**   Yes, Criselda Cruz.  Do you know Criselda Cruz?

5    A.   Yes.

6    **Q.**   And you remember talking with them and providing a

7    statement?

8    A.   What's that?

9    **Q.**   Do you remember talking with them that night and kind of

10   providing a statement?

11   A.   A little bit.

12   **Q.**   A little bit.  Do you remember telling Officer Cruz that

13   you threw them out of the bar because they were intoxicated and

14   arguing amongst the three of them?

15   A.   Yes.

16   **Q.**   And that was Derick, Michael and Miranda.

17   A.   Yes.

18   **Q.**   Yeah, so they were arguing, and you couldn't have them

19   there, especially given how intoxicated they were, so you asked

20   them to leave.

21   A.   Yes.

22          MR. COSTELLO:  No further questions, Your Honor.

23          THE COURT:  Anything else?

24          MS. DEITZ:  No, Your Honor.  Thank you.

25          THE COURT:  All right.  Thank you.  You may step

1    down.  You can call your next witness.

2         MS. DEITZ:  Thank you, Your Honor.  Before we go to

3    our next witness, the government would ask that Ms. Potts be

4    released from her subpoena.

5         MR. COSTELLO:  We're okay with her being released,

6    Your Honor.

7         THE COURT:  All right.  You are excused, ma'am.

8    You're free to leave or free to stay.  You're not bound by the

9    subpoena anymore.

10        MR. O'KONEK:  United States calls Officer Criselda

11   Cruz.

12                   OFFICER CRISELDA CRUZ,

13   having been first duly sworn, was examined and testified as

14   follows:

15                   DIRECT EXAMINATION

16   BY MR. O'KONEK:

17   **Q.**   Good afternoon.  Officer Cruz, where do you currently

18   work?

19   A.   Three Affiliated Tribes Law Enforcement.

20   **Q.**   And what is your duty position?

21   A.   Patrol officer.

22   **Q.**   For how long --

23        THE COURT:  Could you slide up and speak as close as

24   you can into that microphone, please.

25        THE WITNESS:  Sorry.

                              38

1   **Q.**   (MR. O'KONEK CONTINUING)  For how long have you worked at

2   Three Affiliated Tribes?

3   A.   About four years and ten months.

4   **Q.**   All as a patrol officer?

5   A.   Yes.

6   **Q.**   What are some of your job duties?

7   A.   Patrol, answering to calls of service, different aspects

8   of law enforcement, accidents, fights, domestics.

9   **Q.**   Officer Cruz, how do you get told that you need to go to a

10   scene?  What's the mechanism for that?

11   A.   Our dispatch center sends us to calls as they come in.

12   **Q.**   Now, were you working on the night of April 25th, through

13   morning of April 26th of this year?

14   A.   Yes.

15   **Q.**   And take us through what you were doing.  When did you get

16   on shift that day?

17   A.   I do not recall the exact time.

18   **Q.**   Okay.  But were you -- did you receive a dispatch about an

19   individual being -- laying on the street in New Town, North

20   Dakota?

21   A.   Yes, I did.

22   **Q.**   Just take us through what happened.  What was the

23   information you received?

24   A.   We were advised that there was a male that was lying on

25   the ground behind the Legion bar.

1   **Q.**   Okay.  Now, when you say "the Legion bar," can you kind of

2   give us just a description of -- where is the Legion bar

3   located in New Town, North Dakota?

4   A.   It would be located right off of Main Street.  The

5   location that was given to us was the back entryway of the

6   Legion bar.

7   **Q.**   How far away is the Legion bar from, let's say, like the

8   Player's Pub bar?

9   A.   About half a block.

10   **Q.**   So within walking distance?

11   A.   Yes.

12   **Q.**   What was the weather like that day, late on the 25th?

13   A.   There was precipitation between rain and snow, and it was

14   cold.

15   **Q.**   Now, when you arrived on scene, what did you find?

16   A.   I observed Officer Parisien, and a male lying on the rear

17   entry of the Legion bar.

18   **Q.**   Now, when you say that you arrived, you saw Officer

19   Parisien.  Was she the first person that arrived on scene?

20   A.   Yes.

21   **Q.**   And so you were the second.

22   A.   Yes.

23   **Q.**   So take us through -- you said you found a male lying on

24   kind of the street area.  What did he look like?

25   A.   I observed half of his body on the curb and a portion of

1    his body on the road in a puddle of water.

2    **Q.**   When you say "a puddle of water," can you describe like

3    how -- how big was this puddle?  What did it look like?

4    A.   It appeared to be big enough to where we were concerned

5    for his safety.

6    **Q.**   When you say you were concerned for his safety, what do

7    you mean?

8    A.   The amount of water around his person was significant

9    where I felt we had to move him.

10   **Q.**   Now, at this time was the male moving?

11   A.   No.

12   **Q.**   Was he conscious or unconscious?

13   A.   Not responsive.

14   **Q.**   And how did you tell that?

15   A.   He was not waking up to my voice.  He wasn't responding to

16   rubs or shaking.

17   **Q.**   Did he have any injuries?

18   A.   There appeared to be injuries to his face.

19   **Q.**   Okay.  Was he -- did he have blood on his face?

20   A.   Yes.

21   **Q.**   Now, what steps did you take once you found this

22   individual bloodied in a puddle?

23   A.   I did place him in a C collar, and we did move him out of

24   the water using a blanket to avoid moving him too much.

25   **Q.**   Now, was he cold to the touch?

1    A.    Yes.

2    **Q.**    And why did you put a C collar on his neck?

3    A.    It appeared he had injuries to his face.

4    **Q.**    What else did you do?  What other steps did you take to

5    treat him?

6    A.    We covered him with blankets as it was cold that evening

7    and waited for the ambulance to arrive.  I was listening for

8    his breathing.  He did appear to be breathing, but not

9    responsive.

10   **Q.**    And you arrived on scene approximately 1 o'clock in the

11   morning on the 26th?

12   A.    Yes.

13   **Q.**    What time did the ambulance show up?

14   A.    I don't recall the exact time, but it was minutes after.

15   I don't remember.

16   **Q.**    When you -- did you have to make the call, or did somebody

17   from law enforcement have to make the call for the ambulance?

18   A.    Yes, I believe Officer Parisien had requested ambulance.

19   **Q.**    Now, when you found this individual in this puddle, did he

20   have any identification on him?

21   A.    No.

22   **Q.**    At the time did you know who he was?

23   A.    No.

24   **Q.**    So prior to the ambulance arriving, did you take any steps

25   to investigate what had happened?

1   A.   Yes.  I was advised that there was a potential individual

2   that had seen the incident, and I was told to locate.

3   **Q.**   And who was that individual?

4   A.   She was later identified as Olivia Baker.

5   **Q.**   And did you actually speak with her?

6   A.   Yes.

7   **Q.**   Without getting into what she said specifically, what did

8   she tell you that led you to conduct your investigation

9   further?

10  A.   She approached me and advised she would complete a

11  statement at a later time.

12  **Q.**   At this time did she explain that she had witnessed the --

13  Derick assault -- excuse me, the defendant, Derick Wilkinson,

14  assaulting an individual?

15  A.   Yes.

16  **Q.**   Did she appear at that time to be under the influence of

17  any substances?

18  A.   No.

19  **Q.**   Was she able to give you a coherent version of events?

20  A.   Yes.

21  **Q.**   Did you smell any alcohol on her?

22  A.   No.

23  **Q.**   What other steps did you take after speaking with Ms.

24  Baker about what had happened?  What did you do after that?

25  A.   I did return to the ambulance and continued to look for

43

1    identification, as I still didn't know who he was.

2    **Q.**   When the ambulance got there, did you take photographs of

3    the victim?

4    A.   Yes.

5             MR. O'KONEK:  May I approach, Your Honor?

6             THE COURT:  You may.

7             MR. O'KONEK:  I'm handing the witness Government's

8    Exhibit 2.

9    **Q.**   (MR. O'KONEK CONTINUING)  Are these the photographs that

10   you had taken of the victim?

11   A.   Yes.

12   **Q.**   Now, are those photographs a fair and accurate depiction

13   of how the victim looked when you -- when he was placed in the

14   ambulance on the 26th of April of this year?

15   A.   Yes.

16             MR. O'KONEK:  We would request that Government's

17   Exhibit 2 be moved into evidence.

18             MS. MONTEIRO:  No objection.

19             THE COURT:  Does it consist of just the one page,

20   or --

21             MR. O'KONEK:  Just one page, two photographs, Your

22   Honor.

23             THE COURT:  All right.  Exhibit 2 will be received.

24             MR. O'KONEK:  Permission to publish?

25             THE COURT:  You may.

1   **Q.**   (MR. O'KONEK CONTINUING)  Now I want to talk to you about

2   each of those photos kind of in turn.  Now, what is this a

3   photograph of, the first one that we're zooming in on, the one

4   in the upper portion of the piece of paper?

5   **A.**   It's a picture of the victim.

6   **Q.**   Okay.  Now, what is in his mouth at this time?

7   **A.**   I believe it's a respirator the crew had to place in.

8   **Q.**   Do you know why that the crew had to do that?

9   **A.**   He wasn't breathing.

10   **Q.**   Now, at the time that you took this photograph, you had

11   mentioned that you tried to see if he would respond.  At any

12   time when you were treating him or placing him in the

13   ambulance, did he respond in any way to any commands that you

14   had made?

15   **A.**   No.

16   **Q.**   Now I want to go down to the second photograph.  What is

17   this a photograph of?

18   **A.**   That's a closer view of his left profile.

19   **Q.**   And at that time it appears that he had blood on his nose.

20   Is that what you had found when you found him in the puddle

21   that day?

22   **A.**   Yes.

23   **Q.**   And from that photograph it appears that his left eye is

24   swollen shut?

25   **A.**   Yes.

1   **Q.**   Is that what you had noticed during the 26th of April?

2   A.   Yes.

3   **Q.**   Now, after -- sometime during the night did you actually

4   speak with the manager of the Legion bar?

5   A.   Yes.

6   **Q.**   Katie Potts?

7   A.   Yes.

8   **Q.**   Why did you do that?

9   A.   There was -- I had observed a camera on the outside of the

10  door where we had found the individual.

11  **Q.**   And at that time were you trying to get footage of what

12  had happened that night potentially?

13  A.   Yes.

14  **Q.**   Were you able to get said footage?

15  A.   No.

16  **Q.**   Why not?

17  A.   Precipitation and weather conditions.  You couldn't see

18  the actual incident from that camera.

19  **Q.**   Now, at that time was Mr. Wilkinson present at the Legion

20  bar or outside the Legion bar?

21  A.   No.

22  **Q.**   What steps did you take to try to find him, to try to find

23  out what his location was?

24  A.   At this point there was different officers.  We were all

25  taking tasks on what to do.  At one point I was asked to look

1    for the individual and a said vehicle that was described.

2    **Q.**   What was the description of the vehicle that you had

3    received?

4    A.   I don't recall.

5    **Q.**   But you -- ultimately was there some point where you had

6    received information that Mr. Wilkinson had taken off in a

7    vehicle?

8    A.   Yes.

9    **Q.**   And were you and other officers looking for that vehicle?

10   A.   Yes.

11            MR. O'KONEK:  No further questions, Your Honor.

12                      CROSS-EXAMINATION

13   BY MS. MONTEIRO:

14   **Q.**   Good afternoon.  Is it true that you were dispatched to

15   the scene about 1:01 a.m. that night?

16   A.   Yes.

17            THE COURT:  Could you pull that --

18            MS. MONTEIRO:  Sure.

19            THE COURT:  -- microphone close to yourself as well?

20            MS. MONTEIRO:  Is that better?

21            THE COURT:  That's much better.

22   **Q.**   (MS. MONTEIRO CONTINUING)  And you arrived at 1:03, so

23   within two minutes, is that right?

24   A.   Yes.

25            MS. MONTEIRO:  All right.  Nothing further.  Thank

1    you.

2             MR. O'KONEK:  No redirect, Your Honor.

3             THE COURT:  Anyone have any objection to this witness

4    being excused?

5             MS. MONTEIRO:  No.

6             MR. O'KONEK:  We would just like to -- we'll -- we'd

7    like to keep her for just a bit longer.

8             THE COURT:  All right.  So you may step down.  You're

9    not excused completely, but you are free to step off the

10   witness stand at this time.  Thank you.  Your next witness.

11            MR. O'KONEK:  The United States calls Michael White

12   Thunder.

13                    MICHAEL WHITE THUNDER,

14   having been first duly sworn, was examined and testified as

15   follows:

16                    DIRECT EXAMINATION

17   BY MR. O'KONEK:

18   **Q.**   Good afternoon, Mr. White Thunder.  I want to talk a

19   little bit about just your background.  Where do you currently

20   live?

21   A.    Sand Hill, Fifth Street North, 72.

22   **Q.**   And is that in -- where?  What city?

23   A.    New Town.

24   **Q.**   New Town, North Dakota?

25   A.    Yes.

1   **Q.**   And is that part of the Fort Berthold Indian Reservation?

2   A.   Yes.

3   **Q.**   And for how long have you lived on the Fort Berthold

4   Indian Reservation?

5   A.   I'd say 22 years of my life.

6   **Q.**   Are you pretty confident that you know the boundaries of

7   the Fort Berthold Indian Reservation?

8   A.   Yes.

9   **Q.**   Is New Town, North Dakota, within those boundaries?

10   A.   Yes.

11   **Q.**   And New Town is a city in North Dakota?

12   A.   A town?

13   **Q.**   It's a town in North Dakota.

14   A.   Yes.

15   **Q.**   I want to ask a couple of questions about how you know

16   Mr. Wilkinson.  Do you know him?

17   A.   No, to be honest, I don't.

18   **Q.**   And so you say you don't know him.  What was your

19   knowledge prior to the 26th of April?  What did you know about

20   Mr. Wilkinson?  Were you friends, co-workers, anything like

21   that?

22   A.   I just -- I just -- mutual friends.

23   **Q.**   Okay.  Did you know an individual by the name of Miranda

24   Fox?

25   A.   No.

1  **Q.**  So take us through what happened on April 25th, that night

2  of April 25th.  What were you doing that day?

3  A.   I was -- I was getting inebriated and -- due to personal

4  issues, and I guess I went over my limit.

5  **Q.**  And when you say you were getting inebriated, you were

6  drinking alcohol?

7  A.   Yes.

8  **Q.**  And you went over your limit.  Are there parts of that you

9  don't remember?

10  A.   Yeah, I just remember trying to -- I barely remember

11  trying to find a ride from the casino like to town.

12  **Q.**  And for some of us -- like can you describe -- when you

13  say "the casino," are you talking about Four Bears Casino?

14  A.   Yes.

15  **Q.**  How far is that away from New Town?

16  A.   About three miles west of New Town.

17  **Q.**  And do you have to go across a bridge?

18  A.   Yes.

19  **Q.**  You said you were trying to look for a ride.  So you were

20  drinking at the casino.  What were you -- where were you trying

21  to get a ride to?

22  A.   Just to town so I can stay at a relative's place.

23  **Q.**  And what's the next thing you remember after trying to get

24  a ride into town from the Four Bears Casino?

25  A.   Just coming on the bridge, and that's that, and then --

50

1   **Q.**   Say that -- I couldn't hear the last part.

2   A.   Just coming across the bridge.

3   **Q.**   Okay.  And what's your next memory after that?

4   A.   And that's that, and then coming to in the hospital.

5   **Q.**   When you say "coming to in the hospital," you mean waking

6   up in the hospital in Minot, North Dakota?

7   A.   Yes.

8   **Q.**   All right.  Take us through your first -- your first

9   thoughts.  What immediately came to your mind when you woke up

10   in the hospital?

11   A.   Just where I was, wondering where I was at.

12   **Q.**   Were you confused?

13   A.   Yeah.

14   **Q.**   Why were you confused?

15   A.   Fatigue, dehydration, a bright light.

16   **Q.**   Could you see out of both eyes?

17   A.   No, just one.

18   **Q.**   What eye couldn't you see out of?

19   A.   The right one.

20   **Q.**   The right one.  And did that concern you?

21   A.   Yes, just wondering what happened.

22   **Q.**   When you said earlier that you were a little bit confused,

23   did you have anything in your mouth when you woke up?

24   A.   I had something down my throat.  I guess the doctors put

25   something in my throat, or something.

1   **Q.**   Okay.  Do you remember them doing that in the first place?

2   **A.**   No.

3   **Q.**   At what point did they actually take that out?  Was it

4   after you woke up they took it out?

5   **A.**   Yes.

6   **Q.**   So you woke up in the ICU.  Did you -- at that point how

7   were you feeling?

8   **A.**   Like just -- I don't know.  Just wondering.

9   **Q.**   Were -- were you in pain?

10  **A.**   Yes.

11  **Q.**   And you mentioned that you had, you know, a tube in your

12  mouth.  Did that hurt when it was in your mouth or your throat?

13  **A.**   I couldn't breathe.

14  **Q.**   So ultimately how long were you at the hospital?

15  **A.**   I'd say nine, ten hours.

16  **Q.**   Nine or ten hours?

17  **A.**   Yes.

18  **Q.**   From after you woke up?

19  **A.**   Yes.

20  **Q.**   And at some point did family members come and try to get

21  you from the hospital?

22  **A.**   Yes.

23  **Q.**   Now, who came and got you?

24  **A.**   My mom, relatives.  That's about it.

25  **Q.**   And at any time did the doctors tell you what -- what had

1    happened or what your injuries were?

2    A.    No, they said they were giving my x-ray results, and I

3    didn't stay there long enough for them.

4    **Q.**    And why didn't you stay long enough?  What did you end up

5    doing?

6    A.    I just don't like hospitals.  Just wanted to get out of

7    there.

8    **Q.**    So where did you go?

9    A.    I went back to the -- back to the reservation.

10   **Q.**    Okay.  And who did you stay with?

11   A.    I was staying with my uncle, Bentley Heart, Junior.

12   **Q.**    And when you say you stayed with your uncle, were you

13   feeling good after you left the hospital or were you feeling

14   bad?

15   A.    I was feeling good.

16   **Q.**    You were feeling okay?

17   A.    Yeah.

18   **Q.**    But there was a time when you went to the -- living with

19   your uncle, that you had to rest around for about a

20   week-and-a-half?

21   A.    Yeah.

22   **Q.**    Tell us what was going on.  How long did the puffiness and

23   things like that on your face last?

24   A.    Two weeks.

25   **Q.**    Two weeks?

1    A.   Yeah.

2    **Q.**   Would you have any problems doing anything that you

3    couldn't -- you have problems doing things that you could have

4    done before the assault?

5    A.   Just eating hard food.  That's about it.

6    **Q.**   Okay.  Did you ever have any problems with your jaw since

7    this happened?

8    A.   No.

9    **Q.**   You ever have problems with your jaw biting down?

10   A.   In the beginning, like within the first three weeks.

11   **Q.**   Okay.

12   A.   Yeah.

13   **Q.**   So in the first three weeks you mentioned that you had

14   problems closing your jaw?

15   A.   Just biting down, yeah.

16   **Q.**   And your face hurt for about three weeks?

17   A.   Yeah, about that, yeah.

18   **Q.**   And what about breathing?  Did you still have any problems

19   breathing?

20   A.   It's just when I sleep.  Like when I turn a certain way,

21   my nose -- I don't know.  The nasal is messed up, or something.

22   **Q.**   So you say the nose -- the nasal portion is messed up, so

23   you still have problems breathing through your nose?

24   A.   A little bit, yeah.

25   **Q.**   And after all this happened, were you staying at your

1    uncle's house so you could get better, recover from your

2    wounds?

3    A.   Yeah.

4         MR. O'KONEK:  Thank you.  Those are the only

5    questions I have.

6                    <u>CROSS-EXAMINATION</u>

7    <u>BY MS. MONTEIRO:</u>

8    **Q.**   Hello, Mr. White Thunder.

9    A.   Hello.

10   **Q.**   How old are you, sir, 26 years old?

11   A.   Twenty-four.

12   **Q.**   All right.  And what is your height?

13   A.   Six-two.

14   **Q.**   And what's your weight?

15   A.   Two-forty.

16   **Q.**   All right.  So you did previously know Mr. Wilkinson,

17   though, is that correct?

18   A.   Just through mutual friends.  That's about it.

19   **Q.**   You knew him through your ex-girlfriend, Skylar Moran,

20   though, is that right?

21   A.   Yes, he was with Stephanie Moran.  That would be Skylar

22   Moran's sister.

23   **Q.**   Okay.  So the two of you were dating the sisters, Skylar

24   and Stephanie Moran.

25   A.   Yes.

1  **Q.**   And you knew Mr. Wilkinson had children with Stephanie

2  Moran, correct?

3  A.   Yes.

4  **Q.**   And the two of you socialized from time to time, was that

5  right?

6  A.   Yeah, at parties or stuff.

7  **Q.**   So you went out to parties together, correct?

8  A.   Not together, but I'd see him around.  That's about it.

9  **Q.**   And you went to the bar together from time to time, is

10 that right?

11 A.   Just the people -- two people I knew, mutual.  Mutual

12 friends.

13 **Q.**   So you would meet him at the bar with mutual friends.

14 A.   Yes.

15 **Q.**   And, now, you used to hang out at the Player's Pub bar, is

16 that correct?

17 A.   Yes.

18 **Q.**   And the Player's Pub, Mr. Wilkinson was a bartender there,

19 is that right?

20 A.   Yeah.

21 **Q.**   And you'd go in there and he'd serve you alcohol.  He'd

22 wait on you, right?

23 A.   Yes.

24 **Q.**   In fact, you were in the Player's Pub a couple days before

25 this incident, and Mr. Wilkinson was waiting on you, is that

56

1    right?

2    A.    I do not know.

3    Q.    Do you remember going in there on a Saturday with your

4    girlfriend, Skylar Moran, or your ex -- I think it's your

5    ex-girlfriend now?

6    A.    Maybe.

7    Q.    Okay.  And when you went in there on that Saturday, you

8    drank so much that Mr. Wilkinson had to cut you off?  Do you

9    remember that?

10   A.    Not that I know, no.

11   Q.    Okay.  You don't remember that?  Do you remember when you

12   were there, that there was a guy named Goon on that Saturday

13   night that was there as well?

14   A.    Can I ask like the date of when this was all happening?

15   Q.    This would have been the Saturday before this incident

16   occurred that landed you in the hospital, so it probably would

17   have been the 23rd, I would say, 23rd, 24th.

18   A.    I would not know.  I mean --

19   Q.    Do you remember being in the bar and encountering a guy

20   named Goon when you were there with your girlfriend, Skylar

21   Moran?

22   A.    No.

23   Q.    Okay.  Do you remember fighting Goon in the Player's Pub?

24         MR. O'KONEK:  Objection, improper character evidence.

25         MS. MONTEIRO:  Well, can we approach, Your Honor?

1    Would you like us to approach?

2              THE COURT:  Sure.

3              MS. MONTEIRO:  Okay.

4              (At the Court bench with counsel, out of the hearing

5    of the jury.)

6              MS. MONTEIRO:  This is not going to Mr. White

7    Thunder's character.  This is going to, A, why he was angry

8    with Wilkinson and why this whole thing started out; and, B,

9    Mr. White Thunder was apparently fighting with this Goon

10   character in the bar two days before, and that could have

11   explained how some of his injuries occurred.  But it's more

12   being offered to show that there was some type of anger that

13   Mr. White Thunder had towards Mr. Wilkinson.

14             THE COURT:  So did Wilkinson kick him out of the bar?

15             MS. MONTEIRO:  Yes, he kicked him out of the bar, and

16   then --

17             THE COURT:  So then why don't you just stick to that

18   issue rather than bring up the specific instance of --

19             MR. COSTELLO:  Well, Mr. Wilkinson says he got in

20   between them to stop them from fighting.  And it also goes to

21   the fact that this guy was fighting two days prior to this

22   incident, and that could be responsible for his injuries, and

23   that Skylar Moran was there as well, and Mr. White Thunder

24   blamed Mr. Wilkinson for kicking him out, breaking up the

25   fight.  And then this Skylar ended up cheating on Mr. White

1    Thunder.

2              THE COURT:  We got a real soap opera here.

3              MS. MONTEIRO:  I know it's a soap opera.  I know.

4              MR. O'KONEK:  Our objection is -- our objection is

5    the 404(b), 405 to specific instances of conduct of fighting.

6    We filed a motion in limine about this.  This is something that

7    defense could have brought up a couple days ago, when we had

8    this hearing about this issue.

9              MS. MONTEIRO:  Well, we didn't realize there was a

10   fight until just -- well, this incident with Goon was discussed

11   before, but we didn't realize there was an actual fight between

12   the two.

13             THE COURT:  Well, I doubt that that fight had

14   anything to do with the injuries that we saw on the picture.

15   I'll allow some leeway, but let's get to the fact --

16             MS. MONTEIRO:  Okay.

17             THE COURT:  -- he got kicked out.  We don't need to

18   talk about another brawl in New Town.

19             MS. MONTEIRO:  Okay.

20             (In open court with the defendant, counsel, and the

21   jury present.)

22   Q.   (MS. MONTEIRO CONTINUING)  So, Mr. White Thunder, do you

23   remember having a fight with this Goon person on that Saturday

24   night at the Player's Pub?

25   A.   It really wasn't a fight.  It was just making a decision

59

1   on whether to go out to drink more or not.

2   **Q.**   Whether to what?

3   A.   Whether to go and drink more or not.

4   **Q.**   Okay.  And -- but do you remember Mr. Wilkinson kicking

5   you out of the bar and cutting you off that night?

6   A.   As far as I know, I know that me and Goon and Skylar at

7   the time being, we were just going bar to bar, but -- me and

8   Goon -- well, my friend, Goon.  All I remember was just trying

9   to, you know, tell him to stop, you know, go home, whatever.

10  **Q.**   There was some type of altercation that went on, and you

11  left the bar, is that correct, and Skylar and Goon stayed

12  there?

13  A.   I think so, yes.

14  **Q.**   Okay.  And then that night then Skylar and Goon ended up

15  sleeping together behind your back, is that correct?

16  A.   As far as I know, I guess, yeah.

17  **Q.**   And that was one of -- and you were upset with

18  Mr. Wilkinson for cutting you off and kicking you out of the

19  bar and kind of facilitating this cheating that had occurred.

20  A.   No.  Before all that, I was just -- I left town, and then

21  when I came back to town just to help some relatives do some

22  construction, and that was that, and then I guess I went over

23  my limit.  But the time being between Skylar and Goon, they're

24  related and they -- Goon was just looking after Skylar, and I

25  remember like that -- not the night that happened, but the

1    night you're talking about Goon and Skylar, before that

2    happened, we were over at a house party, me and Skylar and

3    Goon, and then I ended up leaving -- just leaving because there

4    was people there I didn't like, so I ended up leaving, on

5    Dakota Drive, and then that's when Goon let Skylar stay at his

6    place, and then that's it.

7    **Q.**   That's when she cheated on you.

8    **A.**   I just -- just for the time being, I don't -- I didn't

9    know what happened, but Skylar's dad was telling me that

10   they're related, so maybe Goon was just letting -- let her stay

11   at her (sic) house, or something.

12   **Q.**   Okay.  Where were you living at the time of this incident?

13   **A.**   I was living with my uncle, Bentley Heart, Junior, in

14   Parshall.

15   **Q.**   That's Bentley Heart, Junior?

16   **A.**   Yes.

17   **Q.**   And is Bentley married to a Betty Mulluk-Heart?

18   **A.**   Yes.

19   **Q.**   All right.  So Bentley is your uncle.

20   **A.**   Yes.

21   **Q.**   And you had lived with Bentley and Betty off and on, is

22   that right?

23   **A.**   Yes.

24   **Q.**   They'd kind of let you stay there when you didn't have a

25   place to go?

1    A.    Yes.

2    Q.    Now, on the day of the incident you said you had been

3    basically drinking all day, correct?

4    A.    Yes.

5    Q.    And had you been -- you had been drinking at your uncle's,

6    Bentley Heart's house?

7    A.    No, I was drinking at a relative's on Sanish all day.

8    Q.    Okay.  You were communicating with Bentley and Betty

9    throughout the night, though, is that correct?

10   A.    Yes, they were just checking on me.

11   Q.    Okay.

12   A.    If I needed a ride, or anything.

13   Q.    And you told them you wanted to come back to the house

14   there in Parshall, correct?

15   A.    Yes.

16   Q.    And is it true that they told you no, you could not come

17   back because you had been using -- using methamphetamine?

18   A.    No.  I told them that -- because they got -- they had

19   their daughter with them, and then they said they were -- they

20   were going to come get me, but I told them not to because of

21   their daughter.

22   Q.    They didn't want you there when you had been using

23   methamphetamine, though, is that correct?

24   A.    No.

25   Q.    No, they didn't want you there, or, no, it's not correct?

1    A.   That's -- that's not correct.

2    Q.   All right.  On the day of this incident, though, you had

3    been using -- using methamphetamine, right?

4    A.   Yes.

5    Q.   You had been using it?

6    A.   Yes.

7    Q.   In fact, you had been on a week-long bender, meth bender.

8    A.   Just alcohol bender.

9    Q.   Okay.  When -- but not a week-long meth bender?

10   A.   No.

11   Q.   And after Bentley Heart then -- or after the relative in

12   Sanish, you went to the casino and were drinking there?

13   A.   Yes.

14   Q.   And the last thing you remember, I think, is that a guy in

15   his forties was agreeing to drive you into town, right?

16   A.   No, it was -- there was a friend's grandma that was

17   willing to take me to New Town.

18   Q.   Okay.  So you found someone that was willing to drive you

19   from the casino to New Town.

20   A.   Yes.

21   Q.   And the last recollection you have is that car ride into

22   New Town?

23   A.   Yes.

24   Q.   And you have no idea what happened after that, right?

25   A.   No.

1    **Q.**   Because you were under the influence of alcohol and you

2    were under the influence of methamphetamine.

3    A.   Yes.

4    **Q.**   You can't remember a single thing.

5    A.   No.

6    **Q.**   You don't remember going to the Player's Pub?

7    A.   No.

8    **Q.**   You don't remember being with Derick and Miranda?

9    A.   No.

10   **Q.**   You don't remember being at the Legion with them?

11   A.   No.

12   **Q.**   You don't remember them agreeing to give you a ride home,

13   right?

14   A.   No, I don't.

15   **Q.**   And you have no idea what you were saying.

16   A.   No, I don't.

17   **Q.**   You have no idea what you were doing.

18   A.   No.

19   **Q.**   You could have been saying or doing anything for all you

20   remember.

21   A.   Yeah, I was pretty much blacked out.

22   **Q.**   You don't know if you were arguing with anybody?

23   A.   No.

24   **Q.**   You don't know if you were fighting with anyone?

25   A.   No.

64

1   **Q.**   And you don't remember fighting with Derick at all.

2   A.   No.

3   **Q.**   The next thing you know, you woke up in the hospital.

4   A.   Yes.

5   **Q.**   And did I hear you say you were in the hospital for about

6   nine to ten hours?

7   A.   Yes.

8   **Q.**   And then you left the hospital against the doctor's

9   advice, right?

10   A.   Yes.

11   **Q.**   And when you left the hospital, you said you felt good.

12   A.   Yes.

13   **Q.**   Now, I understand that you had some facial fractures

14   because of the -- had you had facial fractures previously?

15   A.   No.

16   **Q.**   Never had a broken nose before or any broken face bones?

17   A.   A swollen nose, that's about it.

18   **Q.**   And what caused that?

19   A.   Just some -- I got -- I got head-butted by a friend coming

20   around a corner.

21   **Q.**   Okay.  After you were released from the hospital, then you

22   went back and stayed with Betty Mulluk-Heart and Bentley Heart

23   in Sanish -- or Parshall.  I'm sorry.  Correct?

24   A.   Parshall, yes.

25   **Q.**   And you never received any type of follow-up medical

65

1   care --

2   A.   No.

3   Q.   -- after this incident.  You haven't seen a doctor, right?

4   A.   No.

5   Q.   You never checked as to what the results of your x-rays

6   were or anything like that?

7   A.   No.

8   Q.   All right.  Now, when you went back to stay with Betty and

9   Bentley Heart, you were talking -- is it correct you were

10  talking to them about what you were going to do to get revenge

11  on Derick Wilkinson?

12  A.   No.

13  Q.   Okay.  So you didn't tell Betty Heart that you were going

14  to continuously beat Mr. Wilkinson?

15  A.   No.

16  Q.   And that you were going to beat him, let him get up, and

17  then beat him down again, in essence, to torture him?

18  A.   No.

19  Q.   Did you talk to them at all about what happened?

20  A.   No, I just stayed in the room pretty much.

21  Q.   Okay.  So you never told them anything like that?

22  A.   (No audible response.)

23        MS. MONTEIRO:  Nothing further.  Thank you, sir.

24        THE COURT:  Anything else, Mr. O'Konek?

25     ///

1                        REDIRECT EXAMINATION

2    BY MR. O'KONEK:

3    **Q.**    And you mentioned that some of the people were related.

4    You said Stephanie Moran and Skylar Moran are related?

5    A.    Yes.

6    **Q.**    What are -- what is their relation?

7    A.    Their relation is their dads are brothers.

8    **Q.**    Okay.

9    A.    Yes.

10   **Q.**    And ultimately -- I want to talk to you a little bit about

11   what you remember and what you don't remember.  Do you remember

12   being passed out, being carried by Derick Wilkinson?

13   A.    No.

14   **Q.**    So you don't remember that at all?

15   A.    Nope.

16   **Q.**    Do you remember having Derick put you in the vehicle after

17   you were passed out?

18   A.    No.

19   **Q.**    And when you left the hospital, what -- the doctors told

20   you not to leave, right, but you left anyway?

21   A.    They just said, "If you want to leave, you just got to

22   sign a waiver."

23   **Q.**    And part of that waiver said that the risks of leaving

24   would be infection and death, potentially.

25   A.    Yes.

1          MR. O'KONEK:  No further questions.

2          THE COURT:  Anything else?

3          MS. MONTEIRO:  Just a couple follow-ups.

4                 RECROSS-EXAMINATION

5  BY MS. MONTEIRO:

6  **Q.**  I forgot to ask you, Mr. White Thunder, is it -- it's true

7  that you've been convicted of three crimes before, correct?

8  A.  Yes.

9  **Q.**  You've been convicted of burglary in North Dakota,

10  Burleigh County, 2013?

11  A.  Yes.

12  **Q.**  And then a false -- false report to law enforcement in

13  Ward County, 2013?

14  A.  Yes.

15  **Q.**  And then criminal trespass, 2013 as well, correct?

16  A.  Yes.

17  **Q.**  And they informed you that you could suffer infection,

18  death, but nothing like that happened to you, obviously, after

19  you left the hospital, correct?

20  A.  No.

21          MS. MONTEIRO:  Nothing further.

22          THE COURT:  I just have a couple questions, Mr. White

23  Thunder.

24    ///

25    ///

1                          EXAMINATION

2     BY THE COURT:

3     **Q.**   Who is this Goon?  What's his real name?

4     A.    Kenneth Conklin.

5     **Q.**   Kenneth Conklin?

6     A.    Yes.

7     **Q.**   He's from New Town?

8     A.    Yes.

9     **Q.**   All right.  And in terms of the medical follow-up, why is

10    it that you did not go back to see the physicians that treated

11    you in Minot?

12    A.    The nurse said that -- just write my number down, and they

13    would give me a call about my results.

14    **Q.**   Okay.  And you never got a call that you remember?

15    A.    No.

16             THE COURT:  Okay.  Any other questions that either

17    counsel wished to ask that relate to my questions?

18             MR. O'KONEK:  No, Your Honor.

19             MS. MONTEIRO:  No, sir.

20             THE COURT:  All right.  Thank you, sir.  You may step

21    down.

22             MR. O'KONEK:  Your Honor, we'd ask that he be excused

23    from his subpoena.

24             MS. MONTEIRO:  Your Honor, we'd like to keep him

25    under subpoena.

1              THE COURT:  All right.  So you can step down, but

2     you're not fully excused from this case, understood?  All

3     right.  Thank you.

4              MR. O'KONEK:  And, Your Honor, could we take a brief

5     recess to get some of the equipment --

6              THE COURT:  Oh, okay.  I was told about some problems

7     with the equipment, so, yeah, we will take a 20-minute recess,

8     members of the jury.  During the recess, please don't visit

9     amongst yourselves about this case.  I'll be repeatedly

10    reminding you of that, so it's only because I'm required to

11    remind you that, but we'll come back and reconvene in

12    20 minutes.

13             (A recess was taken from 2:17 p.m. to 2:49 p.m., the

14    same day.)

15             (In open court with the defendant, counsel, and the

16    jury present.)

17             THE COURT:  We're back on the record.  The government

18    may call its next witness.

19             MR. O'KONEK:  United States calls Dr. Jun.

20             THE COURT:  And I would remind all counsel, please

21    pull the microphones closely.  Some members of the jury are

22    having difficulty hearing, so I'm going to continually remind

23    you if you're not speaking directly into the mikes.

24                          DR. HONG JUN,

25    having been first duly sworn, was examined and testified as

                              70

1    follows:

2            THE COURT:  And, Dr. Jun -- is it June (ph)?

3            THE WITNESS:  Jun.

4            THE COURT:  Jun.  If you could pull that microphone

5    close to you as well and speak directly into it so that we can

6    hear you clearly.

7            THE WITNESS:  Yes, sir.

8            THE COURT:  Thank you.

9                      DIRECT EXAMINATION

10   BY MR. O'KONEK:

11   **Q.**   Good afternoon.

12   A.   Good afternoon.

13   **Q.**   I just have a couple of questions about your background.

14   Where are you currently employed?

15   A.   At the Trinity Hospital in Minot.

16   **Q.**   And for how long have you worked at the Trinity Hospital

17   in Minot?

18   A.   Five-and-a-half years.

19   **Q.**   What is your duty position there?

20   A.   Currently I'm a general surgeon with a trauma coverage as

21   a trauma surgeon.

22   **Q.**   What are some of your responsibilities as a general or a

23   trauma surgeon?

24   A.   The work entails the -- you know, seeing the patients in

25   clinic basis and hospital work that includes call coverage

1    24 hours, including trauma patient comes in through the

2    emergency room.

3    **Q.**   I'll ask you a little bit about the emergency room.  Is

4    that something that you do on routine basis as part of your

5    duties?

6    A.   Yes, it is.

7    **Q.**   Let me ask a little bit about your background.  Can you

8    tell us a little bit about your educational background?

9    A.   I went to college in Fairfax, Virginia, and afterwards I

10   got a Master's at the University of Maryland for biochemistry,

11   and the -- I went to medical school, American University of

12   Caribbean.  I went to surgical training at the University of

13   Connecticut and finished the training at the University of New

14   Mexico.

15   **Q.**   And, Doctor, do you -- what kind of training do you have

16   to get to become a general surgeon?

17   A.   After medical school, a typical surgical residency

18   training program requires five years at the certified residency

19   program institutions.

20   **Q.**   And what do you learn?  What are some of the subjects that

21   you learn, or what are some of the things that you learn to

22   treat?

23   A.   Well, it's very broad.  A general surgery training program

24   entails very broad from the abdomen, chest, to vascular trauma,

25   pediatric surgery, and some of the institution there was -- we

72

1    were exposed to such programs, so just broad area of any

2    surgical subsets.

3    **Q.**   So including trauma to the body.

4    A.   Absolutely.

5          MR. O'KONEK:  May I approach, Your Honor?  I'm

6    handing the witness Government's Exhibit 3.

7    **Q.**   (MR. O'KONEK CONTINUING)  Is this a copy of your

8    curriculum vitae?

9    A.   Yes, it is.

10   **Q.**   It sounds like a weird question, but how do you know that?

11   A.   I think I wrote it.

12   **Q.**   And does that fairly and accurately depict your education,

13   training, and experience that we talked about just a little bit

14   earlier?

15   A.   Yes, it is.

16          MR. O'KONEK:  At this time, Your Honor, the

17   government requests to move Government's Exhibit 3 into

18   evidence.

19          MR. COSTELLO:  No objection, Your Honor.

20          THE COURT:  Exhibit 3 is received.

21   **Q.**   (MR. O'KONEK CONTINUING)  Doctor, I want to talk to you

22   just briefly about working in the emergency room.  What sorts

23   of things have you seen or treated working in the emergency

24   room?

25   A.   Well, like I said earlier, the patient, you know, whoever

1    comes in through the emergency room, that's very broad from

2    general surgical cases, including appendicitis, and a situation

3    we're put in in this case from trauma patients.  And, you know,

4    trauma could entail, in terms of the depth of the injuries, to

5    severe to moderate, very severe and critical, simple stab

6    wounds to GSW, mostly -- by far most of the patients are motor

7    vehicle accident patients that we deal with.

8    **Q.**   And your job is, when you get these people to come into

9    the E.R., you treat them for whatever traumatic injuries they

10   have.

11   A.   Yes.

12   **Q.**   Now, tell us the general process, though.  If you're

13   working at the E.R., how long are you working a shift at the

14   E.R. in Trinity Hospital?

15   A.   The -- typically 24-hour coverage, 7:00 a.m. until

16   7:00 p.m.  The recent month we have some changes in our

17   coverage hours.  During the weekdays now we have split the

18   7:00 a.m. to 5:00 p.m. and 5:00 p.m. to following morning.

19   During the weekends we're 24-hour coverage for that particular

20   coverage timeframe, yeah.

21   **Q.**   And so I want to talk to you a little bit about how people

22   get to the -- to the E.R.  Are you notified -- when you're on a

23   24-hour coverage, are you notified somebody is coming in with

24   injuries that you need to treat?

25   A.   Yes.  Yes, I get notified.

74

1    **Q.**   How are you notified?

2    A.   Through the paging system.  The receiver -- direct

3    dispatch, you get a call if any expected trauma coming in in

4    five minutes, ten minutes, half-hour.  It depends.

5    **Q.**   And were you on call working in the E.R. on the 26th of

6    April of 2016?

7    A.   Yes, I was.

8    **Q.**   And did you receive a call through the PA system that

9    there was an individual who had suffered trauma coming to

10   the -- to the E.R.?

11   A.   Yes, I did receive.

12   **Q.**   Can you briefly describe what information you received

13   before you actually met with the patient?

14   A.   The exact description of the patient I do not recall, but

15   I -- I would think that it was something like the unresponsive

16   patient coming in intubated.

17   **Q.**   Okay.  And I want to talk to you a little bit about that.

18   So at approximately 3 o'clock in the morning Mr. White Thunder,

19   Michael White Thunder, came to the E.R.?

20   A.   At the time we did not have the name of the patient, but

21   that we, yeah, expecting, yes.

22   **Q.**   So you later learned that the individual was named Michael

23   White Thunder.

24   A.   Yes, I did.

25   **Q.**   And this individual had come to the E.R. at about

1    3 o'clock in the morning?

2    A.   Yes, it was.

3    **Q.**   And as part of the duties when an individual comes to the

4    E.R., do they -- does your department conduct a triage system

5    of individuals?

6    A.   Yes, we do.  We have a protocol.  Any trauma patient comes

7    in, we have a protocol we follow.

8    **Q.**   And why do you do that?  Why do you follow a protocol for

9    triage?

10   A.   It's the protocol that was laid out by the American Trauma

11   Program.

12   **Q.**   And in this case did you -- did your department create a

13   triage worksheet for Mr. White Thunder when he came into the

14   E.R.?

15   A.   Yes.

16            MR. O'KONEK:  May I approach the witness?

17            THE COURT:  You may.

18            MR. O'KONEK:  I'm handing the witness Government's

19   Exhibit 4.

20   **Q.**   (MR. O'KONEK CONTINUING)  Is this the triage worksheet

21   that we had just talked about?

22   A.   Yes, it is.

23   **Q.**   And is this the triage worksheet that your department had

24   created for Michael White Thunder when he came into the E.R. on

25   the 26th of April?

1    A.   Yes, it was.

2    Q.   And do you use these triage worksheets to help you

3    identify illnesses or trauma and then treat a patient?

4    A.   Yes, it is.

5         MR. O'KONEK:  At this time, Your Honor, the

6    government would move Government's Exhibit 4 into evidence.

7         MR. COSTELLO:  No objection, Your Honor.

8         THE COURT:  Exhibit 4 is received.

9         MR. O'KONEK:  Request to publish, Your Honor.

10        THE COURT:  You may do so.

11   Q.   (MR. O'KONEK CONTINUING)  If possible, I'd like you to

12   just briefly walk us through this triage document.  So we

13   talked a little bit about the fact that Mr. White Thunder had

14   arrived at the hospital at approximately 3:00 -- 3:04.  At this

15   point take us through what you had noted from this worksheet

16   about what Michael White Thunder's condition was.

17        THE COURT:  Can you blow it up as he's --

18        THE WITNESS:  Yeah, the first part under black line

19   -- there are six or seven different lines.  Basically the --

20   it's describing the -- you know, the date and the time when the

21   patient come in, the details of events, meaning the things we

22   were notified, what was going on briefly.  And then at the

23   bottom of the line there's identification of the members of the

24   trauma team available in the trauma room, including nurses and

25   pastors, techs, myself and supervisors and anesthesiologist and

77

1    etcetera.

2    **Q.**   (MR. O'KONEK CONTINUING)  Now, sir, I want to have you

3    focus on the section that says "Pre-hospital."

4    **A.**   Yes.

5    **Q.**   Now, tell me a little bit about -- where it says intubated

6    airway, what does that mean?

7    **A.**   Intubated means in a situation typically a patient is not

8    able to maintain airway, meaning he's not able to breathe by

9    his own -- by himself or herself, and at the time it's a -- the

10   most important thing -- the first thing we do is maintain the

11   -- you know, mechanically we can deliver the oxygen so that the

12   patient could -- deliver the oxygen through the -- manually or

13   mechanically, meaning the breathing tube inside his throat,

14   yeah.  And this first thing we actually do in any trauma

15   situation, make sure the patient breathe okay, either by self

16   or by mechanically, so intubation means patient is being

17   delivered oxygen mechanically because the patient is not able

18   to breathe himself.

19   **Q.**   And, sir, when Michael White Thunder arrived at the

20   hospital, he was already intubated?

21   **A.**   He was.

22   **Q.**   And at that time, when you -- when he had arrived, was --

23   did he have any reaction to the tubing down his throat?

24   **A.**   When he arrived at the -- actually, he was having gag

25   reflexes and gurgling and tried to fight the foreign body in

1    his throat, which is typical from irritations, yeah.

2    **Q.**   Now if I could have you look at the next page, sir, where

3    it says "Secondary Assessment" on the second page, now, under

4    Secondary Assessment it says something along the lines of

5    raccoon eyes and drainage from the ears and nose.  As a doctor,

6    why is that concerning you?  Why is that something that you

7    note on these triage worksheets?

8    **A.**   Raccoon eyes usually indicate -- when we see anybody with

9    a severe head trauma, usually check for a skull fracture or,

10   you know, associated with severe internal hemorrhages, things

11   like that.

12   **Q.**   And in this case, ultimately when you noticed these

13   drainage and raccoon eyes, did you order any CT scans of

14   Michael White Thunder's body?

15   **A.**   Yes, I did.  After he was more stabilized and he was

16   stable to go through further imaging studies, yes, he did have

17   a CT scan of the head.

18   **Q.**   And based upon -- did you actually review the results of

19   the CT scan?

20   **A.**   I did, myself.  I was a certified radiologist, but I'm

21   trained to read acute intracranial hemorrhages, things like

22   that, but later on it was confirmed with the radiologist on

23   call who was reviewing the imaging.

24   **Q.**   And what was confirmed?  What kind of injuries did --

25   skeletal injuries did Michael White Thunder have?

1   A.   Fortunately he did not have any major intracranial

2   hemorrhages, anything like that, but he did have a significant

3   facial fracture.  The bones -- his bones were significant

4   fractured in the face.

5   Q.   So he had facial bone fractures?

6   A.   Yes, he did.

7   Q.   If I could have you look at the third page of this that

8   has the diagram, now, what do you -- what is this diagram

9   called?

10   A.   It's a trauma pictogram.  We actually draw and write down

11   things we observed in the initial trauma workup.  Actually the

12   patient -- once a patient is stripped down from head to toe, we

13   see, we write down, we draw pictures for the coming purpose --

14   for later on, other personnel, so we could easily identify what

15   injuries patient may have on initial assessments.

16   Q.   So is it fair to say that you're documenting any potential

17   injuries they have for treatment later on, so you can identify

18   those injuries?

19   A.   Absolutely.  These -- these things are help -- very

20   helpful.

21   Q.   And so on this diagram, were these all of the injuries

22   that were noted on Michael White Thunder?

23   A.   On the primary, sir, yes, it was.

24   Q.   And on this diagram he doesn't have any -- there aren't

25   any notations about any injuries on his hands?

1    A.    Not obviously.  Not at the time, no.

2    Q.    But there are several injuries that are on his -- on his

3    head, as you've described in this pictogram.

4    A.    Yes.

5    Q.    Now I briefly want to talk -- and you can -- I want to

6    talk a little bit about when Michael White Thunder first showed

7    up.  You'd mentioned he was having problems with the intubate

8    tube.  At any time did you have to give him any pain

9    medication, or do you normally give pain medication to people

10   when they come in for trauma?

11   A.    It's case by case.  We actually use pain medication very

12   judiciously.  Obviously most of the pain medication we utilize

13   in trauma situation, narcotic based, is very sedating.  It's

14   highly sedating, so if we have any questions about patient is

15   not able to maintain his airway, we actually use a very small

16   dose or minimize or even not to use it.  But in his situation

17   his airway is protected, and so I believe we used some sedating

18   agent based on the -- I think we gave some Percocet.  I'm not

19   recalling if we gave any narcotic pain medications to help him

20   with --

21   Q.    So -- and that was based upon the fact that Michael White

22   Thunder had facial swelling?

23   A.    Yes.

24   Q.    He had -- he had temporal -- he had hematomas on the

25   temporal area?

1   A.   Yes.

2   **Q.**   And he had some facial bone fractures.

3   A.   Yes, left orbital wall fractures, nasal bone fractures,

4   and I think maxillary bone fractures, yeah.

5   **Q.**   And when you say "nasal bone fracture," you mean a

6   fracture of the nose?

7   A.   The -- yes.

8   **Q.**   And when you say orbital or maxillary wall fracture, what

9   does that mean?

10   A.   The -- based on the reading and the -- and I looked at the

11   images myself.  It was a -- orbital wall, it's the bones around

12   the left side orbit.  The bones on the left side of the

13   cheekbone, those are the -- that is maxillary bones.

14   **Q.**   And what kind of force -- when you see an orbital fracture

15   like that, how much force is required to cause an injury like

16   that?

17   A.   A very significant force, yes.  I mean, we see these in

18   motor vehicle accidents with the head traumas, steering wheel

19   and then went through the windshield, whatever, you know.  It

20   requires a pretty significant force to break those bones.

21   **Q.**   And ultimately when Mr. White Thunder showed up, did --

22   what was his -- his body temperature, was it below normal?

23   A.   It was.

24   **Q.**   And what was his body temperature, do you remember?

25   A.   By definition he had hypothermia.  There are two ways to

1    measure body temperature, axillary temperature, and to exact

2    decide the core body temperature, we do the either rectal probe

3    or a Foley temperature probe that -- a thermometer probe.  I

4    believe it was 94.7 Fahrenheit, I think it was.

5    **Q.**   So when you say 94.7 degrees Fahrenheit -- and the normal

6    human body temperature is like 98.6 degrees?

7    A.   That's right, 97 or above, yeah.

8    **Q.**   Did you have to treat Michael White Thunder for

9    hypothermia when he came into the --

10   A.   Yes, with external warmer, yes.

11   **Q.**   And was that ever concerning to you?  What would -- what

12   would a low body temperature tell you as a doctor?

13   A.   It tells -- any traumatic patient with suspected internal

14   hemorrhage, the hypothermia will make prognosis very poor.  The

15   -- actually, bleeding complication skyrockets if you do not

16   treat the hypothermia right away, yeah.

17           MR. O'KONEK:  May I approach, Your Honor?  I'm

18   handing the witness Government's Exhibit 9.

19   **Q.**   (MR. O'KONEK CONTINUING)  Was that a photograph of how

20   Mr. White Thunder looked on the 26th of April of 2016?

21   A.   Yes.

22   **Q.**   And do you recognize that because you treated Michael

23   White Thunder on the 26th of April, 2016?

24   A.   Yes.

25   **Q.**   And that fairly depicts how he looked.

1    A.    Yes.

2          MR. O'KONEK:  I'd ask that Government's Exhibit 9 be

3    moved into evidence.

4          MR. COSTELLO:  No objection.

5          THE COURT:  Exhibit 9 is received.

6          MR. O'KONEK:  Permission to publish, Your Honor?

7          THE COURT:  You may publish.

8    Q.    (MR. O'KONEK CONTINUING)  Now, Doctor, I just have a few

9    more questions.  Now, when you talked about the orbital wall

10   fracture, that was on the left side --

11   A.    Yes.

12   Q.    -- of Michael White Thunder?

13   A.    Yes, it was.

14   Q.    And in the photograph it appears that Michael White

15   Thunder's left eye is swollen shut.  Was the orbital fracture

16   below that left eye?

17   A.    It was around.

18   Q.    Around.

19   A.    Around, yes, sir.

20         MR. O'KONEK:  Thank you.  Those are the only

21   questions I have.

22         THE COURT:  Mr. Costello.

23                        CROSS-EXAMINATION

24   BY MR. COSTELLO:

25   Q.    Is it -- Doctor, am I pronouncing it right, Chun (ph)?

84

1    A.    Jun.

2    Q.    Dr. Jun, you went through Government's Exhibit 4 on your

3    direct, which was the triage report?

4    A.    Yes.

5    Q.    You kind of played out on that triage report, the first

6    page of it, some of the standard tests and personnel that are

7    present when an individual comes into the E.R.?

8    A.    Can you repeat that question again, sir?

9    Q.    You said you -- and you explained that -- ETC RN,

10   residential nurse, ICU residential nurse, supervisor, O.R.,

11   trauma, lab, respiratory, those are all areas that were marked

12   off, you talked about are present when someone comes into the

13   E.R. -- or, I mean, when someone comes into the E.R. they're --

14   they're just -- they're called to determine how to treat a

15   patient.

16   A.    That's right, the trauma call system, when the trauma

17   activation goes off.  Some of the boxes not included here is

18   anesthesiologist, CRNAs.  Actually, the box is not complete,

19   yes.

20   Q.    And I believe pastoral care is also not complete.

21   A.    Yes.

22   Q.    So you -- one of the boxes that's complete is lab.

23   A.    Yes.

24   Q.    When an individual comes into the hospital, especially

25   into the E.R., you want to run lab work on them.  You want to

1   test their blood to see what's in their system.

2   A.   Yes.

3   **Q.**   You want to see what kind of medications they've been

4   taking, what kind of drugs they've been taking, what kind --

5   you know, if they've been drinking alcohol.  That's all

6   important for a doctor to know and --

7   A.   That's right.

8   **Q.**   -- to treat a patient.  That's true?

9   A.   That's true.

10   **Q.**   And when you guys ran the lab report on Michael White

11   Thunder, he tested positive for methamphetamine.

12   A.   Yes, he was.

13   **Q.**   He also -- his blood alcohol content came back at

14   .32 percent.

15   A.   Yes, it was.

16   **Q.**   Which is a rather significant blood alcohol content.

17   A.   It is.

18   **Q.**   When Michael -- when you were treating Michael White

19   Thunder, after -- he was there about nine, ten hours, and then

20   he checked himself out against doctor's advice?

21   A.   I don't -- at some point he did, but the timing was more

22   than ten to --

23   **Q.**   You think it was more than nine, ten hours, but he checked

24   himself out against your --

25   A.   Later on he did.  Yes, he did.

1    **Q.**   Yeah.  I guess to your knowledge, Dr. Jun, has he had any

2    further medical complications from this incident or has -- I

3    guess to your knowledge, has he had any further medical

4    complications from this incident?

5    **A.**   He -- I do not know because he -- we offered the family

6    and patient the follow-ups with the ENTs, ophthalmology and

7    trauma service.  Unfortunately, we haven't seen him since

8    his --

9    **Q.**   So let me take you through that again.  You said you

10   offered -- what kind of services did you offer him?

11   **A.**   Trauma service follow-ups.  Any trauma patient who's been

12   discharged with trauma service, if they recover, we always

13   follow up those patients, make sure everything okay.

14   **Q.**   And you always follow up with phone calls to them to kind

15   of explain the results, check in with them, and offer further

16   services?

17   **A.**   If -- most of the time the physical follow-up.

18   **Q.**   Or physical follow-ups.

19   **A.**   Yeah, they actually come up -- come see us in the

20   outpatient clinic and trauma service.

21   **Q.**   Yeah, it's important to have a follow-up --

22   **A.**   Absolutely.

23   **Q.**   And maybe just wait until I finish with the questions.  I

24   know it's probably tough on Sandie if we're both answering at

25   the same time.  I'll try to slow it down a little bit too.  So,

1    you know, it's that standard hospital operating procedure to

2    offer follow-up services.

3    A.   Yes.

4    **Q.**   Do you have any reason to believe the hospital wouldn't

5    have offered follow-up services to Michael White Thunder in

6    this case?

7    A.   I believe it was offered on the -- on the day of

8    discharge.  There are things that we follow, again, just the

9    protocol.  There's things that we write down, and we can't

10   discharge patients -- there are a couple things we follow.

11   Make sure patient is coherent and make decisions on his medical

12   issues, and make sure -- patient has to be stable, of course,

13   and the follow-up.  Also other things we go over is things like

14   medications, follow-ups, those things also, and it's up to

15   patient to decide to take those offers for their -- for his or

16   her --

17   **Q.**   It's up to the patient to decide if they want --

18   A.   That's right.  That's right.

19   **Q.**   So when you ordered the CT scan of Michael White Thunder,

20   you didn't find a concussion there.

21   A.   We do not know.  The concussion is more descriptive

22   medical term about -- after head trauma, they review the

23   symptoms from head trauma, not necessarily they have any

24   anatomical problem like the bleeding or broken -- concussion is

25   more a symptomatic description of the head trauma.

88

1  **Q.**  It's a symptomatic description in which in lay people

2  outside of the medical system don't have a full understanding

3  of what --

4  **A.**  Right.  Right.

5  **Q.**  So you didn't find, though, any intracranial hemorrhages

6  in his brain.

7  **A.**  He did not have internal hemorrhages, no.

8  **Q.**  Yeah, and you didn't find any skull fractures.

9  **A.**  He did not have skull fractures.

10  **Q.**  And what is a hemorrhage, especially a major intracranial

11  hemorrhage?

12  **A.**  In a traumatic head -- head injury, a blood vessel

13  ruptures.  It's a very complicated anatomy.  The brain is in a

14  special tissue called the dura, and there's blood vessels

15  everywhere, above and below the dura layer.  And any of those

16  blood vessels can rupture and can cause significant head

17  trauma.  Sometimes if intervention is delayed, it can be

18  irreversible, yes.

19  **Q.**  So it's a pretty -- it's a pretty serious condition for

20  one to have.

21  **A.**  Yes.

22  **Q.**  It's a very -- it's a very immediate need to provide care

23  for it.

24  **A.**  Yes.

25  **Q.**  All right.  And it's pretty common with a lot of intense

1    traumas to the head.

2    A.    Absolutely.  Yeah.

3    **Q.**    Very common.  Okay.  You also talked about on your direct

4    exam -- you mentioned the term "GSWs," and what does that mean

5    for the jury?

6    A.    It's the Glasgow Coma Scale.  It's formulated by the

7    Scottish trauma surgeon to assessing neurological status in any

8    traumatic patients, and it's used as a prognostic factor, how

9    they're going to do, well or poorly depending on the score.

10   **Q.**    Okay.  And you had referenced it in reference to stab

11   wounds.  Is that -- were you referring to that, or were you

12   referring to gunshot wounds?

13   A.    What do you mean "stab wound"?

14   **Q.**    You had referred to some of the -- kind of the work that

15   you do in an E.R. as trauma work?

16   A.    Yes.

17   **Q.**    You know, maybe someone has to have an emergency

18   appendicitis surgery.

19   A.    Yes.

20   **Q.**    Maybe they have GSWs or stab wounds.

21   A.    Absolutely.  Anybody who comes in the trauma service.

22   **Q.**    So when you say "GSWs or stab wounds," you mean gunshot

23   wounds or stab wounds.

24   A.    Yes, we do assess GSW.  They -- for example, if it's

25   somebody with stab wounds or gunshot wounds, they have

1   hemorrhages.  Their GCS score may be poor or low.

2   **Q.**  Okay.

3   A.  Same as with traumatic head injury patient, their GCS

4   score may be low or high, yes.  Again, this is used as a

5   prognostic indicator of how they're going to perform the next

6   12 to 24 hours, yeah.

7   **Q.**  And you also testified on your direct exam that when an

8   individual has -- is intubated, it's pretty common for them to

9   be irritated by the tube.

10   A.  Absolutely.  Very common.

11   **Q.**  That's common amongst all kinds of patients that have --

12   that are intubated.

13   A.  Well, depending how awake they are or how coherent they

14   are.  If they're more alert, yeah, they may feel more

15   irritation, yes.

16   **Q.**  So if they're more alert, they tend to be more irritated.

17   A.  Absolutely.  Yeah.

18   **Q.**  And just to be clear, Mr. White Thunder didn't have a

19   sphenoid fracture?

20   A.  I do not believe so, no.

21         MR. COSTELLO:  No further questions, Your Honor.

22         MR. O'KONEK:  Briefly, Your Honor.

23                 REDIRECT EXAMINATION

24   BY MR. O'KONEK:

25   **Q.**  We've talked a little bit about when Michael White Thunder

1    left the hospital.  I know the defense had asked you a couple

2    of questions.  Does April 27th at 10:15 p.m., does that sound

3    about right for when he would have left the hospital?

4    A.   I looked at the records and reports from the nursing

5    staff.  Yes, it was.

6    **Q.**   And some of the risks that were provided to him -- were

7    told to him was that he could suffer infection if he left the

8    hospital?

9    A.   Yes.

10   **Q.**   And he could suffer death.

11   A.   Potentially.

12   **Q.**   And part of the reason -- part of the -- what you do when

13   you have somebody leave the hospital, you said that they have

14   to sign a release basically leaving against medical advice?

15   A.   Yes.

16   **Q.**   And in this case, we just talked about with -- infection

17   and death was listed on the form that Mr. White Thunder had

18   signed telling him basically that those were risks he could

19   face.

20   A.   Yes, it was explained.  Yeah.

21            MR. O'KONEK:  And bear with me just one second.  I

22   will show you this document in just one second.  May I

23   approach, Your Honor?  I'm handing the witness Government's

24   Exhibit 110.

25   **Q.**   (MR. O'KONEK CONTINUING)  Now, is this the release form

1    against medical advice that we've been talking about with

2    Michael White Thunder?

3    A.   Yes, it is.

4    Q.   Was that kept in your medical records?

5    A.   Yes.

6    Q.   And is that a fair and accurate depiction of the release

7    that Michael White Thunder signed on the 27th of April, 2016?

8    A.   Yes, it is.

9             MR. O'KONEK:  And we'd request to move Government's

10   Exhibit 110 into evidence, Your Honor.

11            MR. COSTELLO:  No objection.

12            THE COURT:  Exhibit 110 is received.

13            MR. O'KONEK:  And I have no further questions.

14            THE COURT:  Anything else?

15            MR. COSTELLO:  Yes, Your Honor.

16                      RECROSS-EXAMINATION

17   BY MR. COSTELLO:

18   Q.   Dr. Jun, Exhibit 110, you just saw that signed release

19   form.  Did you type that up, yourself?

20   A.   No, sir.

21   Q.   That's a pretyped-up form the hospital has.

22   A.   Yes.

23   Q.   It's prepared probably by your legal department for

24   individuals that are going to check themselves out against

25   hospital -- doctor's advice.

93

1   A.   I wouldn't say, but we use whatever forms are necessary to

2   inform the patient, whatever necessary.  I mean, the -- it is

3   certainly legal documentations, but the page, yeah, I think try

4   to explain to patients that -- in a layman's term that make

5   sure they understand it.  Whenever they sign it, then, you

6   know, they know what they're doing.  I mean, and --

7          MR. COSTELLO:  I'm going -- Your Honor, may I

8   approach the witness?

9          THE COURT:  Sure.

10  Q.   (MR. COSTELLO CONTINUING)  Would you -- would you just

11  read the first line on paragraph 2 on Exhibit 110, just the

12  first line on paragraph 2?  You can read it to the jury.

13  A.   Okay.  "I accept the risks and the consequences of my

14  decision to leave fourth floor at this time and" --

15  Q.   I'm sorry.  That's all I need, the top line.  The fourth

16  floor is what floor?

17  A.   It's surgical floor.

18  Q.   Surgical floor.

19  A.   Yes.

20  Q.   The E.R., where you -- is it post-recovery, or is it the

21  E.R., itself?

22  A.   The post-recovery from ICU.  Typically we transition the

23  patient from ICU recovery, they come to either the sixth or

24  fourth floor.

25  Q.   Okay.  So the --

1    A.    It's a tradition for people to discharge to them, yes.

2    Q.    Okay.  And so with -- that statement obviously is talking

3    about accepting consequences for leaving the hospital.  And

4    when you have a patient sign that, that's because you want to

5    make sure the patient understands that if there's any further

6    complications, it's not your fault because you advised the

7    patient they should stay at the hospital.

8    A.    Absolutely.

9    Q.    Yeah, and part of that's because, unfortunately, in the --

10   in the practice of medicine, medical liability is always an

11   issue.

12   A.    Certainly.  Yes, certain extent.

13   Q.    Okay.  And so when you -- when you provide a patient a

14   waiver, requesting that they accept -- you know, make sure they

15   make a knowing acceptance of the consequences and risks, you

16   want to project any possible consequences and risks that may

17   come from leaving the hospital prematurely?

18   A.    In a way, yes.

19              MR. COSTELLO:  No further questions, Your Honor.

20              THE COURT:  All right.  Thank you, sir.  You may step

21   down.

22              THE WITNESS:  Thank you, sir.

23              MR. O'KONEK:  Your Honor, we'd ask that the doctor be

24   excused from his subpoena.

25              MR. COSTELLO:  No objection, Your Honor.

1          THE COURT:  So you are excused from these

2    proceedings, Doctor.  You're free to leave or free to stay if

3    you wish.

4          THE WITNESS:  Thank you.

5          THE COURT:  You can call your next witness.

6          MR. O'KONEK:  The United States calls Dr. Sridhar

7    Naidu.

8                    DR. SRIDHAR NAIDU,

9    having been first duly sworn, was examined and testified as

10   follows:

11                   DIRECT EXAMINATION

12   BY MR. O'KONEK:

13   **Q.**   Good afternoon, Dr. Naidu.  I just have a couple of brief

14   questions about your background.  Where are you currently

15   employed?

16   A.   I'm currently employed at Trinity Hospital in Minot, North

17   Dakota.

18   **Q.**   And what is your job at Trinity?

19   A.   I'm a staff physician, radiologist.

20   **Q.**   Take us through your education background.  What did you

21   study before you became a radiologist?

22   A.   I did my undergraduate degree in Michigan State University

23   in biochemistry.  And then I attended medical school at Nova

24   Southeastern University in Fort Lauderdale, Florida.  I did my

25   radiology residency in Dallas, Texas, and my surgical radiology

1    fellowship in Miami, Florida.

2    **Q.**   What is -- what is radiology?  What is it you do like on a

3    day-to-day basis?

4    A.    Radiology basically consists of the study of imaging

5    modalities, so we interpret many different imaging modalities

6    such as x-rays, CTs, MRIs.  Basically through those we are able

7    to detect disease or trauma or whatever else that may be --  so

8    it basically allows us to see inside the body to detect any

9    abnormalities.

10   **Q.**   And during your residency, did you receive training and

11   hands-on experience to be able to identify things like broken

12   bones or things like that?

13   A.    Yeah.  Absolutely.  Our training is pretty intensive,

14   actually.  It's a five-year residency program, so we cover for

15   -- everything from pediatrics to geriatrics and in between, so

16   we -- we're trained to interpret all imaging from x-rays to CT

17   scans to MRIs to cancer treatment, PET scans and ultrasounds as

18   well.

19   **Q.**   And do you --

20            THE COURT:  Could you pull that microphone a little

21   closer, please?  Thank you.

22            THE WITNESS:  Is that better?  Thank you.

23   **Q.**   (MR. O'KONEK CONTINUING)  Do you have any licenses that

24   you maintain?

25   A.    Yes, I am board-certified in radiology, so after our five

1    years of training, we're -- we take a nationalized examination

2    that allows us to be board-certified in all 50 states, so --

3              MR. O'KONEK:  May I approach the witness?

4              THE COURT:  You may.

5              MR. O'KONEK:  Handing the witness Government's

6    Exhibit 13.

7    **Q.**  (MR. O'KONEK CONTINUING)  Is this your curriculum vitae?

8    **A.**  Yes, it is.

9    **Q.**  I'll ask you a weird question.  How do you know that?

10   **A.**  I recognize all the training that I did.

11   **Q.**  Did you create this document?

12   **A.**  Yes, I did.

13   **Q.**  And is it a fair and accurate depiction of the training

14   and schooling that you took in order to become a radiologist?

15   **A.**  Yes, it is.

16             MR. O'KONEK:  We'd request to move Government's

17   Exhibit 13 into evidence.

18             MS. MONTEIRO:  No objection.

19             THE COURT:  Exhibit 13 is received.

20   **Q.**  (MR. O'KONEK CONTINUING)  Now, Doctor, I want to talk to

21   you a little bit about CT scans.  What is a CT scan?

22   **A.**  A CT scan is one of the more advanced imaging that we

23   perform.  It's readily available in all emergency rooms and

24   major hospitals.  And basically what it uses is x-rays and

25   allows us to look inside the body as the -- from head to toe,

98

1    so wherever we want to image the patient, we're able to scan.

2    So it basically allows us to see inside the body from bones to

3    injuries to organs, as well as any other abnormalities we're

4    looking for.  It's very accurate.  It's very fast and allows us

5    to readily interpret any kind of damage or injuries in the

6    body.

7    Q.   Are you able to see more than just broken bones?

8    A.   Yeah.  Absolutely.  CT scans can be used not only for

9    bones, but they can be used to look for internal bleeding.  It

10   can even go as to interpreting certain types of cancers, so the

11   whole gamut is covered with CT imaging.  That's why it's

12   performed so often.

13   Q.   Now, on April 26th of 2016, did you conduct CT scans of a

14   Michael White Thunder?

15   A.   Yes.

16   Q.   I want to talk to you just a little bit about that.  So

17   when an individual gets orders from the doctor to undergo a CT

18   scan, where do you fit into that process?

19   A.   I would be the one interpreting the scan.  We have our --

20   the patient gets wheeled to the CT department, and we have CT

21   technologists that actually put the patient in the imaging

22   scanner and do the technical aspect of the imaging.  And so

23   once that's done, they'll send it over to the radiologist, and

24   we use high-resolution monitors to actually interpret the CT

25   scans, which is the imaging portion, so I'd be doing the

1    interpretation and relaying the information to the doctors.

2    **Q.**   That's because you have more specialized training than

3    just a regular physician.  This is what you're kind of trained

4    to do.

5    A.   Yes.  So basically what we interpret kind of -- kind of

6    guides the patient as to whether they require surgery or not

7    surgery, and we kind of explain the extent of the damages that

8    we see.  And the E.R. physician kind of takes it over from

9    there and calls the appropriate specialist to take care of the

10   patient.

11          MR. O'KONEK:  Now may I approach the witness, Your

12   Honor?

13          THE COURT:  Sure.

14   **Q.**   (MR. O'KONEK CONTINUING)  Doctor, I'm handing you five

15   different things.  Government's Exhibit 14 is a CD containing

16   some images, and then there are four images, which are

17   Government's Exhibit 15, 16, 17, and 18.  I'd like you to just

18   look at those documents and the CD.  Let me know when you're

19   done.

20   A.   Okay.

21   **Q.**   I want to start first with the CD, Government's

22   Exhibit 14.  What is this CD?

23   A.   This is a CD of the CT scans that I have reviewed, and

24   that's my signature on there, so I've interpreted the images

25   previously.

1   **Q.**   And those are the CT scans of Michael White Thunder that

2   were conducted on the 26th of April of this year?

3   A.   Yes, they are.

4   **Q.**   You said you reviewed them and you've actually seen what

5   it purports to be?

6   A.   Yes.

7   **Q.**   And is that a fair and accurate depiction of the CT scans

8   as they are contained on the CD for Michael White Thunder?

9   A.   Yes.

10          MR. O'KONEK:  We'd request Government's Exhibit 14 be

11   moved into evidence.

12          MS. MONTEIRO:  No objection.

13          THE COURT:  Exhibit 14 is received.

14   **Q.**   (MR. O'KONEK CONTINUING)  Now, Government's Exhibits 15,

15   16, 17 and 18 -- starting first with Government's Exhibit 15,

16   what is this an image of?

17   A.   Okay.  Do I get to show this?

18   **Q.**   Before you do anything, just what is that document

19   specifically?

20   A.   This is a -- one of the images that's obtained from the CT

21   scan that was performed of the facial bones.  This is a special

22   scan that we do to detect any kind of facial trauma.  We

23   specifically -- there's specific algorithms that we use to look

24   for any kind of bone trauma, and in this particular image it

25   shows multiple --

1    **Q.**   Without going into what the image says, is that something

2    that's kept in the -- is that something that accurately

3    reflects the CT scan that you did of Michael White Thunder?

4    **A.**   It's identical.

5    **Q.**   And I will have you take a look at Government's

6    Exhibit 16, 17, and 18, if you could just briefly describe to

7    us what each three of these are and how you can identify them.

8    **A.**   These are, again, the remainder of the facial bone CT

9    images.  Typically there's a couple hundred, but these

10   particular images show certain -- depict certain injuries that

11   the patient had during the time of admitting.

12   **Q.**   And are Government's Exhibit 15, 16, 17 and 18, are they

13   -- do they fairly and accurately depict the CT scans that were

14   done of Michael White Thunder on the 26th of April of this

15   year?

16   **A.**   Yes.

17           MR. O'KONEK:  We'd request that Government's

18   Exhibit 15, 16, 17 and 18 be moved into evidence.

19           MS. MONTEIRO:  No objection.

20           THE COURT:  Exhibits 15, 16, 17 and 18 are received.

21           MR. O'KONEK:  Permission to publish, Your Honor?

22           THE COURT:  You may.

23           MR. O'KONEK:  Since we're having some technical

24   difficulties, I'm going to publish them -- and may I have

25   permission to have the witness step down to point on the

1    exhibit?

2         THE COURT:  That would be fine.  Just make sure that

3    everybody speaks into the microphone.

4         MR. O'KONEK:  Yes, sir.

5    **Q.**   (MR. O'KONEK CONTINUING)  And, Doctor, can you briefly

6    take us through Government's Exhibit 15?  What is contained on

7    there, and what do you notice after looking at it?

8    **A.**   Okay.  So, again, this is the -- one of the images of the

9    facial bones CT that we did just to kind of get everyone on par

10   with the anatomy here.  Right here at this part would be your

11   -- your eyes, and this would be the nasal area (indicating).

12   **Q.**   The witness is pointing to the top portion of the exhibit.

13   **A.**   So this particular area shows multiple broken bones, and

14   there's a lot of swelling of the nose here, as well as around

15   the eyeballs as well, the skin of the eyes.  So this shows what

16   we call commuted nasal bone fractures, so they're -- they're

17   fractures of both sides of the nasal bones.  And these little

18   divots here are little fractures that we see.

19   **Q.**   The witness has pointed to the right-side fracture.  How

20   many fractures do you see in the nasal bone area, Doctor?

21   **A.**   Multiple.  There's at last six fractures of this

22   particular image.

23   **Q.**   And you mentioned there was some swelling.  How are you

24   able to determine there was swelling?

25   **A.**   Normally if you look at the nasal bones here, which are --

1    which are depicted in white, and then the more gray-color area

2    that you -- that you see, that appear significantly swollen --

3    if you touch your nose, there shouldn't be any -- anything but

4    skin there, but clearly there's a lot of soft-tissue swelling

5    on either side of the nose.  That's usually from trauma.

6    **Q.**   And I'm replacing Government's Exhibit 15 and showing you

7    Government's Exhibit 16.  Doctor, if I could have you briefly

8    explain what is identified in this image.

9    A.   In this particular image we go -- the scan goes a little

10   further down from the nose, and we're starting to get into the

11   cheekbones, which are right here (indicating).  As you can see

12   on this side here, the bone is followed very, very normally

13   without any cracks in there.  But in this particular instance,

14   right here there's a defect, and that's a fracture of the

15   orbital wall, which is basically right underneath your -- the

16   left eyeball.  That's fractured.

17   **Q.**   And just to clarify, Doctor, you said -- so the way that

18   this is oriented is what's on the left is actually the right

19   side of the patient?

20   A.   Yes.  Sorry.

21   **Q.**   And so the right side you said looked perfectly normal?

22   A.   Correct.  This would be the right side, and that would be

23   the left side, so this is called your inferior orbital wall, or

24   also known as a maxillary bone.

25   **Q.**   And how are you able to tell on the -- what is our right,

104

1    the patient's left, that there was an orbital wall fracture?

2    A.    This is like the standard in which the CT scans are

3    scanned, where the right is left and left is right.  So when

4    we're interpreting them -- and typically the reading of the

5    scans that we have here, everything has to be symmetric, so we

6    kind of look for any kind of defects on one side versus the

7    other.  And clearly in this particular scenario, with the

8    amount of swelling that you have in the cheek area, plus that

9    defect, that's indicative of a traumatic fracture.

10   Q.    And when you say "defect," what do you mean?

11   A.    Defect meaning just a space.  You know, there's -- there's

12   discontinuity of the bone there.  That's what usually happens

13   when you have a fracture.

14   Q.    And so based on your training and experience, on the left

15   side of the patient, that is a maxillary orbital wall fracture.

16   A.    Yes.

17   Q.    Okay.  I'm handing you Government's Exhibit 17, and can

18   you please briefly tell us what's going on in that image?

19   A.    Again, this is another sliced image from the CT of the

20   facial bones.  If you can concentrate in this area, these are

21   your sinuses (indicating).  Typically when people get colds, or

22   whatnot, these things fill with mucus.  But in this particular

23   scenario there's fluid on this side versus the other side, so

24   that's usually indicative of some kind of a traumatic injury,

25   and that's usually blood.

1           Also, the patient's nasal septum, which is the bone

2    that kind of divides the nostrils on the right from the left,

3    are also fractured in this particular image.  This should go as

4    a straight line all the way through.  There's clearly a detect

5    there as well, so that's an additional fracture.

6    **Q.**   And when we talk about on the patient's left side versus

7    the right side of the sinuses, on the right side of the image,

8    left side of the patient, what does the black portion represent

9    that's kind of filled up in the left side but not on the right

10   side?

11   A.   That's actually air, so our sinuses are filled with air

12   normally, so if you could look at the outside of the patient --

13   air is usually black on CT scans, so all this is normal.  In

14   this particular area there's fluid filling in, and I'm not sure

15   if we can see it correctly, but there's an additional fracture

16   here (indicating).

17   **Q.**   And by "here," you mean on the left side of the patient?

18   A.   On the left side of the patient, yes.

19   **Q.**   And so on the left side of the patient there's -- like you

20   said, there is some fluid in the sinus and there's an

21   additional fracture.

22   A.   Yeah, right here.  There's a little defect right here.

23   That's a fracture, and that's basically bleeding into the

24   sinus.

25   **Q.**   I would hand you Government's Exhibit 18, if I could have

1    you explain what is happening in this image.

2    A.    Again, this particular image slice is going a little

3    further down into the nasal area.  And in this particular

4    sequence we're reimaging a portion of the nasal bones, and as

5    you can see, there's multiple defects in the nasal bone.  It

6    should just be one continuous bony structure, but in this

7    particular scenario there's multiple fractures that we saw

8    initially on the prior -- on the first scan, I should say.

9    **Q.**    And when you say "defects," you mean fractures.

10   A.    Yes.  Sorry.  Defects or fractures, yeah.

11   **Q.**    Okay.  Yes.  Is there anything else that you notice in

12   this image as opposed to any of the others that we've already

13   talked about?

14   A.    No, pretty much the same thing, a lot of swelling of the

15   skin in the face area, around the nose, and it just shows

16   another image of the nasal bones that are fractured.

17   **Q.**    Thank you, Doctor, if you can retake your seat on the

18   witness stand.  Doctor, briefly, what types of force would be

19   required to cause those nasal fractures?  What type of force

20   would be used to have to cause that left orbital wall fracture?

21   A.    Typically the facial bones are very sensitive in terms of

22   ability to be fractured, and in these particular scenarios the

23   one -- the picture that we saw where you have a fracture of the

24   maxillary bone, that's more of a harden -- that's more of a

25   thicker bone, so it takes a lot more impact to fracture that

1    particular part of the face.  And usually trauma is the number

2    one thing that would cause all these multiple areas because

3    it's not in one particular area.  There's multiple fractures in

4    different parts of the face.  We can usually see them in

5    automobile accidents or any kind of other traumatic causes,

6    such as assaults or --

7                    MR. O'KONEK:  Those are the only questions I have.

8                    THE COURT:  Mr. Costello or Ms. Monteiro?

9                         CROSS-EXAMINATION

10   BY MS. MONTEIRO:

11   **Q.**  I just have a couple questions for you, Doctor.

12   A.   Sure.

13   **Q.**  Is it correct that Mr. White Thunder had had a previous

14   nasal fracture that you were able to observe?

15   A.   The way we can kind of tell when something is an old

16   fracture or a new fracture, we can decipher that on the CT

17   scan.  We also use a lot of secondary signs about trauma from

18   the facial swelling that we typically see.  In this particular

19   scenario, when I read his scan, those would be more what we

20   call acute or fresh fractures because of the amount of

21   soft-tissue swelling there.

22                    And also we look for signs of any kind of healing as

23   well in these nasal bones.  I believe on the particular scan he

24   did have some -- I believe he did have some old fracture of the

25   nasal bone, but there were also fresh ones as well, in

                              108

1    addition.  Typically we call these acute, so they might have

2    re-injured the same area, but in this particular scenario, some

3    of those nasal bones fractures were new.

4    **Q.**   So you did observe at least one previous nasal fracture.

5    A.   Correct.

6    **Q.**   So we've got a fracture to the -- or several fractures in

7    the nasal bone, correct?

8    A.   Yes.

9    **Q.**   And then a fracture in the orbital wall, correct?

10   A.   Correct.

11   **Q.**   And then a nasal septum fracture, correct?

12   A.   Yes.

13   **Q.**   We don't have any type of jaw fracture or mandible, I

14   guess, is --

15   A.   Not that I've seen, no.

16           MS. MONTEIRO:  Nothing further.  Thank you.

17           MR. O'KONEK:  No redirect, Your Honor.

18           THE COURT:  All right.  Thank you, sir.  You are --

19   you may step down.  You are excused.

20           THE WITNESS:  Okay.  Thank you.

21           MR. O'KONEK:  We request that he be released from his

22   subpoena, Your Honor.

23           MS. MONTEIRO:  No objection.

24           THE COURT:  You are excused.  You're released from

25   the subpoena.  You're free to stay or free to leave, sir.

1          THE WITNESS:  Thank you.

2          THE COURT:  Thank you.  You may call your next

3    witness.

4          MR. O'KONEK:  United States calls Officer Kristy

5    Parisien.

6                    OFFICER KRISTY PARISIEN,

7    having been first duly sworn, was examined and testified as

8    follows:

9                      DIRECT EXAMINATION

10   BY MR. O'KONEK:

11   **Q.**  Good afternoon.

12   A.   Good afternoon.

13   **Q.**  Officer Parisien, just want to go over a little bit about

14   your background.  Where do you currently work?

15   A.   For the Three Affiliated Tribes police department.

16   **Q.**  For how long have you worked there?

17   A.   Approximately over three-and-a-half years.

18   **Q.**  And what are your job responsibilities?

19   A.   Patrolling the whole reservation, responding to calls.

20   **Q.**  Now, were you on duty in the early morning hours of the

21   26th of April of 2016?

22   A.   Yes.

23   **Q.**  Take us through what happened.  Did you get a call about

24   having to respond to a male who was unconscious?

25   A.   Yes.

1   **Q.**   Take us through that.

2   A.   I received a call from the New Town dispatch advising that

3   Olivia Baker stated there was a man passed out behind the

4   Legion.

5   **Q.**   And what time did you approximately arrive on scene?

6   A.   Approximately 1:02 in the morning.

7   **Q.**   And were you the first officer on scene?

8   A.   Yes, I was.

9   **Q.**   What did you find when you arrived?

10   A.   Whenever I arrived, I observed a male, face was full of

11   blood, laying in the middle -- or halfway off the roadway.

12   **Q.**   Was he laying in any --

13   A.   Unconscious.

14   **Q.**   Okay.  So he was unconscious?

15   A.   Yes.

16   **Q.**   And was he laying in any water?

17   A.   Yes, he was laying in water, and it was accumulating

18   around him.

19   **Q.**   What was the weather like that day?

20   A.   It was raining.

21   **Q.**   How far into the water was this individual that you found?

22   A.   The bottom -- the bottom half of his body was semi

23   submerged.  It wasn't safe.

24   **Q.**   And did you notify anybody to send an ambulance?

25   A.   As soon as I arrived on -- I didn't even stop my unit, and

111

1  that was at 1:02 a.m. I did advise dispatch to send me an
2  ambulance.
3  **Q.**  And we heard earlier from Officer Cruz.  Did you assist
4  Officer Cruz in giving aid to the man that you found in the
5  alley?
6  A.   Yes, Officer Cruz and myself.  Officer Cruz secured the
7  individual's neck with the C collar, and we carefully moved him
8  out of harm's way, out of the water using blankets.
9  **Q.**  Now, at some time the individual later identified as
10  Michael White Thunder was placed on an ambulance?
11  A.   Correct.
12  **Q.**  What did you do to try to figure out what was going on,
13  who had committed the offense?  What actions did you take?
14  A.   As soon as we loaded him up in the ambulance, I went
15  downstairs of the Legion's bar.  I asked to look at the video
16  footage because I did see the cameras outside.
17  **Q.**  Were you able to get any video footage at that time?
18  A.   At that time, no.
19  **Q.**  Why not?
20  A.   We were looking at the video footage.  It appeared the
21  lens was covered with rain.
22  **Q.**  Now, at some time did you speak with an individual named
23  Olivia Baker?
24  A.   When I first arrived on scene, she pointed out that -- she
25  pointed out that Mr. Derick Wilkinson was kicking the

112

1    individual in the face and drug him across the road and kicked

2    his face again and jumped in his vehicle and left.

3    **Q.**   Did she give you a description of the vehicle that

4    she (sic) got into?

5    A.   Correct.  I did ask her for a description.  She advised

6    that it was a silver Ford Taurus, four-door.

7    **Q.**   And once you got that information about the silver Ford

8    Taurus, did you attempt to try to find Mr. Wilkinson and that

9    vehicle?

10   A.   After -- at that time I went down for the video footage.

11   After that was unsuccessful, then I did advise -- before I went

12   down for the video footage -- excuse me -- I did advise --

13   radioed into New Town dispatch of the description of the

14   vehicle and the witness's name.

15   **Q.**   And at any point did you learn that Mr. Wilkinson was

16   staying at Bruce Freeman's house?

17   A.   Later on.  Whenever I was attempting to locate the Ford

18   silver Taurus, I was advised by a dispatcher, Dispatcher

19   Gadewoltz, that he could possibly be staying at Bruce Freeman's

20   residence on Highway 22.

21   **Q.**   And when you say "Highway 22," is that still within Fort

22   Berthold Indian Reservation?

23   A.   Correct.

24   **Q.**   And did you ever go out to Bruce Freeman's house?

25   A.   I was -- I was on my way out to Bruce Freeman's house with

1    MHA Trooper Everett, and I was advised by the sergeant over the

2    radio that no one to go in alone, there'd be -- a lot of

3    weapons are registered to the homeowner.

4    **Q.**   Okay.  When you got -- did you eventually, though -- did

5    you eventually get in Bruce Freeman's house after somebody had

6    let you in?

7    A.   No, not at that time.

8    **Q.**   At any time did you end up in Bruce Freeman's house?

9    A.   Yes, after -- after Mr. Wilkinson was detained.

10   **Q.**   And at that time when you went in, did -- had Trooper

11   Everett received consent to look for Mr. Wilkinson?

12   A.   The trooper was already on scene.  During the duration of

13   the call, Trooper Everett and myself had separated and was

14   given different details to do.  I had to go secure the scene

15   behind the Legion, and I do believe that Trooper Everett -- I

16   heard over the radio that she was going back to the residence.

17   **Q.**   And after you secured the scene, you went back to Bruce

18   Freeman's house?

19   A.   Correct.

20   **Q.**   And Trooper Everett was already inside the house?

21   A.   Correct.

22   **Q.**   Derick Wilkinson was -- had just been put in custody?

23   A.   He was -- I overheard on the radio that he was placed into

24   custody while I was still on scene, securing the scene.

25   **Q.**   Any time when you were in the house when Mr. Wilkinson was

114

1    in custody, did you find any boots in the house?

2    A.   Yes.

3    **Q.**   Where did you see them?

4    A.   Myself and CI at the time Johnson asked Bruce Freeman

5    where Derick Wilkinson's room was located.  He said it was onto

6    the left, the last room onto the left.  We entered the room,

7    and in plain view in the middle of the room -- there was a pair

8    of boots in the middle of the room.

9    **Q.**   And did you notice anything that was on those boots?

10   A.   There was a red substance on the boots.  I did point it

11   out to CI Johnson at the time.  He did advise me just to stop

12   what we were doing because he said he was going to make a call.

13   **Q.**   And was that call to get a search warrant?

14   A.   More than likely so.  I'm unsure.

15          MR. O'KONEK:  May I approach, Your Honor?

16          THE COURT:  Sure.

17          MR. O'KONEK:  I'm handing the witness Government's

18   Exhibits 61 through 64.

19   **Q.**   (MR. O'KONEK CONTINUING) Can you take a look at those

20   photographs real quickly?

21   A.   Yes.  Yes.

22   **Q.**   Were those the photographs (sic) that you had found in

23   Derick Wilkinson's room at --

24   A.   Them are the boots.

25   **Q.**   Those are the boots that you found?

1    A.    Yes.

2    **Q.**    And just to clarify, once you had found those boots, you

3    talked with one of the criminal investigators, and he made a

4    call, and that was kind of your end of the involvement in the

5    case.

6    A.    Correct.

7              MR. O'KONEK:  I have no further questions.

8              THE COURT:  Any questions?

9              MR. COSTELLO:  Yes, Your Honor.  Sorry.  I'm just

10   getting organized here.

11                        CROSS-EXAMINATION

12   BY MR. COSTELLO:

13   **Q.**    You received a call at 1:01 a.m. to respond to the Legion

14   bar?

15   A.    Behind the Legion bar.

16   **Q.**    Behind the Legion bar.

17   A.    Yes.

18   **Q.**    You explained on direct that you were notified the

19   homeowner, Bruce Freeman, had had a lot of firearms registered

20   to him?

21   A.    Correct.

22   **Q.**    And Mr. Freeman is allowed to have firearms?

23   A.    Correct, up to my knowledge.  I don't know.

24   **Q.**    To your knowledge.  And he's a former Marine.

25   A.    Correct.

116

1    **Q.**   Okay.  Then you spoke with Special Agent Megan Bennett of

2    the FBI, I think, on December 3rd of 2016.  There were some

3    questions about touching the boots or manipulating the boots.

4    Had you guys had some issue with touching the boots or some

5    issue of chain of custody with them?

6    A.   No.

7    **Q.**   No?

8    A.   I have never -- I did advise her that the boots weren't

9    bagged in my presence.

10   **Q.**   They were not bagged in your presence?

11   A.   No.

12   **Q.**   And CI Chad Johnson requested that you guys not touch them

13   until --

14   A.   Correct.

15   **Q.**   -- a search warrant was obtained.

16         MR. COSTELLO:  One moment, Your Honor.  No further

17   questions.

18         MR. O'KONEK:  No redirect, Your Honor.

19         THE COURT:  All right.  Thank you.  You may step

20   down, ma'am.

21         THE WITNESS:  Thank you.

22         MR. O'KONEK:  And we'd request her to be released

23   from her subpoena as well.

24         MR. COSTELLO:  No objection.

25         THE COURT:  You are excused from these proceedings.

117

1          THE WITNESS:  Thank you.

2          MS. DEITZ:  Your Honor, the government's next witness

3     is Jennifer Everett.

4                    JENNIFER EVERETT,

5     having been first duly sworn, was examined and testified as

6     follows:

7                    DIRECT EXAMINATION

8     BY MS. DEITZ:

9     **Q.**   Could you please state your name for the record?

10    A.    My name is Jennifer Everett.

11    **Q.**   Where are you currently employed?

12    A.    For the Three Affiliated Tribes.

13    **Q.**   How long have you been in that position?

14    A.    About a month now.

15    **Q.**   And where did you work prior to that?

16    A.    At the MHA Highway Patrol.

17    **Q.**   And you said "MHA"?

18    A.    Three Affiliated Tribes Highway Patrol.

19    **Q.**   And when did you work in that capacity?

20    A.    September 2014 to November of 2016 -- or October 2016.

21    **Q.**   Can you describe your training and education?

22    A.    I was in the military for 12 years, and then after that I

23    got out and was unemployed for a couple months.  And then I

24    joined the Highway Patrol, went to the academy in Minot State

25    in 2015 of -- May is when I graduated Minot State Academy.

1    Q.   Can you describe your job duties while you were working

2    with MHA Highway Patrol?

3    A.   Public safety, traffic stops, enforcement for criminal,

4    and that's about it.

5    Q.   While you were working with MHA Highway Patrol, what were

6    your jurisdictional boundaries?

7    A.   Reservation-wide for Fort Berthold.

8    Q.   And is the city of New Town within the jurisdictional

9    boundaries of Fort Berthold Indian Reservation?

10   A.   Yes, ma'am.

11   Q.   And Fort Berthold is in the state of North Dakota?

12   A.   Yes, ma'am.

13   Q.   And were you working in your capacity with the Highway

14   Patrol in the early morning hours of April 26th, 2016?

15   A.   Yes, ma'am.

16   Q.   Were you working at approximately 1:00 a.m.?

17   A.   Yes, ma'am.

18   Q.   Where were you?

19   A.   I was at the New Town P.D. around that time.

20   Q.   And what happened at that approximate hour that caught

21   your attention?

22   A.   Well, I was standing by dispatch, and we received a phone

23   call from a person describing an assault that had happened

24   behind the Legion.

25   Q.   And what was significant about it to you?

119

1   A.   It just -- it sounded like it was a pretty horrible, you

2   know, crime, so I knew I had to respond.

3   **Q.**   So what happened next?

4   A.   I -- well, I responded out to the Legion, and I found a

5   man there who was laying on the ground face-up.

6   **Q.**   And what do you recall about the individual, just briefly?

7   A.   He was pretty beat up.  He had bruises and kind of like --

8   face was kind of just really beat up, and the officers already

9   were on scene, had a C collar on him.

10   **Q.**   What time did you get called out?

11   A.   About 01:04 is when I responded.

12   **Q.**   And was an ambulance called?

13   A.   They had already called the ambulance prior, but it had

14   not arrived yet.

15   **Q.**   What time did the ambulance arrive?

16   A.   01:10.

17   **Q.**   So after the ambulance arrives, what happens next?

18   A.   We help load up the person.  We just kind of put him on

19   the stretcher, and everything.

20   **Q.**   And then what happened?

21   A.   Well, we got the vehicle description, and we went down

22   into the Legion to see if they had any security footage of it.

23   **Q.**   And did you receive information about who may be involved?

24   A.   Yes, I did.

25   **Q.**   And what did you do based upon that information?

1    A.    I was told to go look in the Player's Pub for Derick

2    Wilkinson.

3    Q.    And once you arrived there, did you find out any

4    additional information?

5    A.    That he had worked there as a bartender, but he wasn't

6    there.

7    Q.    That Mr. Wilkinson had worked at the Player's Pub as a

8    bartender.

9    A.    Yes.

10    Q.    And what information did -- other information did they

11    give you?

12    A.    They didn't really -- they just -- they didn't give us no

13    information at that time.  I had left afterwards to go BOLO for

14    that silver car.

15    Q.    Did you eventually get information where Mr. Freeman might

16    -- excuse me, where Mr. Wilkinson might be living?

17    A.    Yes.  Well, I thought to go back to the Player's Pub like

18    maybe 20 minutes later to go see if they had any record of him

19    because he worked there.

20    Q.    Did you -- you previously testified that you had received

21    some information about a vehicle of interest, is that accurate?

22    A.    Yes.

23    Q.    And what was that information?

24    A.    It was just a silver vehicle that we were going to BOLO

25    for.

1    **Q.**  And "BOLO," what does that mean?

2    **A.**  To be on the lookout.

3    **Q.**  So what did you do next?

4    **A.**  Well, I was at -- I went back to the Player's Pub, and I

5    decided to ask the bartender there if they had any records on

6    Derick Wilkinson, as any addresses.  And the bartender called

7    Lacey Jacobs, and I spoke to her, and she told me that he had

8    been living with Bruce Freeman.

9    **Q.**  And what did you do with that information then?

10   **A.**  I radioed back to our dispatch and I let all the other

11   officers know.

12   **Q.**  What happened next?

13   **A.**  We drove out to -- well, I was told to go meet with Kristy

14   Parisien over at Highway 22 and Highway 23 to go to Bruce

15   Freeman's house, but when I got over there, Sergeant Brugh, he

16   was with Kristy Parisien.  And they said they checked the area

17   of Bruce Freeman's residence already, but they didn't -- they

18   didn't find nobody, so then they told me to follow Officer

19   Brugh to the casino to look for him there.

20   **Q.**  And you said "look for him there."  You mean

21   Mr. Wilkinson?

22   **A.**  Yeah, for Mr. Wilkinson at the casino.

23   **Q.**  And did you find Mr. Wilkinson there?

24   **A.**  No, ma'am, we did not.

25   **Q.**  What did you do after leaving the casino then?

1    A.   Well, I told Sergeant Brugh that I had seen a vehicle pass

2    us going -- what would it be?  It would be east -- or westbound

3    when we were going eastbound, and he said, "Okay.  Well, let's

4    go back to the residence," so we went back to the residence at

5    that time.

6    Q.   And what was it about the vehicle that caught your

7    attention?

8    A.   It was just the only vehicle that had passed us.

9    Q.   Why was that significant to you?  Is -- what about

10   Mr. Freeman's location, his residence makes that significant to

11   you?

12   A.   Because it just -- it's right off of Highway 22, maybe a

13   mile down from it, and it's just -- I don't know if it was the

14   truck that kind of made me think like, okay, maybe that's his

15   truck, because I had been out there prior to that.

16   Q.   And what happened next?  Did you go out to Freeman's

17   residence?

18   A.   Yes, we did.

19   Q.   And what did you observe?

20   A.   As soon as I got out of the car, Sergeant Brugh had

21   informed me that that truck -- that black truck was not there

22   when he had previously went over there.

23   Q.   And approximately what time did you arrive out at

24   Mr. Freeman's residence?

25   A.   Around 02:30, I believe.

1    **Q.**   Did you eventually go to the door?

2    A.   Yes.  Yes, I did.

3    **Q.**   And what did you find upon going to the door?

4    A.   Sergeant Brugh knocked on the door, and Bruce Freeman came

5    to the door.

6    **Q.**   What happened next?

7    A.   We just asked him if he -- if Derick was here -- if Derick

8    had been staying here, and he said yes.  And we asked him if he

9    was here, and he said no.  And then we asked him if he knew

10   what was going on, and he told us what he had heard about a

11   Michael Thunder -- White Thunder.

12   **Q.**   And did you -- did you go inside of the residence?

13   A.   Yes, I asked him if we could go inside to look around, and

14   he let us come inside.

15   **Q.**   Did law enforcement find anything inside of Mr. Freeman's

16   residence?

17   A.   Yes, we did.  Officer Brugh had seen a --

18          MS. MONTEIRO:  Objection, hearsay.

19   **Q.**   (MS. DEITZ CONTINUING)  What did you observe?

20          THE COURT:  Well, overruled, because she said,

21   "Officer Brugh had seen."  I'm going to let her finish her

22   response first, but the objection is overruled as to that

23   response.

24          THE WITNESS:  He had seen like a -- kind of a leg --

25   like part of his leg in a crawl space hole, and he told me to

124

1    call for backup because Derick was underneath the ground, you

2    know, in the crawl space crawling around.

3    **Q.**   (MS. DEITZ CONTINUING)  And did you see that leg,

4    yourself, as well?

5    A.   I wasn't really, you know, sure.  It kind of happened so

6    quick, and it was just -- I guess, my --

7    **Q.**   Was it pointed out to you by Officer Brugh?

8    A.   Yes, he did point it out.  We were standing right next to

9    each other.

10   **Q.**   So you stated you called for backup then?

11   A.   Yes, I did.  I called for backup.

12   **Q.**   What happened after you called for backup?

13   A.   Sergeant Brugh told me to go outside and see if there's a

14   way out.  And I ran around the back, and I thought I seen like

15   a footprint in the -- in the snow, kind of -- and there was an

16   opening there.  And I just kind of looked out back, shined my

17   flashlight, but I didn't really see anything, and then I think

18   -- after that I think the canine came on.  It took a while --

19   not the canine, but Sergeant Roe came on scene after that.

20   **Q.**   Did you notice anything else outside?

21   A.   No.  No, I did not.

22   **Q.**   Any vehicles or anything catch your attention?

23   A.   Later on, when they brought the dog out, the canine

24   officer told me to kind of stay away from the dog a little bit,

25   you know.  So anyways, when I was walking behind like the

1   garage is where I found the silver vehicle.

2   **Q.**   And do you remember what kind of vehicle it was?

3   A.   No.

4   **Q.**   Did you take any information down from that vehicle?

5   A.   Yes, I did.  I took the license plate down from it.

6   **Q.**   And what did you -- what did you do with that information?

7   A.   I walked back to my truck, but before I walked back to my

8   truck, there was a blood splatter on the rear of the passenger

9   -- yeah, passenger's door.

10   **Q.**   How could you tell that it was blood?

11   A.   I just -- I guess it was a red substance.

12   **Q.**   And so with that you have the plate, correct?

13   A.   Yes.

14   **Q.**   And then you take that information back to your patrol

15   vehicle.

16   A.   Back to my patrol vehicle, and I ran it on my laptop, and

17   it came up to a Miranda Fox.

18   **Q.**   And was that name significant to you at all at that point?

19   A.   Yes.

20   **Q.**   And why was it significant?

21   A.   Because that's who Derick's girlfriend was at the time,

22   Miranda Fox, and that's who he was said to be with.

23   **Q.**   Do you recall about what time it was that you had observed

24   this vehicle?

25   A.   Maybe around 3 o'clock a.m.

126

1    **Q.**   So you see that there's a red matter or substance inside

2    the vehicle windows, and you run the plate information.  What

3    happens after you do that?

4    **A.**   Sergeant Roe asked me to call a tow for it to secure it

5    pretty much, and then I had to walk back in the house.

6    **Q.**   And what observations did you make once you're back

7    inside?

8    **A.**   Well, I had seen like a little -- like a gray wristband on

9    the table with what appeared to be blood on it, and I kind of

10   -- me and Kristy were kind of talking.  You know, we weren't

11   really --

12   **Q.**   Did you observe any other individuals that were inside

13   that weren't there before, outside of law enforcement?

14   **A.**   Can you repeat the question, ma'am?

15   **Q.**   Did you observe any individuals inside of the residence

16   that weren't previously there before, sans law enforcement,

17   besides law enforcement?

18   **A.**   No, not -- not at that time.

19   **Q.**   At some point did you see the defendant, Derick Wilkinson?

20   **A.**   Yes.  Yes, I did.

21   **Q.**   And approximately what time would you say that happened?

22   **A.**   Possibly around 4:00.

23   **Q.**   Okay.  And I guess tell me what -- just walk me through

24   what you're seeing, at what point you see the defendant and if

25   you see anybody else.

1    A.    Well, I was standing in the kitchen area, and another

2    officer goes back into the back room, and then he -- I hear him

3    kind of, you know, shouting commands.  And then Miranda and

4    Derick come out of the back room.

5    Q.    And did you make any observations of -- first of all, of

6    Miranda?  Did you make any observations of Miranda Fox?

7    A.    She seemed to be really intoxicated.  She was uncoherent,

8    and I placed handcuffs on her and sat her down on a chair.

9    Q.    Do you recall -- when you looked at her, did you notice

10   any blood or any red substance on her?

11   A.    No, I didn't notice anything like that on her.

12   Q.    Okay.  And what about the defendant?  What did you -- what

13   were your observations of him?

14   A.    He didn't have a shirt on and kind of -- and no shoes.

15   Q.    And what about blood on him?  Did you notice any blood or

16   red substance on him?

17   A.    I didn't notice anything like that on him.

18   Q.    So what did you do next?

19   A.    I ran Miranda for warrants, and she didn't have none.  And

20   I kind of was in charge of, you know, keeping her in one area

21   and seeing if we were going to -- if we needed her, she was

22   involved in the crime, or anything.

23   Q.    And at some point you gave some people a ride to the

24   casino, is that correct?

25   A.    Yes.

1    **Q.**   And who were those people you gave a ride to the casino?

2    A.   John Smith, Bruce Freeman and Miranda Fox.

3    **Q.**   Is that the extent of your involvement in this case?

4    A.   Yes, ma'am.

5         MS. DEITZ:  I have nothing further, Your Honor.

6                    CROSS-EXAMINATION

7    BY MS. MONTEIRO:

8    **Q.**   Good afternoon, ma'am.  So Mr. Wilkinson and Miranda Fox

9    were found in the room in the back with the water heater,

10   correct?

11   A.   Yes, ma'am.

12   **Q.**   They weren't found hiding in the crawl space.

13   A.   No.  No, they weren't.

14        MS. MONTEIRO:  Okay.  Nothing further.

15        MS. DEITZ:  No redirect, Your Honor.  Thank you.

16        THE COURT:  All right.  Thank you.  You may step

17   down.

18        THE WITNESS:  Thank you.

19        THE COURT:  May this witness be excused?

20        MS. DEITZ:  Yes, Your Honor.

21        MS. MONTEIRO:  No objection.

22        THE COURT:  All right.  You are excused.  You're free

23   to leave now.

24        MS. DEITZ:  Your Honor, the government's next witness

25   is Miranda Fox.

1                          <u>MIRANDA FOX,</u>

2    having been first duly sworn, was examined and testified as

3    follows:

4                      <u>DIRECT EXAMINATION</u>

5    <u>BY MS. DEITZ</u>:

6    **Q.**  Please state your name for the record.

7    A.   Miranda Fox.

8    **Q.**  And how old are you, Ms. Fox?

9    A.   Twenty-eight.

10   **Q.**  And where do you currently live?

11   A.   White Shield, North Dakota.

12   **Q.**  How long have you lived there?

13   A.   About a year.

14   **Q.**  Do you work or go to school?

15   A.   I go to school.

16   **Q.**  And where do you go to school?

17   A.   The college in Fort Berthold.

18   **Q.**  And what are you going to school for?

19   A.   Business.

20   **Q.**  Do you know the defendant, Derick Wilkinson?

21   A.   Yes, I do.

22   **Q.**  How do you know him?

23   A.   He's my boyfriend.

24   **Q.**  How long have you known him?

25   A.   Since February, March.

1    **Q.**   Of what year?

2    A.   Of this year.

3    **Q.**   And you stated that he's your boyfriend.

4    A.   Yes.

5    **Q.**   How long have you been together?

6    A.   I'd say since March -- March, April.

7    **Q.**   And have you been official since then?

8    A.   We've been dating.

9    **Q.**   And when did you make it official?

10   A.   We made it official I'm going to say October or September

11   maybe.

12   **Q.**   Of 2016?

13   A.   Yeah.

14   **Q.**   And your relationship, you said, before that was just

15   dating.

16   A.   Dating and seeing each other like almost every day.

17   **Q.**   Okay.  And how did you come to know the defendant?

18   A.   I worked with him at the casino.

19   **Q.**   Now, the person that I just referred to as the defendant,

20   Mr. Derick Wilkinson, do you see him in the courtroom today?

21   A.   Yes.

22   **Q.**   Can you please identify him for the jury?

23   A.   Like point or -- okay.

24   **Q.**   Describe an article of clothing.

25   A.   Okay.  A black shirt, black pants, tie, glasses on.

131

1          MS. DEITZ:  Okay.  Thank you.  Let the record reflect

2    the witness has identified the defendant.

3          THE COURT:  So noted.

4    **Q.**  (MS. DEITZ CONTINUING)  Now, Ms. Fox, I want to take you

5    back to April 25th of 2016.  Where were you living on that

6    date?

7    A.   I was in between Bruce's and my grandma's.

8    **Q.**  And did you meet up with Mr. Wilkinson on that date?

9    A.   Yes.

10   **Q.**  Approximately what time?

11   A.   I want to say about maybe late afternoon, early afternoon.

12   **Q.**  And where did you meet up with him at?

13   A.   At Bruce's.

14   **Q.**  How did you get there?

15   A.   I drove.

16   **Q.**  What did you drive?

17   A.   A Ford Taurus.

18   **Q.**  What color is it?

19   A.   Silver.

20   **Q.**  Is it your car?

21   A.   Yes.

22   **Q.**  And when you go to Bruce's -- that's Bruce Freeman, right?

23   A.   Yes.

24   **Q.**  When you go there, was anybody else there?

25   A.   John.

132

1  **Q.**  Who is John?

2  A.  John -- our friend, John Smith.  Jonathan Smith.

3  **Q.**  Do you know who was all living there at that time, back in

4  April of 2016?

5  A.  It was -- it was Bruce, John, Derick, and then like I

6  said, I was there in between my grandma's and Bruce's.

7  **Q.**  And you previously testified that you guys were hanging

8  out almost every day.

9  A.  Yes.

10  **Q.**  And can you just describe to me what a stereotypical day

11  is for you two when you're hanging out?

12  A.  Basically hang out at the house until maybe the evening

13  hours, and then we would go either to the casino or the pub or

14  the Legion.

15  **Q.**  And when you say "the house," you mean Mr. Freeman's?

16  A.  Yes.

17  **Q.**  So describe -- let's go back to focus on April 25th of

18  2016.  You get to Mr. Freeman's, and what's your intention?

19  What's going on?

20  A.  We were planning on going to Fargo that day.

21  **Q.**  And that obviously didn't happen.  Why?

22  A.  Because it got too late, and I really didn't want to drive

23  all that way.

24  **Q.**  So what happened next?

25  A.  We just planned on doing what we usually did, just going

133

 1   out on the town in New Town.

 2   **Q.**   So where did you go?

 3   A.   We went to -- I can't really specifically remember what

 4   order we went in, but I know we went to -- I know we went to

 5   the grocery store at one time, the liquor store.  We went to

 6   Teddy's.

 7   **Q.**   And what's Teddy's?

 8   A.   Teddy's is the hotel there.

 9   **Q.**   Do they serve liquor, or are they --

10   A.   Yes, there's a bar.  There's a bar in Teddy's.

11   **Q.**   And you said you went to other bars as well?

12   A.   Yeah.

13   **Q.**   And what other bars, do you remember?

14   A.   The Pub and Legion.

15   **Q.**   And when you're going to these various places, are you

16   driving?  How are you getting there?

17   A.   Driving.

18   **Q.**   And are you driving?  Is Mr. Wilkinson driving?  Is

19   someone else driving?

20   A.   I'm driving.

21   **Q.**   And it's your car?

22   A.   Yes.

23   **Q.**   And so you -- where do you think you went to first?

24   A.   I want to say -- I want to say the liquor store.

25   **Q.**   Okay.  After the liquor store, which bar?

1    A.   I know we went to Teddy's first, before the other two.

2    Q.   How long are you at Teddy's bar?

3    A.   About -- I want to say about an hour.

4    Q.   And do you remember how much you had to drink there?

5    A.   Not really.  I know I had a few drinks.  I'm not really

6    sure how many.

7    Q.   And then where do you go next?

8    A.   We went to -- we went to the Pub.

9    Q.   And how long were you there for?

10   A.   That was -- I think we were there for a little while.  I

11   want to say hour or two max.

12   Q.   And then after that the Legion?

13   A.   Yeah.

14   Q.   And Player's Pub is in New Town, right?

15   A.   Yes.

16   Q.   And so is the Legion?

17   A.   Yep.

18   Q.   Did anyone join you and Mr. Wilkinson during the night at

19   all?

20   A.   Nobody -- nobody joined us.  It was --

21   Q.   Did anybody start tagging along?

22   A.   Yes.

23   Q.   And who was that?

24   A.   Michael.

25   Q.   Do you know Michael's full name?

1   A.   White Thunder.

2   **Q.**   And at which bar did that happen at?

3   A.   The Player's Pub.

4   **Q.**   About what time did that happen?

5   A.   I really don't remember what time.

6   **Q.**   And so Mr. Michael White Thunder starts tagging along.

7   Did you interact with him at all?

8   A.   I didn't.  Actually, I don't -- well, not -- I mean, I

9   tried to stay away from him.

10   **Q.**   Sure.

11   A.   I was avoiding him.

12   **Q.**   What about Mr. Wilkinson?  Did he -- did he appear to know

13   Michael White Thunder?

14   A.   Yes.

15   **Q.**   And did he carry on a conversation with him?

16   A.   They were -- I really wasn't paying attention.

17   **Q.**   Had you seen Mr. White Thunder and Mr. Wilkinson together

18   before this time?

19   A.   No.

20   **Q.**   And what were they doing?

21   A.   They were just -- they were just talking.

22   **Q.**   Were the three of you all drinking at this point?

23   A.   I don't know if Michael was.  I don't know what -- what he

24   was doing at all, to be honest.  I wasn't paying attention at

25   all.

1   **Q.** So at the very least all three of you were at Player's

2   Pub, and you and Mr. Wilkinson are drinking.

3   **A.** Mm-hmm.

4   **Q.** And then you go to the Legion at some point?

5   **A.** Yes.

6   **Q.** And what are you doing at Legion?

7   **A.** Drinking at the Legion.

8   **Q.** Were you at a table?  Were you sitting up at the bar?

9   **A.** I remember we were sitting at the bar.

10  **Q.** And so tell me the order of who's sitting where.

11  **A.** I know Derick was between us.

12  **Q.** And do you remember hearing any of the conversation

13  between Mr. Wilkinson and Mr. White Thunder?

14  **A.** I just know Michael was upset that night.  He -- he was

15  obviously really -- he was already really drunk before we even

16  interacted with him at all.  I mean, I really -- I really don't

17  know him at all.  Can you repeat what you said?

18  **Q.** Sure.  Was there any point while you're sitting there that

19  you hear -- overhear some comments from Mr. White Thunder?

20  **A.** Okay.  Yes.  He was -- he was upset.  He was talking about

21  his -- I don't know if it was his girlfriend, ex-girlfriend.  I

22  just remember hearing the name Skylar.

23  **Q.** And was there any point in which you heard some comments

24  about you?

25  **A.** Yes, at one point I did hear something, because I do

137

1    remember getting upset and saying something to him.  I'm not

2    really clear what I said, but I know I was mad and I was upset.

3    **Q.**  And did the bartender yell?

4    A.  The bartender did say something to him.

5    **Q.**  So what happens next?

6    A.  We left the Legion.

7    **Q.**  Okay.

8    A.  I was ahead.  I was walking ahead to my car first and --

9    **Q.**  Did the three of you leave together?

10   A.  We left -- we were -- well, I guess I was ahead of Derick

11   and Michael.

12   **Q.**  Was it your intention for the three of you to leave

13   together?

14   A.  Yes.

15   **Q.**  And where were you going?  What --

16   A.  We were -- we were just going to drop off Michael because

17   he was very, very drunk, and it just seemed that Derick was

18   being a good guy and thought it would be, you know -- he just

19   didn't want, you know, to leave him there when he wasn't even

20   -- he didn't know how he was getting home, or anything.

21   **Q.**  So you went out before them, and where did you go to?

22   A.  To my car.

23   **Q.**  The same silver Ford Taurus that you were driving around

24   before?

25   A.  Yes.

138

1   **Q.**   And is that the same vehicle that Mr. Wilkinson and

2   Mr. White Thunder were eventually coming to?

3   A.   Yes.

4   **Q.**   And they eventually did come to that vehicle, right?

5   A.   Mm-hmm.

6   **Q.**   And so everybody gets into the car, and tell me where

7   everyone is seated.

8   A.   Michael was sitting behind me in the -- I was in the

9   driver's seat, and Michael was sitting in the seat behind me,

10  and Derick was in the passenger's side.

11  **Q.**   And what happened next?

12  A.   I just remember Michael getting upset.  He kind of like

13  just -- he kind of just freaked out.  He lost control and

14  started like swinging his arms like he was -- like he was

15  fighting somebody.  And I did -- I was freaking out.  I told --

16  you know, I was telling Derick -- I'm like, "You need to stop

17  what he's doing, it's freaking me out."  I told him what he was

18  doing was freaking me out, and I told him that he needed to

19  stop.  And I'm not sure -- because he -- he was punching my

20  seat full force like he was really fighting somebody, or

21  something.

22          And Derick did tell him to stop, and I do remember

23  Derick saying, you know, "I told you three times to stop, to

24  stop."  And, I mean, I think he might have hit me in the back

25  of the head.  I'm not really sure because after that, I mean, I

1    just -- I had an anxiety attack because that's what happens, I

2    have anxiety attacks.

3    **Q.**   And what do you remember happening next?

4    A.    I -- I honestly didn't really watch what happened.  I

5    mean, I had an idea of what happened.

6    **Q.**   Do you remember what Mr. Wilkinson did?

7    A.    I know there was -- I know there was fighting, and I know

8    they -- he eventually got Michael out of the car, and I just --

9    I just had my little anxiety attack in the car by myself.

10   **Q.**   Ms. Fox, was there a point in which you observed the

11   defendant reach back towards Mr. White Thunder and swing at

12   him?

13   A.    Yes.  Like I said, there was -- there was fighting.  There

14   was definitely fighting.  I know there was fighting.  I mean,

15   that's the reason why I freaked out too, as well, because -- I

16   don't know.

17   **Q.**   And, Ms. Fox, you previously testified that you were

18   scared.

19   A.    I was.

20   **Q.**   And you also testified that at some point Mr. Wilkinson

21   removed Mr. White Thunder from the vehicle?

22   A.    They got -- they got out eventually.  I mean, he needed to

23   get out of the car.

24   **Q.**   Ms. Fox, you've met with me before, is that correct?

25   A.    Yes.

1   **Q.**   And I actually came to your house with Special Agent

2   Bennett, Mr. O'Konek, correct?

3   A.   Yes.

4   **Q.**   And we talked about what happened that night.

5   A.   Mm-hmm.

6   **Q.**   And do you recall telling me that the defendant pulled the

7   -- Mr. White Thunder from the -- from the vehicle, your

8   vehicle?

9   A.   I said that's probably what happened because I told you he

10   needed to get out of the car.  He was freaking me out.  I was

11   freaking out.

12   **Q.**   So I'm going to ask you again --

13   A.   Okay.  Yes.  Yes.

14   **Q.**   -- did the defendant pull -- did Mr. Wilkinson pull

15   Mr. White Thunder from your vehicle?

16   A.   Yes.

17   **Q.**   And this happened behind the Legion?

18   A.   Yes.

19   **Q.**   You actually met with Special Agent Bennett before you met

20   with me, correct?

21   A.   Mm-hmm.

22   **Q.**   And you gave her a statement, is that right?

23   A.   Yes.

24   **Q.**   And when you did that, you drew her a map?

25   A.   Yes.

1   **Q.**   Ms. Fox, I'm handing you what's marked as Government's

2   Exhibit Number 20.  Do you recognize this document?

3   A.   Yes.

4   **Q.**   What is it?

5   A.   It's my car and where the car was outside the Legion.

6   **Q.**   Is that a copy of the map that you drew for Special Agent

7   Megan Bennett?

8   A.   Yes.

9   **Q.**   And that happened when she interviewed you, is that

10   accurate?

11   A.   Yes.

12   **Q.**   Did you make any notations on that?

13   A.   I don't remember.

14   **Q.**   And just looking at this document, did you write down the

15   date in which you drew that?

16   A.   Yes.

17   **Q.**   And does this document fairly and accurately depict what

18   you recall from the scene and what you drew for Special Agent

19   Bennett on that date?

20   A.   Yes.

21          MS. DEITZ:  Government offers Exhibit Number 20.

22          MS. MONTEIRO:  No objection.

23          THE COURT:  Exhibit 20 is received.  Ms. Deitz, I

24   think we'll -- were you going to display that, or were you

25   moving on to something else?

1          MS. DEITZ:  I was going to request to publish it,

2    Your Honor.

3          THE COURT:  You may publish it, and then I think

4    we'll call it a day.

5          MS. DEITZ:  Okay.  Permission to publish?

6          THE COURT:  You may.

7    **Q.**   (MS. DEITZ CONTINUING)  Ms. Fox, correct me if I'm wrong,

8    but what we can see in this is -- zooming in a little bit, you

9    drew the street, the Legion and the -- and the Player's Pub.

10   **A.**   Yes.

11   **Q.**   And they're really close proximity to one another, is that

12   fair to say?

13   **A.**   Yes.

14         MS. DEITZ:  And I guess, Your Honor, that's all I

15   really wanted to discuss with regard to this exhibit.  I don't

16   know if you want me to stop for the day, or if you want --

17         THE COURT:  Yeah, I think we're at that time of the

18   day where we probably should stop.  And the jury has been

19   sitting a long time today.  I promised them I'd try to conclude

20   matters by 4:30, so we'll recess for the day, members of the

21   jury, and we'll reconvene at 9 o'clock tomorrow morning.

22         Please don't visit with anyone about this case.

23   Please do not go on the Internet and attempt to do some of your

24   own investigation and research into anything related to this

25   case because your decision, as I told you earlier, needs to be

1    based on what's presented in this courtroom.  And we can't have

2    jurors getting on the Internet, trying to conduct their own

3    investigation, so please don't do that.  Have a nice evening.

4    We'll see you back at 9 o'clock.

5            (A recess was taken from 4:31 p.m., Monday,

6    December 12, 2016, to 9:00 a.m., Tuesday, December 13, 2016.)

7                      - - - - - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25